JULIE CAVANAUGH-BILL (NV Bar No. 11533)
Cavanaugh-Bill Law Offices, LLC
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, Nevada 89801
Tel: (775)753-4357
Email: Julie@cblawoffices.org

CLARE LAKEWOOD (CA Bar No. 298479), *pro hac vice*
MICHAEL SAUL (CO Bar No. 30143), *pro hac vice*
Center for Biological Diversity
1212 Broadway, # 800
Oakland, CA 94612
Tel: (510) 844-7121
Email: clakewood@biologicaldiversity.org

*Attorneys for Plaintiffs*
*Center for Biological Diversity and Sierra Club*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, and SIERRA CLUB | Case No. 3:17-cv-00553 |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| U.S. BUREAU OF LAND MANAGEMENT; RYAN ZINKE, in his capacity as Secretary of the Department of the Interior; and BRIAN STEED, in his capacity as Acting Director of the Bureau of Land Management, | |
| Defendants. | |

1

2

**INTRODUCTION**

3   1.   Plaintiffs Center for Biological Diversity and Sierra Club (collectively "Plaintiffs")

4   bring this civil action for declaratory and injunctive relief against the United States Bureau of Land

5   Management, Brian Steed, Acting Director of the Bureau of Land Management, and Ryan Zinke,

6   Secretary of the Interior (collectively "BLM"), challenging BLM's decision to lease sensitive lands

7   in Nevada for oil and gas development without analyzing the full environmental effects of doing so.

8   This action arises under, and alleges violation of, the Administrative Procedure Act ("APA"), 5

9   U.S.C. §§ 701-706; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*;

10   and the statutes' implementing regulations.

11   2.   On June 13, 2017, BLM auctioned approximately 195,732 acres of federal estate in

12   BLM's Battle Mountain district in a competitive oil and gas lease sale. In doing so, BLM relied on

13   an environmental assessment ("EA") prepared pursuant to NEPA that failed to analyze many of the

14   significant environmental effects of the oil and gas development that could occur upon development

15   of the leases. BLM failed to address the impacts that may result from hydraulic fracturing

16   ("fracking"), a likely method of extracting oil and gas in the leased areas. BLM also unlawfully

17   ignored or downplayed the impacts that the lease sale and subsequent development would have

18   upon rare Nevada wetlands and riparian habitats, and the species that rely upon them.

19   3.   On September 12, 2017, BLM auctioned another approximately 3,680 acres of

20   federal estate, also in the Battle Mountain district. BLM did not prepare an EA for this lease sale,

21   but instead relied upon the EA prepared for the June lease sale. In doing so, BLM again failed to

22   analyze many of the significant environmental effects of the oil and gas development that could

23   occur upon development of the lease parcels. BLM again failed to address the impacts of fracking,

24   and unlawfully ignored or downplayed the environmental impacts of the proposed lease sale and

25   subsequent development of the leases.

26   4.   Plaintiffs ask the Court to overturn BLM's unlawful lease sales and ensure that BLM

27   allows oil and gas leasing and subsequent development on the lands at issue, if at all, only following

28   a thorough environmental review that fully considers the potential impacts of fracking and possible

effects to, *inter alia*, water resources, wildlife, air quality, and seismicity.

## JURISDICTION AND VENUE ASSIGNMENT

5.     This action arises under 42 U.S.C. § 4331 et. seq and 5 U.S.C. §§ 702, 704, 706. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331. The relief requested is authorized by 28 U.S.C. §§ 2201-2202 and Rule 57 of the Federal Rules of Civil Procedure.

6.     BLM has not remedied its violations of NEPA and is in violation of these statutes under the standards of review provided by the APA. Plaintiffs have exhausted all available administrative remedies to the degree such exhaustion is required. There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

7.     Venue is proper pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to each of Plaintiffs' claims occurred in this judicial district. BLM's Battle Mountain District Office, which is in Lander County, Nevada, was the location from which BLM developed the EA at issue here and made many of the decisions resulting in the issuance of the leases. BLM's Nevada State Office, which issued the EA, Finding of No Significant Impact ("FONSI") and Decision Records, and made many of the determinations leading to the dismissal of Plaintiffs' protests, and the land subject to the present action, is located in Nevada.

8.     Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaration of rights under the laws of the United States. There exists now between the parties an actual, justiciable controversy between the parties.

## PARTIES

9.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit corporation with offices in offices in Arizona, Colorado, Alaska, California, Florida, Hawaii, Minnesota, Oregon, Washington, Washington D.C., and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. One of the Center's primary missions is to protect and restore habitat and populations of imperiled species, including from the impacts of fossil fuel development. The Center brings this action on its own behalf and on behalf of its adversely affected members. The Center has over 61,400 members throughout the United States and the world, including those living in Nevada and who have visited

these public lands in BLM's Battle Mountain District for recreational, scientific, educational and other pursuits and intend to do so in future, and are particularly interested in protecting the many native, threatened and endangered, or sensitive species and their habitats that oil and gas leasing and development may harm.

10.     The Sierra Club is a national nonprofit organization with 67 chapters and more than 825,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Toiyabe Chapter of the Sierra Club has approximately 5,900 members in the state of Nevada. Sierra Club members use the public lands in Nevada, including the lands and waters affected by actions under the lease sale, for quiet recreation, aesthetic pursuits, and spiritual renewal.

11.     Plaintiffs have individual members and staff who use and enjoy the wildlife habitat, wetlands, rivers, streams, playas and healthy environment in and around the federal estate offered for lease in the June and September lease sales ("Lease Area"). Plaintiffs' members and staff derive recreational, aesthetic, and spiritual benefit from their activities. Plaintiffs' members and staff intend to continue to use and enjoy the wildlife habitat, wetlands, streams, rivers, playas and healthy environment in and around the Lease Area on an ongoing basis in the future.

12.     Additionally, Plaintiffs' members and staff have an interest in ensuring that BLM complies with all applicable laws, including the substantive, procedural, and informational provisions of NEPA. The Center participated in BLM's decisions whether to lease the federal lands at issue by commenting on the preliminary EA for the decision. Plaintiffs also participated in the decisions by submitting administrative protests against the June and September lease sales.

13.     This suit is brought by Plaintiffs and their adversely affected members and staff. BLM's determination to sell oil and gas leases in the federal lands subject to this case will harm Plaintiffs' and their members' present and future interests in and use of those areas. For example, new oil and gas leases will allow increased fracking and oil and gas development, resulting in noise, visual blight, increased traffic, seismic risks, habitat fragmentation and degradation, increased air

pollution, increased water pollution and increased water consumption. All of these harms will diminish Plaintiffs' members' ability to enjoy the recreational, spiritual, professional, aesthetic, educational, and other activities in and around the Lease Area.

14.     Plaintiffs' injuries will be redressed by the relief sought herein.

15.     Plaintiffs have no adequate remedy at law, and have exhausted all available administrative remedies.

16.     Defendant BLM is an agency within the United States Department of the Interior and is responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands across the United States, including the land that is subject to the lease sales at issue in this case.

17.     Defendant Ryan Zinke is the Secretary of the United States Department of the Interior, and is sued in his official capacity. Mr. Zinke is the official ultimately responsible under federal law for ensuring that the actions and management decisions of BLM comply with applicable laws and regulations.

18.     Defendant Brian Steed is the Acting Director of the Bureau of Land Management, and is sued in his official capacity.

## LEGAL BACKGROUND

### A.     The National Environmental Policy Act

19.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its twin aims are to ensure that federal agencies consider the environmental impacts of their proposed actions and to ensure that agencies inform the public that environmental concerns have been considered.

20.     To accomplish these objectives, NEPA requires "responsible [federal] officials" to prepare an environmental impact statement ("EIS") to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). To determine whether the impacts of a proposed action are significant enough to warrant preparation of an EIS, the agency may prepare an environmental assessment, or "EA."

21.     Under NEPA's implementing regulations, an agency's EA must include "brief

1   discussions of the need for the proposal, of the alternatives . . . , [and] of the environmental impacts

2   of the proposed action and the alternatives." 40 C.F.R. § 1508.9. The EA must take a "hard look" at

3   the impacts, and if the agency decides the impacts are not significant, it must supply a convincing

4   statement of reasons why. The EA must analyze not only the direct impacts of a proposed action,

5   but also the indirect and cumulative impacts. *Id.* § 1508.7, 1508.8.

6         22.    Further, NEPA's implementing regulations require that the agency "shall identify

7   any methodologies used and shall make explicit reference by footnote to the scientific and other

8   sources relied upon for conclusions," and shall ensure the scientific accuracy and integrity of

9   environmental analysis. *Id.* § 1502.24. The agency must disclose if information is incomplete or

10  unavailable and explain "the relevance of the incomplete or unavailable information to evaluating

11  reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1). The agency must also

12  directly and explicitly respond to dissenting scientific opinion. *Id.* § 1502.9(b).

13        23.    An agency must prepare an EIS for any action that has "individually insignificant but

14  cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A cumulative impact is defined as

15  "the impact on the environment which results from the incremental impact of the action when added

16  to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or

17  person undertakes such other actions. Cumulative impacts can result from individually minor but

18  collectively significant actions taking place over a period of time." *Id.* § 1508.7.

19        24.    If, after preparing an EA, the agency determines an EIS is not required, the agency

20  must provide a "convincing statement of reasons" why the project's impacts are insignificant and

21  issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9, & 1508.13.

22        **B.    The Administrative Procedure Act**

23        25.    The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides for

24  judicial review of administrative actions, and waives the sovereign immunity of the United States,

25  its agencies, officers, and employees, 5 U.S.C. § 702.

26        26.    The APA provides that a reviewing court shall "hold unlawful and set aside agency

27  action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

28  otherwise not in accordance with law." 5 U.S.C. § 702(2).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Lease Area

27.     The areas that BLM offered for lease for oil and gas development in the challenged lease sales are located within the boundaries of BLM's Battle Mountain District, in Lander, Nye and Eureka counties. There are lease parcels in parts of Diamond Range and Valley, Sulphur Spring Range, Garden Valley, Fish Creek Range and Valley, Big Smoky Valley and Railroad Valley. Though the Lease Area is generally a semiarid and arid desert environment, the Lease Area includes rare and precious wetlands. Parcels for lease include at least 34 springs and seeps, 3.9 miles of perennial streams, 127.9 miles of ephemeral and intermittent streams, 674 acres of wetlands, 9,118 acres of lakes and 13,044 acres of playa, including areas categorized as major wetlands and major playas by the Nevada Natural Heritage Program. Some of these lease parcels largely or entirely overlay water bodies, such that it any development of the parcel would necessarily impact hydrological features.

28.     These riparian and wetland areas are the most productive and important ecosystems in BLM's Battle Mountain District. The springs, streams, seeps, playas and wetlands are oases for a wide variety of wildlife, both resident and migrating.

29.     Several fish species of conservation concern are known to occupy habitat on or near the parcels for lease. The Big Smoky Valley tui chub and speckled dace are located on parcels offered for lease. The Fish Creek Springs tui chub, a BLM Sensitive and state-protected species, as well as the speckled dace and Railroad Valley tui chub respectively occupy habitat within 400 meters, 700 meters, and 2.5 miles of parcels for lease. The Railroad Valley springfish, a federally listed Threatened species, has habitat in a spring complex approximately two miles from several leased parcels.

30.     The Lahontan cutthroat trout, which is listed as a Threatened species under the Endangered Species Act ("ESA"), occurs in Pete Hanson Creek, which terminates in one of the parcels for lease. The Columbia spotted frog, which is protected by the Nevada Administrative Code meets the criteria for a BLM Sensitive species, occupies habitat on one of the parcels for lease.

31.     Other amphibian species of concern—western toad, chorus frog, and Great Basin spadefoot—are known to occur in Antelope and Big Smoky Valley, where some lease parcels are located. A newly discovered species of toad has been found only in the Railroad Valley, where some lease parcels are located.

32.     Riparian vegetation along streams in the Lease Area is also important fawn-rearing area for mule deer.

33.     The playas in the region are also important habitats. They support species that occur nowhere else, like the fairy shrimp, the eggs of which can survive in a dry lake bed for years waiting for optimal conditions to hatch. Pronghorn and other animals, such as migratory birds, may rely on seasonally flooded playas for drinking water. Flooded playas may also provide breeding habitat for the Western snowy plover, a BLM Nevada Sensitive species.

34.     Wetland habitats are not the only important habitats in the Lease Area. Many of the parcels provide crucial winter range for mule deer and pronghorn, or comprise mule deer movement corridors. Some of the parcels include sagebrush habitat that supports the greater sage-grouse, and others include known raptor nests.

### B.     Impacts of Oil and Gas Development

35.     Though they are the most productive and important ecosystems in BLM's Battle Mountain District, riparian and wetland areas are also very fragile environments. The consequences of oil and gas exploration or development in wetlands and riparian areas are potentially severe, because these areas are so sensitive to any disturbance.

36.     The high volumes of chemicals and water used in fracking, and the high volumes of oil and gas produced in shale formations, requires larger-scale infrastructure and equipment—e.g., larger pipelines, tanks, pits, and rigs—and thus greater land disturbance than conventional oil and gas development. Construction of access roads for oil and gas development in wetland areas and playas may degrade those habitats. They can cause fragmentation of habitat, introduce invasive species, and increase erosion. Increased erosion may impact nutrient levels, temperature, and pH levels of aquatic habitats, and impact food sources for wildlife due to changes in vegetation. Impacts to seeps and springs could impact local population levels of these frogs.

37.     Oil and gas development may result in spills of oil, brine backflow, drill fluids, gasoline, diesel and solid waste. Stormwater run-off from production wells can carry heavy metals and volatile organic compounds.

38.     Backflow from drilling can be extremely saline, as well as including chemicals added to the well by operators, and naturally occurring chemicals. If backflow spills into surface waters, it can raise the pH of that water body. BLM acknowledges that backflow spills have been known to kill off all vegetation and render the soil unusable.

39.     The hydraulic fracturing process involves hundreds of toxic chemicals that can escape into water supplies either through deep well injection or through more conventional routes, like migration through faulty casing or via surface spills. In 2016, the U.S. Environmental Protection Agency (EPA) finalized a study that concluded that fracking can and has resulted in adverse effects on drinking water resources. The study noted numerous cases of water contamination resulting from spills, leaks, and faulty wells. Numerous studies indicate that leaks from fracked wells are a chronic problem, even for newer wells.

40.     Run-off, erosion, sedimentation and accidental contamination into water bodies may spread some distance and impact protected areas. Contaminants spilled in wetlands easily spread throughout the wetland system. The impacts of hazardous waste spills in a wetland area would be potentially substantial and difficult to mitigate.

41.     Fish species of conservation concern could be seriously affected by any impact to water quality. Changes in water quality from run-off and accidental spills can impact invertebrate populations, reducing food sources for Western snowy plovers. Any adverse effects on springs and wetland areas could also adversely affect populations of pronghorn and mule deer.

42.     The presence of oil and gas infrastructure in mule deer seasonal habitat and corridors is proven to adversely affect mule deer population. Mule deer will avoid oil and gas infrastructure, reducing the available habitat and resulting in reductions in mule deer abundance.

43.     Conventional oil and gas wells in Nevada typically require 50,000 to 300,000 gallons of fresh water. Currently, Nevada's surface water supplies are virtually fully appropriated, and new groundwater appropriations are expected to meet some of the increasing demand for water, including

for oil and gas production. If the water needed for oil or gas well is drawn from shallow alluvial aquifers, adjacent springs, wetlands, and other features may dry up, impacting the species reliant on those wetlands.

     **C.**    **Impacts of Hydraulic Fracturing**

     44.    Under the terms of BLM's lease sale, lessees may use horizontal drilling and hydraulic fracturing – or "fracking" – technology to develop the oil and gas on the leases.

     45.    Fracking is a method of extracting oil or gas in which operators inject large volumes of a blend of toxic chemicals, proppant (typically sand) and water down into a well at a pressure high enough to break up the surrounding rock formations, releasing oil or gas. The process may be repeated several times to obtain greater fractures. These wells may extend more than 10,000 feet underground, or may extend several thousand feet horizontally.

     46.    Fracking requires huge volumes of water and proppant in order to produce oil or gas. In Nevada, as many as 10 million gallons of water might be used to frack a well, and thousands of tons of proppant. Up to 5,000 gallons of chemicals may be used for every 1.5 million gallons of water.

     47.    When the well begins to produce, the chemicals and water injected flow back up the well, along with naturally occurring salts, heavy metals, radioactive materials and hydrocarbons. This hazardous wastewater must be disposed of. A common method for disposal is by injection deep underground.

     48.    With the rise in fracking and horizontal drilling in recent years, new information has emerged showing significant impacts to air quality, public health, water resources and wildlife.

     49.    The high volumes of chemicals and water involved require larger-scale infrastructure and equipment, including tanks and pits to store drilling muds, drilling fluids, water, proppant and chemicals, resulting in greater land disturbances.

     50.    Fracking poses risks to water resources. The hydraulic fracturing process involves hundreds of toxic chemicals that can escape into water sources or wetlands through poorly constructed or abandoned wells, and newly created or naturally occurring fractures, as well as through conventional routes like surface spills.

51.     Nevada does not require that flowback be stored in closed tanks, instead allowing fluids to be stored in open pits. Open pits create hazardous conditions for wildlife and humans. Wildlife that comes into contact with wastewater in pits may be harmed or killed. Volatile organic compounds that can affect human health and pollute the air, including benzene and toluene, may evaporate from the surface of a pit.

52.     Scientific papers have examined the harmful nature of the chemicals used in fracking fluid. One analysis found that 37 percent of the chemicals found at fracked gas wells were volatile, and that of those volatile chemicals, 81 percent can harm the brain and nervous system, 71 percent can harm the cardiovascular system and blood, and 66 percent can harm the kidneys.

53.     Fracking has also been linked with increased seismic activity. Research has linked increased earthquake activity in recent years to the disposal of fracking wastewater via injection wells. Earthquakes at magnitudes that are felt, or that are destructive, have been attributed to underground disposal of wastewater in at least five states.

### D.     BLM's June Lease Sale and Environmental Assessment

54.     On January 5, 2017, BLM notified the public of the availability of a preliminary EA ("Preliminary EA") for a proposed sale of oil and gas leases. The Preliminary EA presented an analysis for the sale of 106 parcels covering approximately 195,732 acres of federal estate in BLM's Battle Mountain district. It considered the "proposed action"—leasing all the parcels— and two alternatives—deferring certain parcels from sale, and leasing no parcels. The proposed action and alternatives were assessed for conformance with the Resource Management Plans ("RMPs") that cover the lease sale area, the Tonopah Resource Management Plan, finalized in 1997, and the Shoshone-Eureka Resource Management Plan, approved in 1986. Neither of these RMPs analyze the impact of oil and gas development on wetlands in the Lease Area, nor do they analyze any of the impacts posed by fracking.

55.     On the basis that certain resources would not be adequately protected by the stipulations included in the Resource Management Plans, and land use conflicts existed that could not be resolved, the "Partial Deferral Alternative" proposed that 104,176 acres, comprising approximately 53 percent of the original nominated acreage, be deferred from sale. The Preliminary

EA proposed stipulations to include in an upcoming, revised RMP for the area to protect the resources or address the land use conflict on the deferred parcels. The stipulations included No Surface Occupancy for water bodies, riparian and wetland areas, No Surface Occupancy for 100-year floodplains, No Surface Occupancy for seasonally flooded playas, No Surface Occupancy for certain slopes greater than 40% grade, and Controlled Surface Use for a 500 ft. riparian-wetland habitat buffer.

56.     During the public comment period, BLM received approximately 8,000 comments from numerous individuals and groups, including Plaintiffs, which filed comments on February 3, 2017. The majority of comments opposed the oil and gas lease sale.

57.     On April 25, 2017, BLM released an amended EA ("Final EA"). The Final EA was amended to include an alternative not included in the Preliminary EA—the "Additional Resource Protection Alternative." Under this alternative, all 106 parcels would be offered for sale, but stipulations would be applied to certain of the parcels that would be deferred under the Partial Deferral Alternative, and certain other parcels with important wildlife habitat. Not all parcels identified for deferral under the Partial Deferral Alternative would have protective stipulations attached under the Additional Resource Protection Alternative.

58.     The Water Resources Stipulation that would be applied under the Additional Resource Protection Alternative does not prohibit surface occupancy of the lease. It provides that surface disturbing activities within 100-year flood plains and playas; within 500 feet of perennial waters, springs, wells, and wetland/ riparian areas; and within 100 feet of the inner gorge of ephemeral channels may require special engineering design, construction and implementation measures. Those requirements may be waived by a BLM officer if the areas to be protected cannot be avoided.

59.     The Pronghorn Antelope Seasonal Habitat Stipulation that would be applied under the Additional Resource Protection Alternative does not prohibit surface occupancy, but provides that no new surface-disturbing activity shall be allowed from November 1 through April 30 of any year. It does not prohibit the operation and maintenance of existing wells during this time period.

60.     The Mule Deer Stipulation that would be applied under the Additional Resource

Protection Alternative does not prohibit surface occupancy, but provides that no new surface-disturbing activity shall be allowed from January 15 through May 15 of any year. It does not prohibit the operation and maintenance of existing wells during this time period.

61.     The Mule Deer Migration Corridors Stipulation that would be applied under the Additional Resource Protection Alternative does not prohibit surface occupancy, but provides that no new surface-disturbing activity shall be allowed from November 1 through April 30 of any year. It does not prohibit the operation and maintenance of existing wells during this time period.

62.     On April 25, 2017, BLM also released a draft Finding of No Significant Impact ("FONSI"). The draft FONSI stated that the Additional Resource Protection Alternative identified in the EA will not significantly affect the quality of the human environment, and that an Environmental Impact Statement is not required to be prepared.

63.     On April 26, 2017, BLM issued a notice of lease sale for all 106 parcels. It subsequently amended the notice on May 11, 2017, and June 8, 2017, to correct errors in certain parcel descriptions.

64.     Plaintiffs filed a protest against the lease sale on May 25, 2017. The bases for Plaintiffs' protest included that the EA failed to take a hard look at the impacts of the proposed lease sale, and that the stipulations were inadequate to protect ground and surface waters, steep slopes, and mule deer habitat.

65.     BLM finalized the FONSI on June 6, 2017, and on June 12, 2017, dismissed the Plaintiffs' protest and published its Decision Record offering all 106 parcels for sale for oil and gas leasing.

66.     On June 13, 2017, BLM auctioned the parcels in an online auction sale. Three parcels (designated NV-17-06-035, NV 17-06-036, and NV-17-06-106), totaling 5,760 acres, were sold at auction. An additional four parcels, totaling 9,164 acres, were sold by non-competitive offer the following day. The remaining parcels remain available for non-competitive sale.

67.     BLM's EA failed to analyze numerous impacts associated with and flowing from its lease sale.

68.     The Final EA acknowledges that it is reasonably foreseeable that hydraulic

fracturing will be used on the parcels proposed for sale. However, the Final EA does not analyze the impacts of hydraulic fracturing on the Lease Area.

69.    The Final EA also fails to analyze the impacts of obtaining the enormous quantities of water required to produce oil and gas through conventional means. It also fails to analyze the impacts of disposing of the waste produced by oil and gas wells.

70.    The Final EA limits its analysis on the basis that the act of leasing the parcels has no environmental impact, and future development is uncertain; and that future activity on the leased parcels will require subsequent environmental review. However, BLM asserts that once a lease is sold, the lessee obtains the right to use as much of the lease lands as is necessary to explore for, drill for, mine, extract, remove and dispose oil and gas, subject to specific statutes and lease stipulations.

71.    The EA concludes that several of the leased parcels largely or entirely overlay a combination of water bodies "to the extent that it would be difficult or impossible to avoid impacts to these hydrological features and their associated plant communities and wildlife habitats." The EA acknowledges that riparian and wetland areas in the Lease Area could be damaged "beyond repair through indirect impacts of any future oil and gas exploration or development." Yet BLM asserts that application of the Water Resources Stipulation, which does not prohibit surface occupancy, and the requirements of which may be waived if impacts cannot be avoided, will protect these water resources from "all impacts." BLM also asserts this stipulation will protect wetlands from indirect impacts, including accidental contamination.

72.    BLM also asserts that stipulations cannot be attached to protect resources that are off-parcel. The Water Resources Stipulation was not applied to parcels identified in the EA as close to habitat of fish species of conservation concern, and therefore will not prevent foreseeable impacts to aquatic habitat necessary for the survival of listed and sensitive species.

73.    The EA concludes that the Pronghorn Antelope Seasonal Habitat Stipulation, the Mule Deer Stipulation and the Mule Deer Migration Corridor Stipulation would protect crucial pronghorn winter range and mule deer winter range, even though those stipulations allow oil and gas infrastructure to remain in the pronghorn and mule deer habitat year-round.

**E.    BLM's September Lease Sale and Determination of NEPA Adequacy**

74.     On June 21, 2017, BLM officials signed a Determination of NEPA Adequacy for the sale of three parcels covering 3,680 acres in Railroad Valley BLM's Battle Mountain district. On the basis that the lease of the parcels conforms with the Tonopah Resource Management Plan, and that these three parcels are very near to Parcel NV-17-06106, which was analyzed in the EA, BLM concluded that the EA prepared for the June sale was adequate to satisfy BLM's NEPA obligations.

75.     BLM concluded that these three parcels would be subject to the same stipulations imposed on parcel 106.

76.     The Water Resources Protection stipulation proposed under the Additional Resource Protection Alternative – the alternative selected for the June sale – was not applied to Parcel 106.

77.     The Water Resources Protection stipulation was not applied to the parcels offered in the September sale.

78.     In the Final EA, under the Partial Deferral Alternative, Parcel 106 was proposed for deferral until stipulations prohibiting surface occupancy of playas, floodplain and riparian habitat; and restricting surface use within 500 feet of riparian habitats, could be applied.

79.     On June 22, 2017, BLM issued a notice of lease sale for the three parcels.

80.     Plaintiffs filed a protest against the lease sale on July 24, 2017. The bases for Plaintiffs' protest included that BLM failed to take a hard look at the impacts of the proposed lease sale, substantial new information was available that wildlife resources in the area would be affected by the lease sale, and that the stipulations were inadequate to protect ground and surface waters.

81.     BLM published the Decision Record for this lease sale on September 11, 2017, offering all three parcels for sale for oil and gas leasing. BLM relied on the Determination of NEPA Adequacy, the EA, and the FONSI for the June lease sale in reaching its decision.

82.     On September 12, 2017, BLM auctioned the parcels in an online auction sale. All three parcels sold at auction.

83.     On September 13, 2017, BLM dismissed the Plaintiffs' protest.

**FIRST CLAIM FOR RELIEF**

**[Violation of NEPA and the APA; Preparation of an Unlawful EA and FONSI]**

84.     Plaintiffs reallege and incorporate by reference the allegations set forth in the

preceding paragraphs.

85.     Pursuant to NEPA, Defendants must take a "hard look" at the potential environmental impacts and adverse effects of the proposed actions. 42 U.S.C. § 4332(C)(ii); 40 C.F.R. § 1508.9. In determining whether an EIS is necessary, Defendants must take a "hard look" at the consequences, environmental impacts, and adverse effects of the proposed actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9; *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1144 (D. Mont. 2004).

86.     NEPA requires that BLM consider all reasonably foreseeable environmental effects of its actions. If an agency finds that a project's reasonably foreseeable impacts are not significant, the agency must provide a convincing statement of reasons why. 40 C.F.R. § 1501.4; *Ctr. for Biological Diversity & Sierra Club v. BLM*, 937 F. Supp. 2d 1140, 1154 (N.D. Cal. 2013).

87.     BLM minimized the impacts it analyzed by unlawfully determining that few environmental effects results from the lease sale stage and that impacts would be avoided by subsequent environmental review processes. Consequently, the agency failed to analyze the nature, intensity, and extent of the lease sale's actual effects.

88.     BLM failed to take a hard look at the numerous effects of fracking on water resources, vegetation, wildlife, air quality, public health, seismicity, greenhouse gas emissions, and climate change.

89.     BLM failed to take a hard look at impacts to species and their habitats resulting from water consumption, ground disturbance, oil spills, contamination and disposal of waste.

90.     BLM arbitrarily failed to take a hard look at impacts to water resources, wildlife, and wildlife habitat by asserting, without any reasonable basis, that the Water Resources Stipulation will avoid impacts to water resources, wildlife and habitat in the Lease Area. It also arbitrarily minimized the impacts previously analyzed by summarily concluding, without reasonable basis, that the Pronghorn Antelope Seasonal Habitat Stipulation, Mule Deer Stipulation and Mule Deer Migration Corridors Stipulations would avoid impacts to those species and their habitat.

91.     For each of the above reasons, and others, BLM unreasonably concluded that the lease sales would have no significant environmental impact and therefore an EIS was not necessary.

The agency's adoption of an inadequate EA and a FONSI for the lease sales is arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA, and is subject to judicial review under the APA. 5 U.S.C. §§701-706, 706(2).

## SECOND CLAIM FOR RELIEF

### [Violation of NEPA and APA; Failure to Prepare an EIS]

92.     Plaintiffs reallege and incorporate by reference the allegations set forth in the proceeding paragraphs.

93.     NEPA requires the preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. The BLM's lease sales are major federal actions significantly affecting the quality of the human environment. The BLM's conclusion that preparation of an EIS prior to holding of the lease sales was not required was arbitrary, capricious, and inconsistent with the law.

94.     Numerous factors requiring the preparation of an EIS are triggered by BLM's decisions. Ten factors must be considered in determining the significance of an action's environmental consequence. 40 C.F.R. § 1508.27. Among these are that the action affects wetlands and "ecologically critical areas," is "highly controversial," involves possible effects that are "highly uncertain or involve unique or unknown risks," is related to other actions with "cumulatively significant impacts," and "may adversely affect an endangered or threatened species." 40 C.F.R. §§ 1508.27(b)(3), (4), (5), (7) & (9). The presence of any or all of these factors in the actions challenged here renders BLM's decisions to not prepare an EIS arbitrary, capricious, and inconsistent with the law.

95.     For each of the above reasons, and others, BLM's sale of the oil and gas leases without preparing an EIS is arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA, and is subject to judicial review under the APA. 5 U.S.C. §§ 701-706, 706(2).

## PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court:

1.     Declare that BLM's adoption of the Final EA; Finding of No Significant Impact; June

12, 2017, Decision Record; Determination of NEPA Adequacy; and September 11, 2017 Decision Record violated NEPA, its implementing regulations, and the APA;

2.   Declare that BLM 's failure to prepare an EIS before holding the lease sales violated NEPA, its implementing regulations, and the APA;

3.   Set aside as unlawful BLM's EA, Finding of No Significant Impact, Determination of NEPA Adequacy, Decision Records,  and all leases or approvals issued in reliance on the foregoing documents or decisions;

4.   Enjoin the Bureau and its agents, employees, officers and representatives from implementing BLM's June 12, 2017, and September 11, 2017, Decision Records, or from authorizing oil and gas leasing, exploration or development in the Battle Mountain District until BLM completes an EIS analyzing the effects of new oil and gas leasing allowed under the Final EA and Finding of No Significant Impact, and allowed in the June 19, 2017 and September 12, 2017 lease auctions.

5.   Award Plaintiffs the costs of this action, including reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6.   Grant such other relief as the Court deems just and proper.


DATED: November 20, 2017                    Respectfully submitted,



_____/s/ Julie Cavanaugh-Bill_____

JULIE CAVANAUGH-BILL (NV Bar No. 11533)
Cavanaugh-Bill Law Offices, LLC
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, Nevada 89801
Tel: (775)753-4357
Email: Julie@cblawoffices.org

_____/s/ Clare Lakewood_____

CLARE LAKEWOOD (CA Bar No. 298479),
*pro hac vice*
MICHAEL SAUL (CO Bar No. 30143),
*pro hac vice*
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7121
Facsimile: (510) 844-7150
Email: clakewood@biologicaldiversity.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on November 20, 2017, I filed the foregoing Complaint on behalf of Plaintiffs

Center for Biological Diversity and Sierra Club via the CM/ECF system which will provide

electronic service to all counsel of record.


DATED: November 20, 2017

_/s/ Clare Lakewood_____

CLARE  LAKEWOOD
*Attorney for Plaintiffs*