JULIE CAVANAUGH-BILL (NV Bar No. 11533)
Cavanaugh-Bill Law Offices, LLC
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, Nevada 89801
Tel: (775)753-4357
Email: Julie@cblawoffices.org

CLARE LAKEWOOD (CA Bar No. 298479), *pro hac vice*
MICHAEL SAUL (CO Bar No. 30143), *pro hac vice*
VICTORIA BOGDAN TEJEDA (CA Bar No. 317132), *pro hac vice*
Center for Biological Diversity
1212 Broadway, # 800
Oakland, CA 94612
Tel: (510) 844-7121
Email: clakewood@biologicaldiversity.org

Attorneys for Plaintiffs
Center for Biological Diversity and Sierra Club

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, and SIERRA CLUB<br>  Plaintiffs,<br>  v.<br><br>U.S. BUREAU OF LAND MANAGEMENT; RYAN ZINKE, in his capacity as Secretary of the Department of the Interior; and BRIAN STEED, in his capacity as Acting Director of the Bureau of Land Management,<br>       Defendants. | Case No. 3:17-cv-00553<br><br><br>**NOTICE OF MOTION; MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

# TABLE OF CONTENTS

NOTICE OF MOTION.............................................................................................................10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT .................................10

I.     INTRODUCTION ...................................................................................................10

II.    STATUTORY AND REGULATORY BACKGROUND...........................................11

     A.    National Environmental Policy Act ("NEPA") ...........................................11

     B.    Federal Land Policy and Management Act ("FLPMA") ..............................13

I.     FACTUAL BACKGROUND ....................................................................................14

     A.    The Lease Area ...........................................................................................14

     B.    Environmental Impacts of Conventional Oil and Gas Drilling ...................16

     C.    Environmental Impacts of Hydraulic Fracturing ........................................18

II.    PROCEDURAL BACKGROUND............................................................................21

     A.    BLM's June Lease Sale and Environmental Assessment ...........................21

     B.    BLM's September Lease Sale and Determination of NEPA Adequacy..........22

III.   STANDARD OF REVIEW ......................................................................................23

IV.   ARGUMENTS ........................................................................................................24

     A.    Plaintiffs Have Standing to Challenge the Decisions to Lease....................24

     B.    BLM Failed to Take the "Hard Look" at Impacts that NEPA Requires.........25

          1.    BLM Unlawfully Postponed Analysis of Impacts.................................26

          2.    BLM Failed to Take a Hard Look at the Impacts of Fracking.............29

          3.    BLM Relied on Outdated and Inadequate RMPs .................................31

          4.    BLM Improperly Relied on Ineffective Mitigation Measures to Ignore

               Impacts to Mule Deer and Pronghorn ................................................33

     C.    BLM's Conclusion that the Lease Stipulations Avoid Impacts is Arbitrary and

         Capricious ...................................................................................................36

          1.    The Water Resources Stipulation Does Not Protect Wetlands in the

               Area or Species that Rely Upon Them ................................................36

          2.    The Mule Deer Timing Limitation Stipulation Will Not Eliminate

               Adverse Impacts to Big Game Habitat, Behavior, and Abundance.......42

D.   BLM Violated NEPA by Failing to Prepare an Environmental Impact
     Statement..........................................................................................................43

     1.   The Presence of "Significance Factors" Requires the Preparation of an
          EIS..........................................................................................................43

          a. The action affects wetlands and ecologically critical areas ..........................43

          b. The action is highly controversial..................................................................44

          c. The lease sale presents highly uncertain or unknown risks ..........................46

     2.   An Environmental Impact Statement is Required Before an Agency
          Issues Surface-Occupancy Oil and Gas Leases ......................................47

E.   The September Sale's Determination of NEPA Adequacy Does Not Satisfy
     BLM's Obligations Under NEPA .......................................................................48

V.   CONCLUSION..........................................................................................................49

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# TABLE OF AUTHORITIES

**Cases**

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ............................................................. passim

*Cantrell v. City of Long Beach*,
   241 F.3d 674 (9th Cir. 2001) ............................................................. 25

*City of Davis v. Coleman*,
   521 F.2d 661 (9th Cir. 1975) ............................................................. 28

*Conner v. Burford*,
   848 F.2d 1441 (1988) ............................................................. passim

*Ctr. for Biological Diversity v. BLM*, 937 F. Supp.
   2d 1140 (N.D. Cal. 2013) ............................................................. 14, 28

*Ctr. for Biological Diversity v. U.S. DOI*,
   563 F.3d 466 (D.C. Cir. 2009) ............................................................. 47

*Ctr. for Biological Diversity v. U.S. DOI*,
   623 F.3d 633 (9th Cir. 2010) ............................................................. 25

*Envtl. Def. Fund, Inc. v. Andrus*,
   596 F.2d 848 (9th Cir. 1979) ............................................................. 47

*Found. for N. Am. Wild Sheep v. USDA*,
   681 F.2d 1172 (9th Cir. 1982) ............................................................. 45

*Friends of Animals v. Haugrud*,
   236 F. Supp. 3d 131 (D.D.C. 2017) ............................................................. 48

*Hall v. Norton*,
   266 F.3d 969 (9th Cir. 2001) ............................................................. 25

*Helena Hunter & Anglers v. Tidwell*,
   841 F. Supp. 2d 1129 (D. Mont. 2009) ............................................................. 41, 44

*Hunt v. Wash. State Apple Advert. Comm'n,*

   432 U.S. 333 (1977)......................................................................................... 24

*Idaho Conservation League v. Mumma,*

   956 F.2d 1508 (9th Cir. 1992) ..................................................................... 24

*Kern v. BLM,*

   284 F.3d 1062 (9th Cir. 2002) ..................................................... 13, 28, 31

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*

   387 F.3d 989 (9th Cir. 2004) ....................................................................... 31

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.,*

   373 F. Supp. 2d 1069 (E.D. Cal. 2004)...................................................... 46

*LaFlamme v. FERC,*

   852 F.2d 389 (9th Cir. 1988) ....................................................................... 43

*Lands Council v. U.S. Forest Serv.,*

   395 F.3d 1019 (9th Cir. 2004) ..................................................................... 33

*Lujan v. Defs. of Wildlife,*

   504 U.S. 555 (1992)....................................................................................... 25

*Marble Mountain Audubon Soc'y v. Rice,*

   914 F.2d 179 (9th Cir. 1990) ....................................................................... 12

*Massachusetts v. EPA,*

   549 U.S. 497 (2007)....................................................................................... 24

*Metcalf v. Daley,*

   214 F.3d 1135 (9th Cir. 2000) ............................................................. 12, 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*

   463 U.S. 29 (1983)......................................................................................... 23

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*

   177 F.3d 800 (9th Cir. 1999) ................................................................. 31, 36

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

*N. Idaho Cmty. Action Network v. U.S. Dep't. of Transp.*,

    545 F.3d 1147 (9th Cir. 2008) ................................................................ 48

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,

    668 F.3d 1067 (9th Cir. 2011) ................................................................ 33

*N.M. ex rel. Richardson v. BLM*,

    565 F.3d 683 (10th Cir. 2009) ........................................................ passim

*Nat'l Parks & Conservation Ass'n v. Babbitt*,

    241 F.3d 722 (9th Cir. 2001) ................................................ 12, 43, 44, 46

*NLRB v. Brown*,

    380 U.S. 278 (1965) ............................................................................. 23

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,

    117 F.3d 1520 (9th Cir. 1997) .......................................................... 44, 46

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

    18 F.3d 1468 (9th Cir. 1994) ................................................................ 23

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,

    361 F.3d 1108 (9th Cir. 2004) ........................................................ passim

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,

    402 F.3d 846 (9th Cir. 2005) ................................................................ 33

*Or. Natural Res. Council Fund v. Goodman*,

    505 F.3d 884 (9th Cir. 2007) ................................................................ 23

*Pennaco Energy v. U.S. Dep't of the Interior*,

    377 F.3d 1147 (10th Cir. 2004) ............................................................ 14

*Robertson v. Methow Valley Citizens Council*,

    490 U.S. 332(1989) ........................................................................ 25, 27

*S. Fork Band Council of W. Shoshone of Nevada v. DOI*,

    588 F.3d 718 (2009) ........................................................ 36, 39, 41, 42

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

*S. Utah Wilderness Alliance v. Kempthorne*,

    525 F.3d 966 (10th Cir. 2008) ................................................................ 48

*S. Utah Wilderness Alliance v. Norton*,

    457 F. Supp. 2d 1253 (D. Utah 2006)...................................................... 48

*Save the Yaak Comm. v. Block*,

    840 F.2d 714 (9th Cir. 1988) .................................................................. 42

*Sierra Club v. Peterson*,

    717 F.2d 1409 (D.C. Cir. 1983)............................................................... 47

*Sierra Club v. U.S. EPA*,

    346 F.3d 955 (9th Cir. 2003),

    *amended by* 352 F.3d 1186 (9th Cir. 2003) ........................................... 23

*Sierra Forest Legacy v. Sherman*,

    646 F.3d 1161 (9th Cir. 2011) ................................................................ 24

*Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*,

    565 F.3d 545 (9th Cir. 2009) .................................................................. 23

*Udall v. Tallman*,

    380 U.S. 1 (1965)..................................................................................... 32

*Western Energy Alliance v. Salazar*,

    709 F.3d 1040 (10th Cir. 2013) .............................................................. 32

*Wetlands Action Network v. U.S. Army Corps of Eng'rs.*,

    222 F.3d 1105 (9th Cir. 2000) .......................................................... 23, 42


**Statutes**

30 U.S.C. § 226(a) ......................................................................................... 32

43 U.S.C. §§ 1701 *et seq.*.............................................................................. 13

43 U.S.C. § 1701(a)(8).................................................................................... 13

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

43 U.S.C. § 1712(a) .......................................................................................... 13, 31

43 U.S.C. § 1712(c) ................................................................................................ 32

43 U.S.C. § 1732(b) ............................................................................................... 13

5 U.S.C. § 706(2)(A) .............................................................................................. 23

5 U.S.C. §§ 500 *et seq* .......................................................................................... 23

**Regulations**

40 C.F.R. § 1500.1(a) ............................................................................................ 11

40 C.F.R. § 1500.1(b) ............................................................................................ 26

40 C.F.R. § 1500.1(c) ....................................................................................... 11, 33

40 C.F.R. § 1501.1(d) ............................................................................................ 25

40 C.F.R. § 1501.2 ................................................................................................. 13

40 C.F.R. § 1501.4 ................................................................................................. 12

40 C.F.R. § 1506.1(c) ............................................................................................ 13

40 C.F.R. § 1508.11 ............................................................................................... 43

40 C.F.R. § 1508.27 ............................................................................................... 12

40 C.F.R. § 1508.27(b) .......................................................................................... 43

40 C.F.R. § 1508.27(b)(3) ................................................................................ 12, 43

40 C.F.R. § 1508.27(b)(4) ................................................................................ 12, 43

40 C.F.R. § 1508.27(b)(5) ................................................................................ 43, 46

40 C.F.R. § 1508.8 ................................................................................................. 25

40 C.F.R. § 1508.9 ........................................................................................... 12, 31

40 C.F.R. § 3101.1 ........................................................................................... 38, 47

40 C.F.R. § 3101.2 ........................................................................................... 38, 47

42 U.S.C. § 4332(2)(C) .................................................................................... 12, 43

43 C.F.R. § 1610.1(b) ............................................................................................ 31

43 C.F.R. § 3162.3-1(c) .................................................................................................... 14

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 23

U.S. District Court District of Nevada Local Rule 56-1 .................................................. 10

U.S. District Court District of Nevada Local Rule 7-2 .................................................... 10

9

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: Pursuant to Federal Rule of Civil Procedure 56, and Local Rules 7-2 and 56-1, Plaintiffs Center for Biological Diversity and Sierra Club ("Plaintiffs") hereby move for summary judgment as there is no genuine dispute as to any material fact and plaintiffs are entitled to judgment as a matter of law. This motion is based on the Memorandum of Points and Authorities below, the declarations, pleadings, records and files in this action, and other such documentary and oral evidence that may be supplied at the hearing. For the reasons set forth below in the Memorandum of Points and Authorities, the U.S. Bureau of Land Management Battle Mountain District Office's June 2017 and September 2017 sales of oil and gas leases totaling roughly 199,292 acres violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* To remedy these violations of law, Plaintiffs seek an order vacating and remanding the lease sale, along with the underlying decision documents, and any leases issued pursuant to the sale.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**I.     INTRODUCTION**

In June 2017, Defendants the Bureau of Land Management, Ryan Zinke and Brian Steede (hereinafter "BLM") decided to auction off nearly 200,000 acres of public lands for oil and gas development. The lease parcels are spread across scenic valleys and ranges that have, until now, remained largely free from industrial development. The basins at risk contain unique and ecologically invaluable—yet fragile—wetlands supporting rare and threatened species, as well as critical seasonal habitat for mule deer and pronghorn. BLM acknowledges that development of these parcels will likely include hydraulic fracturing, or "fracking," a range of risky methods of extracting oil or gas by shattering underground rock formations. The agency also admits that both fracking and conventional oil and gas development have the potential to catastrophically impact the wetlands on and near the parcels, and the species that rely on those wetlands. BLM nevertheless erroneously asserts that there would be no significant impacts from the lease sale. It reached this conclusion by

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

unlawfully 1) postponing analysis of impacts to some point in the future; 2) ignoring the impacts that fracking may have; 3) relying on outdated planning documents; 4) making assumptions contrary to the information before the agency about the efficacy of mitigation measures attached to certain lease parcels; and 5) relying on a flawed Environmental Assessment ("EA").

In September 2017, BLM decided to auction off another three lease parcels. This time, it did not to undertake any environmental analysis at all. It relied on the flawed EA from June, and concluded that there would be no significant impacts from this sale, either. Though the agency's own records showed that there are wetlands present on all three parcels, BLM did not even attach the stipulations (contractual provision regulating mineral lessees' use of the public land) that it relied on in its earlier analysis to ostensibly protect these features from adverse impacts before offering these parcels for sale. The sum of these arbitrary decisions is that BLM has subjected Nevada's fragile springs, wetlands, and fish and wildlife habitats to serious—but unexamined—risks from oil and gas drilling and fracking, without the prior analysis required by the National Environmental Policy Act.

By proceeding with the June and September lease sales based on the minimal analysis and unsubstantiated conclusions contained in its woefully-deficient June EA and September Determination of NEPA Adequacy, and on the arbitrary and capricious assumption in its Findings of No Significant Impact and Records of Decision that attaching stipulations to certain leases would avoid all significant impacts, BLM violated NEPA, 42 U.S.C. §§4321 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.* Plaintiffs therefore move for summary judgment and seek orders vacating the lease sales and the underlying decision documents.

## II.   STATUTORY AND REGULATORY BACKGROUND

### A. National Environmental Policy Act ("NEPA")

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its aims are to ensure that federal agencies 1) consider the environmental impacts of their proposed actions; 2) inform the public about environmental concerns; and 3) take actions that protect, restore, and enhance the environment. 40 C.F.R. § 1500.1(c). To accomplish these

11
Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1    objectives, NEPA requires federal officials to prepare an environmental impact statement ("EIS") to

2    consider the effects of each "major Federal action[ ] significantly affecting the quality of the human

3    environment." 42 U.S.C. § 4332(2)(C). To determine whether a project's impacts may be significant

4    enough to require an EIS, an agency first conducts an Environmental Assessment ("EA"). 40 C.F.R.

5    §§ 1501.4, 1508.9; *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). An EA "[s]hall include

6    brief discussions of the need for the proposal [and] of the environmental impacts of the proposed

7    action and alternatives."  40 C.F.R. § 1508.9.

8          If the EA reveals that "the agency's action *may* have a significant effect upon the . . .

9    environment, an EIS must be prepared." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722,

10   730 (9th Cir. 2001) (emphasis in original; internal quotations omitted). Whether impacts are

11   significant depends on a proposed action's "context and intensity." *See* 40 C.F.R. § 1508.27. The

12   regulations enumerate factors an agency should consider when evaluating intensity, including the

13   unique characteristics of the geographic area and whether the action is highly controversial. *Id.* §

14   1508.40 27(b)(3), (4). Presence of any one of the factors is sufficient to require preparation of an

15   EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1125 (9th Cir. 2004).

16         If the agency concludes in the EA that no significant impacts are possible, it issues a Finding

17   of No Significant Impact ("FONSI") and foregoes an EIS. 40 C.F.R. §§ 1501.4; 1508.9. In such a

18   case, the agency must supply a "convincing statement of reasons" in the FONSI adequately

19   explaining why the action's effects are insignificant. *Blue Mountains Biodiversity Project v.*

20   *Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). The statement of reasons is crucial to determining

21   whether the agency took the requisite "hard look" at the potential environmental impacts of the

22   project. *Id.*; *see also Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 182 (9th Cir. 1990)

23   ("An agency must set forth a reasoned explanation for its decision and cannot simply assert that its

24   decision will have an insignificant effect on the environment.").

25         As the Ninth Circuit has noted, "proper timing is one of NEPA's central themes." *Metcalf*,

26   214 F.3d at 1142 (citation omitted). All environmental analyses required by NEPA must be

12

conducted at "the earliest possible time." 40 C.F.R. § 1501.2; *see also N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir. 2009) ("assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made"). This ensures that an assessment "can serve practically as an important contribution to the decisionmaking process," and not as a tool "to rationalize or justify decisions already made." *Metcalf*, 214 F.3d at 1142 (quoting 40 C.F.R. § 1502.5).

Pending completion of an EIS, an agency "shall not undertake in the interim any major Federal action covered by the program which may significantly affect" the environment." 40 C.F.R. § 1506.1(c). As the Ninth Circuit has noted, "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment" but is "designed to require such analysis as soon as it can reasonably be done." *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002).

**B.  Federal Land Policy and Management Act ("FLPMA")**

BLM's management of the public lands, including oil and gas leasing and development, is managed in accord with the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*. The statute provides that, "[i]n managing the public lands," BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). BLM must also manage public lands:

> in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition, that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

BLM carries out its FLPMA obligations in the oil and gas context via a three phase decision-making process. BLM first prepares a land use plan, known as a resource management plan ("RMP"), to identify goals and uses for an area. 43 U.S.C. § 1712(a). RMPs broadly guide which federal lands BLM will consider leasing. 43 C.F.R. § 1601.0-5(n), *see also Pennaco Energy v. U.S.*

13
Pfs.' Motion for Summary Judgment & MPA in Support Thereof

*Dep't of the Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). In the second phase, BLM leases lands for oil and gas development. In the third phase, a lessee submits an application for a permit to drill an oil or gas well ("APD") for approval by BLM. 43 C.F.R. § 3162.3-1(c). This case concerns second-phase decisions—decisions to lease land for oil and gas development.

Each phase of the process is an agency action triggering environmental review under NEPA. However, once a lease is issued (the second phase), BLM's options for imposing additional conditions or considering alternatives are more limited, as "the lessee has the right to use as much of the leased lands as . . . necessary to explore and drill for oil and gas," (subject to any stipulations and after receiving BLM approval before conducting "ground-disturbing activities"). AR01346, 01400. [1] Under BLM's interpretation of its regulations, the agency "cannot deny a lessee the right to drill once a lease is issued unless the action is in direct conflict with another existing law." *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1152 (N.D. Cal. 2013).

I.      **FACTUAL BACKGROUND**

   **A. The Lease Area**

The parcels offered in the June and September 2017 lease sales are all located within BLM's Battle Mountain District. AR05658, 05912. The June 2017 lease sale offered approximately 195,613 acres across 106 parcels. AR05650. The September 2017 lease sale offered approximately 3,680 acres across three parcels. AR05916. The parcels are located across a vast geographic area in Nevada ("Lease Area") spanning portions of Nevada's Diamond Range and Valley, Sulphur Spring Range, Garden Valley, Fish Creek Range and Valley, Big Smoky Valley, and Railroad Valley. AR05674; 05920; 05661 (map of parcels).

Though the Lease Area is generally a semiarid and arid desert environment, there are many wetlands and other critical water features present. AR05698-99, 05714 ("several parcels are largely or entirely composed of wetland-riparian areas"). The lease parcels contain at least 34 springs and

---

[1] Documents contained in the administrative record are cited herein as "AR," followed by the Bates number.

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

seeps, 3.9 miles of perennial streams, 127.9 miles of ephemeral and intermittent streams, 286 acres of swamps and marsh, 348 acres of freshwater forested and shrub wetlands, 9,118 acres of lakes and 13,044 acres of playa, including areas categorized as major wetlands and major playas by the Nevada Natural Heritage Program. AR05698. Riparian and wetland areas are "the most productive and important ecosystems in the Battle Mountain District." *Id.* They "form literal oases that support all life and encourage biodiversity. Wetlands, seeps, and springs play an important role in wildlife habitat and in the food chain for many wildlife taxa, including non-game and game-species." AR05697. Within Big Smoky Valley, the location of 32 lease parcels, are "extremely unusual and rare hydrological feature[s]," known as spring mounds. AR05698, 05664 (showing location of parcels in Big Smoky Valley). Standing five to 10 feet high, these mounds seep water up to an inch deep. AR05698-99. The wet surfaces of the mounds are covered in bacterial mats and support rich plant and insect life. *Id.* BLM acknowledges "there remains much to learn" about these features, and their "preservation . . . is essential." AR05701.

The wetlands support a wide array of aquatic wildlife, including seven amphibian and 19 fish species. AR05710. Several of these species are endemic (i.e. found only in one geographic location) and others are species of conservation concern. *Id*. The Big Smoky Valley tui chub—a Nevada Natural Heritage Program "critically imperiled" species—is found on three parcels;[2] the "critically imperiled" Big Smoky speckled dace occupies a spring within 400 meters of parcel 55 and another spring on parcels 20 and 21; the Fish Creek Springs tui chub—a BLM Sensitive and state-protected species endemic to Fish Creek Springs—occupies habitat within 700 meters of parcel 66; and the Railroad Valley tui chub—a BLM Nevada sensitive species—is found 2.5 miles from parcel 106. AR05712. In addition, parcel 106 and all three September parcels are within two

---

[2] June parcels 14, 20, and 21 parcels 14, 20, and 21. Lease parcels for the June and September 2017 action are named according to the following convention: "NV-17-06-XXX," with the last three digits providing a unique identifier for the parcels. *See, e.g.*, AR00033. June parcels are referred to herein as "parcel XXX," using just the last three identifying digits. The three parcels from the September sale are referred to collectively as the "September parcels."

miles of the Lockes Ranch spring complex, home to the federally-threatened Railroad Valley springfish. AR01281, 06002. That fish occurs in just a few springs (all of which the U.S. Fish and Wildlife Service has designated as critical habitat) in two Railroad Valley localities. AR06002. Lahontan cutthroat trout, also a federally-threatened species, is found in a creek terminating in parcel 37. AR05715. Five species of springsnail—each of which is found in only extremely isolated habitat, usually just one spring—occur in the Lease Area. AR01281. The Columbia spotted frog— protected by Nevada state law and meeting the criteria for a BLM Sensitive species—is found on one parcel. AR05712. Other amphibian species of concern—the western toad, chorus frog, and Great Basin spadefoot—occur in Antelope and Big Smoky Valley, where dozens of lease parcels are located. *Id.*

The Lease Area is rich in other kinds of wildlife. Sagebrush, woodlands, salt desert scrub, and seasonally-flooded playas support approximately 73 types of mammals, including mule deer and pronghorn, 231 birds, 24 reptiles, and numerous invertebrate species. AR05710, 05703. Songbirds, migratory birds, and the Western snowy plover rely on wetlands throughout the Lease Area. AR05712-13.

## B. Environmental Impacts of Conventional Oil and Gas Drilling

All oil and gas exploration and drilling substantially impacts the environment. Even when operations proceed according to plan, exploration and drilling impairs water quality and quantity, disturbs and destroys plants and wildlife habitat, produces significant air pollution, increases seismicity, and generates noise pollution and waste. AR05752-53.

Accidents during oil and gas exploration and development are an ever-present risk. AR05752-53. Spills of oil, brine backflow, drill fluids, gasoline, diesel, solid waste, and hazardous water treatment chemicals can contaminate habitats and injure wildlife. AR05753; *see also* AR05715 (population levels of amphibian species of concern in the Lease Areas could be harmed by impacts to water sources). Any adverse effects on springs and wetland features could be "severe, as these environments are extremely sensitive" to any disturbance. AR05701. Contaminants can easily

16

spread throughout the wetland system and be difficult to mitigate. *See* AR05698 (describing presence of wetlands on parcels); AR05758 (the risks from spillage are "increased in the several parcels that contain springs/seeps, riparian areas, floodplains, and seasonally-flooded playas."); AR05701 (contaminants from spills "are easily . . . spread throughout the [aquatic] system."). BLM acknowledges that even indirect impacts on spring mounds could damage these resources "beyond repair." AR05701.

Even if spills do not occur, oil and gas activities can degrade groundwater quality. Clearing, grading, and soil stockpiling—all necessary activities in developing a well—can alter groundwater flow and viability. AR05699. Drilling modifies subsurface faults and interferes with groundwater flows. AR05701. Groundwater degradation leads to "decrease[d] biodiversity" and invasion of more drought-tolerant invasive species that could "outcompete native riparian species for limited nutrients and water." AR05705.

Not only does it risk polluting water resources, oil and gas development *consumes* huge volumes of water. Conventional oil and gas wells in Nevada typically require 50,000 to 300,000 gallons of water per well. AR05842. Obtaining this water can be difficult, particularly in Nevada, where surface water supplies are "virtually fully appropriated." AR05844. If water needed for oil or gas production is drawn from underground aquifers, then surface springs, wetlands, and other connected water features may dry up, harming or possible causing the extinction of species reliant on those wetlands. AR60078-79, 05699.

Other environmental impacts accompany oil and gas operations. Stormwater run-off from production wells carries heavy metals and volatile organic compounds, threatening soil and vegetation health. AR05752. Nonhazardous solid waste such as trash, drill cuttings or mud, wastewater, and cement easily accumulate. *Id.* Exploration and production require road construction, vegetation "removal and crushing," and soil compaction—activities that increase wind and water erosion, raise the potential for invasion by nonnative and noxious species, fragment and destroy

habitat, and disturb the desert's slow-growing, but critical, microbiotic crusts. AR05756, 05705, 05714-15.

The effects of these activities on wildlife can be significant. The Big Smoky Valley tui chub and speckled dace are especially vulnerable to impacts, as they occupy habitat within lease parcels. AR05714. Groundwater pumping near the Railroad Valley springfish would pose a dire threat to its survival. AR01281. The mere presence of oil and gas infrastructure in mule deer and pronghorn seasonal habitat and movement corridors adversely affects those species. AR23898 (discussing mule deer susceptibility to stressors); AR25590-91 (noting impact of resource extraction on animal movements and habitat use, including pronghorn). BLM acknowledges that any adverse impacts on springs and wetlands, noise from well development, and other human activities "could . . . disturb or displace mule deer and pronghorn from crucial winter range or migration corridors, potentially limiting population numbers." AR05715.

Oil and gas development also leads to significant impacts on air quality. BLM admits that development "will result" in emissions of hazardous air pollutants ("HAPs"). AR05689. Well testing and production releases continuous emissions of air pollutants, including dangerous particulate matter. AR05688. Well flaring during exploration and development, a common practice, releases volatile organic compounds ("VOCs"). AR05689. Reserve pits, produced water disposal, and onsite storage tanks also emit VOCs. *Id.* These air pollutants contribute to ozone production and prolong the life of methane in the atmosphere, further exacerbating the impacts of climate change. AR05690. Expansion of fossil fuel production will also substantially increase the volume of greenhouse gases emitted into the atmosphere. AR01304.

### C. Environmental Impacts of Hydraulic Fracturing

Development of the lease parcels is not restricted to conventional oil and gas development. BLM admits that hydraulic fracturing ("fracking") is "reasonably foreseeable." AR05679; *see also* AR44014 (on potential for fracking operations in Nevada). Fracking is an extreme method of extracting oil and gas that entails injecting a mix of water, toxic chemicals, and a proppant such as

18

sand (together, referred to as "fracking fluid") into the ground at pressures high enough to break up the underlying rock formation and release oil or gas. AR59835.

The chemicals used in fracking fluid include those known to harm the reproductive system or cause cancer, including benzene, and hazardous air pollutants like crystalline silica, methanol and formaldehyde. AR48432; 49387-88; 49706. Much of this fluid returns to the surface after fracking, along with naturally occurring fluid that can contain heavy metals, salts and naturally-occurring radioactive materials. AR38960, 27069. Fracking is associated with health impacts including lower birth weights and reduced Apgar scores, [3] and increased cardiology, dermatology, neurology, oncology and neonatal hospitalizations. AR49313; 49649.

Because of the toxic fluids associated with fracking, water contamination is an ever-present risk. It can come from chemical spills, leakage, and leaching; pipeline and well casing failure; drilling; and construction-related activities. AR05846, 28727 ("There have been many reports of changes in surface, ground, and drinking water quality near natural gas drilling operations . . . ."). Studies show that fracking well casings regularly fail, which can result in contamination of aquifers and drinking water wells. *See, e.g.*, AR28727, 45256, 44646, 45185-86. Spills can kill vegetation and contaminate soil, and be deadly to aquatic life. AR05752, 27070, 06643. Spills of fracking wastewater are particular severe and long-lasting, even compared to conventional oil spills, because many of the chemicals used in fracking do not break down over time. AR49737. In 2016 a U.S. Environmental Protection Agency ("EPA") study concluded that fracking can, and has, resulted in adverse effects on drinking water. AR45943.

The toxic fluid that returns from fracked wellbores must be disposed of. AR59836. It can be dumped into surface evaporation pits (AR05679), which create hazardous conditions for wildlife and humans. AR29520, 27176 (birds are attracted to the pits, causing mortality). Volatile organic compounds dangerous to human health and air quality evaporate from the pits' surfaces. AR28844.

---

[3] The Apgar score is a rating given to a newborn that provides a measure of health at birth. Low scores are correlated with the need for respiratory support at birth. AR49324-25.

19

Alternatively, the waste fluid can be injected underground. AR05679. It is well-established that injection of oil and gas wastewater causes earthquakes (AR44648, 44783, 44795 ("analysis demonstrates a clear spatial and temporal correlation between seismic activity and wastewater injection volumes…"), 45175, 49717 (earthquakes linked to wastewater injection in Arkansas, Texas, Ohio and Oklahoma)), including one in central Oklahoma that destroyed 14 homes and injured two people. AR44648.

The tremendous amount of fresh water used to frack also poses a grave threat to water resources. In Nevada, the most arid state in the union (AR60078), 800,000-10 million gallons of water may be used to frack a well. AR05842. Because fracking requires that water be freshwater-quality, operators generally use local surface water or groundwater. *Id.*, 05844. This can lower the water table and threaten wildlife and plants. AR05635, 27069.

Changes in water quantity and quality can lead to cascading and catastrophic impacts on plant and animal species. AR27068-69; 27175 ("The overall health of an aquatic habitat derives from the conditions of the entire watershed," and impacts from activities such as fracking can be immediate). Changes to water features reduce habitat, especially "critical spawning habitat for resident species" such as endemic fish, and threaten species with extinction. AR27069 (noting that water extraction for fracking is different in "pace and location" and "likely more important" for resident species than other water use).

Fracking can also result in habitat loss and fragmentation; and air, noise, and light pollution. AR27186 (impacts are particularly acute in areas with high sensitivity to disturbance, such as sagebrush habitat, springs, and streams). Roads and pipelines can bisect habitats and migration corridors, produce sediment and runoff, and lead to the spread of invasive species. AR27068-69, 27187.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## II.    PROCEDURAL BACKGROUND

### A. BLM's June Lease Sale and Environmental Assessment

On January 5, 2017, BLM issued a draft EA purporting to assess the impact of leasing 106 parcels in BLM's Battle Mountain District. *See* AR63513-63706. The draft EA considered the proposed action—leasing all the parcels—and two alternatives: the "Partial Deferral Alternative," which would defer some of the parcels from sale, and a no-action alternative. AR63521. The Partial Deferral Alternative, which BLM identified as its preferred action, would withhold approximately 53 percent of the acreage from leasing. AR63531. BLM reasoned that deferring parcels containing "wetlands, seeps/springs, riparian areas, floodplains and playas" was necessary to protect these resources from the impacts of oil and gas development. AR63556.[4]

BLM received over 8,000 comments from individuals and groups including Nevada state agencies, nonprofit organizations, Eureka County, the Duckwater Shoshone Tribe, and U.S. Fish and Wildlife Service, raising concerns about the sale and the environmental analysis. AR05871-86. Plaintiffs filed comments discussing inadequacies in the draft EA and asserting the need for preparation of an EIS. AR05626-46.

On April 25, 2017, BLM released a final EA (AR05651-5886) and a draft Finding of No Significant Impact ("FONSI") (AR63807-12). In response to "new direction from the BLM Nevada State Office," the final EA includes, and selects as the preferred action, an alternative not included in the draft EA—the so-called "Additional Resource Protection Alternative." AR05659, 05674-75. This alternative eliminates all of the proposed deferrals, instead making all 106 parcels available for immediate sale. AR05659. BLM asserted that it would attach stipulations to the parcels containing "water resources" (wetlands, springs, seeps, floodplains, riparian areas and playas) and mule deer and pronghorn range and migration corridors, to protect water resources and mule deer and pronghorn from impacts. AR05702, 05675. However, without explanation, BLM offered many

---

[4] The Nevada Department of Wildlife recommended deferring June parcels 42-43, 44-46, 47-49, 52-56, 61, 66, 67, 73, 90-97, 104, and 105 because of their crucial importance to mule deer. AR06642. BLM later rejected this recommendation, as described below.

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

parcels containing wetlands for sale without attaching stipulations. *Cf* AR05816-17; 05827-30. The draft FONSI proclaims that the Additional Resource Protection Alternative will not significantly affect the quality of the human environment, and that an EIS is therefore not required. AR63808. The day after releasing these documents, BLM issued a notice of lease sale for all 106 parcels. AR01395-01466.

Plaintiffs filed a protest with BLM on May 25, 2017 arguing, *inter alia*, that the EA failed to adequately analyze the impacts of the lease sale, the stipulations were inadequate to protect water resources and mule deer habitat, and that the project's significant impacts required preparation of an EIS. AR01268-01311.

BLM released its final FONSI on June 6, 2017. AR01530-35. On June 12, 2017, the agency dismissed Plaintiffs' protest (AR 25543-55) and published its Decision Record offering all 106 parcels for oil and gas leasing (AR05647-50). The agency auctioned the parcels on June 13-14, 2017. AR23924. Three parcels, totaling 5,760 acres, sold. AR23924. The remaining parcels remain available for anyone to purchase, without further agency action or analysis, at a noncompetitive price of $1.50 per acre. AR01401.

**B.  BLM's September Lease Sale and Determination of NEPA Adequacy**

On June 21, 2017, BLM officials issued a Determination of NEPA Adequacy for the sale of three parcels covering 3,680 acres in Railroad Valley. AR05912-20. In the Decision Record, BLM concludes that the EA prepared for the June 2017 lease sale satisfies the agency's NEPA obligations for the September sale (AR05921-22) because the September parcels are "very near" one of the parcels included in the June sale.[5] AR05913. BLM did not describe or analyze the resources on these parcels any further.

The next day, BLM issued a notice of lease sale for the September parcels. AR05887-96. Plaintiffs filed a timely protest on July 24, 2017. AR05986-6039. BLM published its Decision Record for this lease sale on September 11, 2017, offering all three parcels for oil and gas leasing.

---

[5] Parcel 106, in the Railroad Valley.

22

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1   AR05921-24. On September 12, 2017, BLM auctioned the parcels. AR05961. BLM denied

2   Plaintiffs' protest on September 13, 2017. AR06059-71.

3   **III.    STANDARD OF REVIEW**

4           Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to

5   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

6   Judicial review of BLM's June and September 2017 lease sales and compliance with NEPA is

7   governed by the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* ("APA") (*Or. Natural Res.*

8   *Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007)); and based on review of the

9   administrative record. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir.

10  1994). Under the APA, courts must hold unlawful and set aside any agency action that is "arbitrary,

11  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

12          The APA's standard of review "while narrow, nonetheless requires the court to engage in a

13  substantial inquiry, a thorough, probing, in-depth review." *Siskiyou Reg'l Educ. Project v. U.S.*

14  *Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009). The Court must "not rubber-stamp" agency

15  decisions. *Ocean Advocates*, 361 F.3d at 1119 (quoting *NLRB v. Brown*, 380 U.S. 278, 291-92

16  (1965)). Rather, it must "ensure that [the] agency has taken the requisite 'hard look' at the

17  environmental consequences of its proposed action, carefully reviewing the record to ascertain

18  whether the agency decision is 'founded on a reasoned evaluation of the relevant factors.'" *Wetlands*

19  *Action Network v. U.S. Army Corps of Eng'rs.*, 222 F.3d 1105, 1114 (9th Cir. 2000). A decision is

20  also arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

24  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Sierra*

25  *Club v. U.S. EPA*, 346 F.3d 955, 961 (9th Cir. 2003), *amended by* 352 F.3d 1186 (9th Cir. 2003)).

26  The court therefore must also "determine whether the [agency] articulated a rational connection

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1  between the facts found and the choice made." *Ocean Advocates*, 361 at 1119 (internal citations and

2  quotations omitted).

3  ## IV.  ARGUMENTS

4  ### A.  Plaintiffs Have Standing to Challenge the Decisions to Lease

5  Plaintiffs have standing under Article III of the Constitution to maintain this action. To

6  establish standing, plaintiffs must show that they have "suffered a concrete and particularized injury

7  that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is

8  likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517

9  (2007). An organization has Article III standing "when its members would otherwise have standing

10  to sue in their own right, the interests it seeks to protect are germane to the organization's purpose,

11  and neither the claim asserted nor the relief requested requires the participation of individual

12  members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

13  BLM's decisions to lease hundreds of thousands of acres of federal land for oil and gas

14  drilling cause Plaintiffs' members concrete injury. Oil and gas drilling will degrade the landscapes

15  where declarant Brian Beffort, a member of the Sierra Club, hikes, climbs and photographs. Beffort

16  Decl. at ¶¶ 15-21. Such degradation will significantly diminish his enjoyment of these recreational

17  activities. Declarant Patrick Donnelly, a member of the Center for Biological Diversity, will also

18  experience diminished enjoyment of recreational activities including camping, hiking, and observing

19  spring features and rare wildlife in the Lease Area. Donnelly Decl. at ¶¶21-29. *See Sierra Forest*

20  *Legacy v. Sherman*, 646 F.3d 1161, 1179-80 (9th Cir. 2011) (where member declarations establish

21  interests in areas, "a procedural NEPA violation is complete even before an implementing project is

22  approved"); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1515-16 (9th Cir. 1992)

23  (possible land development a different alternative might have prevented is a harm the court "must

24  deem immediate, not speculative" under NEPA).

25  "Once a plaintiff has established an injury in fact under NEPA, the causation and

26  redressability requirements are relaxed." *Cantrell v. City of Long Beach,* 241 F.3d 674, 682 (9th Cir.

24

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

2001); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). "It suffices that, as NEPA contemplates, BLM's decision could be influenced by the environmental considerations that NEPA requires an agency to study." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). Here, Plaintiffs' injuries will be redressed if the Court invalidates BLM's decisions to lease and any leases issued as a consequence of its decisions, or requires BLM to reevaluate the leases under NEPA.

Declarants' interests are germane to Plaintiffs' organizational purposes, which include the protection of wild places and the quality of the natural environment (Beffort Decl. at ¶3) and protecting diversity and securing a future for all species on the brink of extinction. (Donnelly Decl. at ¶¶4-5).

### B.  BLM Failed to Take the "Hard Look" at Impacts that NEPA Requires

NEPA mandates that BLM identify and analyze all direct and indirect reasonably foreseeable environmental effects of its actions. 40 C.F.R. §§ 1501.1(d), 1508.8. This obligation establishes "action-forcing procedures that require agencies to take a 'hard look' at environmental consequences." *Ctr. for Biological Diversity v. U.S. DOI*, 623 F.3d 633, 642 (9th Cir. 2010) (citations omitted); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (NEPA requires agencies take a "hard look" at environmental consequences and disseminate relevant environmental information). Despite this, BLM failed to fully analyze numerous foreseeable, substantial impacts of oil and gas drilling on the Lease Area. First, BLM unlawfully postponed analysis of the impacts of oil and gas development until it receives applications for permits to drill. Second, it unlawfully failed to analyze the potential impacts of fracking on the Lease Area. Compounding this failure, BLM's environmental review documents tier to outdated Resource Management Plans that contain no analysis whatsoever of the potential impacts of fracking. Third, BLM unlawfully failed to disclose or analyze impacts to big game species, relying on an assumption that the stipulations to protect mule deer habitat are sufficient to avoid impacts, contrary to information before the agency.

1     1. <u>BLM Unlawfully Postponed Analysis of Impacts</u>

2   Throughout the EA, BLM fails to analyze the impacts of its decisions to lease, instead

3 deferring the analysis to some point in the future when an applicant files an application for a permit

4 to drill a well ("APD") on a particular parcel. BLM treats the leasing of land as a mere paperwork

5 exercise with no real impacts. For example, BLM asserts that:

6    [t]here would be no direct impacts from issuing new oil and gas leases because
    leasing does not directly authorize ground disturbing activities . . . . If an APD is
7    received for a leased parcel, additional site-specific, project-specific NEPA
    analysis would address direct and indirect effects of any action and alternatives
8    proposed at that time.

9   AR05682. This argument is disconnected from the reality of the lease process and

10 inconsistent with the law.

11   The leases BLM offered in these sales do not prohibit surface occupancy (AR05746

12 (Additional Resource Protection Alternative "would not prohibit exploration and development"))

13 and therefore constitute an "irretrievable commitment of resources" requiring pre-APD

14 environmental analysis. *See N.M. ex rel. Richardson*, 565 F.3d at 717-18 (citations omitted); *Conner*

15 *v. Burford*, 848 F.2d 1441, 1451 (1988) (leases that do not prohibit surface occupancy constitute the

16 "point of commitment"). In so refusing to analyze impacts at the leasing stage, BLM is left with an

17 EA that fails to take the required "hard look" at the impacts of leasing hundreds of thousands of

18 acres of Nevada public lands for oil and gas activities, and violates NEPA's guarantee that relevant

19 information be made available to public officials and citizens before decisions are made. 40 C.F.R. §

20 1500.1(b).

21   In one particularly glaring example, BLM fails to take a timely "hard look" at the multiple

22 significant impacts of its lease sale on water resources. AR05699 ("The act of offering, selling, and

23 issuing federal oil and gas leases does not produce impacts to water quality and surface water . . . .

24 Impacts of any future proposed exploration or development would be analyzed under additional site-

25 specific, project specific environmental analysis"). BLM also avoids analyzing the risk that oil and

26 gas development may introduce noxious weeds and invasive plants (AR5709 ("There would be

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

minimal direct impacts from issuing new oil and gas leases because leasing does not directly authorize oil and gas exploration and development activities, and no ground disturbance would be authorized)," *but see id.* ("it is reasonably foreseeable that oil and gas exploration and development would occur within the next 10 years on leased parcels.")); induced seismicity (AR05850 ("[t]he potential for induced seismicity [from fracking] cannot be made at the leasing stage; as such, it will be evaluated at the APD stage should the parcel be sold/issued, and a development proposal submitted")); and climate change (AR05692 ("It is currently not feasible to predict with certainty the net impacts from the Proposed Action on climate, as leasing is an administrative action and has no direct effects.")). As to wildlife, BLM acknowledges that "there may be indirect impacts to wildlife resources from future ground disturbing activities . . . on any leased parcels." AR05713. Yet following this, BLM arbitrarily concludes that "the sale of parcels and issuance of oil and gas leases is strictly an administrative action" producing no direct impacts, and that "the specific acres that would be disturbed and the types of habitat that would be disrupted cannot be determined, as the BLM would not receive any applications for exploration or development until after the lease sale." *Id.*; *see also* AR05874 (noting "a slight risk for activities associated with oil and gas exploration, development and production to disrupt or contaminate any nearby spring flows" but deferring analysis until the APD stage).

The Finding of No Significant Impact likewise concludes that, for instance, "[t]he proposed action and alternatives are designed to offer lease parcels for sale, and would not have an effect on wetlands or cultural resources at the lease sale or lease issuance stage. AR05133; *see also* AR01534 (no known direct, indirect or cumulative effects at the leasing stage).

This "approve now and ask questions later [approach] is precisely the type of environmentally blind decision-making NEPA was designed to avoid." *Conner v. Burford*, 848 F.2d at 1450-51; *see also Robertson*, 490 U.S. at 349 (NEPA assures that "the relevant information will be made available" to the public and decisionmakers). Rather, NEPA requires that "assessment of all 'reasonably foreseeable' impacts occur at the earliest practicable point, and must take place before

27

an 'irretrievable commitment of resources' is made." *N.M. ex rel. Richardson*, 565 F.3d at 717

(citations omitted); *see also Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d at 1152 (citing 40

C.F.R. § 1502.5 ("Agencies are required to conduct this review at the 'earliest possible time' to

allow for proper consideration of environmental values . . . . A review should be prepared at a time

when the decisionmakers 'retain a maximum range of options.'"). This is because "NEPA is not

designed to postpone analysis of an environmental consequence to the last possible moment. Rather,

it is designed to require such analysis as soon as it can reasonably be done." *Kern*, 284 F.3d at 1072.

BLM's contention that it cannot know the "specific" acres and habitat that would be affected

by oil and gas development until it receives an application for a permit to drill (*see* AR 05713) does

not excuse its refusal to analyze impacts. *Conner v. Burford*, 848 F.2d at 1450 ("The government's

inability to fully ascertain the precise extent of the effects of mineral leasing . . . is not . . . a

justification for failing to estimate what those effects might be before irrevocably committing to the

activity."). This is because "[r]easonable forecasting and speculation is . . . implicit in NEPA," *City

of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) (citation omitted). Agencies cannot "shirk

their responsibilities under NEPA by labeling any and all discussion of future environmental effects

as 'crystal ball inquiry.'" *Id*. Thus courts have routinely rejected the approach BLM employed here.

*See Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d at 1157-58 (agency's attempt to defer

analysis of impacts of fracking until it received site-specific proposals to drill deemed contrary to

NEPA); *Kern*, 284 F.3d at 1074 (EIS that contained two sentences about the impacts of an

ecosystem-destroying fungus, and a statement by the Bureau that it would address the impacts of this

fungus in later site-specific NEPA analysis, was "obviously inadequate").

This court must likewise reject BLM's refusal to analyze the impacts of oil and development

until it receives APDs. Because BLM's postponement of analysis violates NEPA's "hard look"

requirement, the agency's Records of Decision for the June and September 2017 sales, and any

leases issued, should be vacated and remanded to the agency with an order to analyze all foreseeable

impacts of the agency's decisions to offer parcels for lease.

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

2.  <u>BLM Failed to Take a Hard Look at the Impacts of Fracking</u>

Hydraulic fracturing ("fracking") poses environmental risks above and beyond those threatened by conventional oil and gas development. *Supra* at Section I.C. BLM acknowledges this fact (*see, e.g.*, AR05847) (naming points during fracking process that could produce impacts), and admits that oil and gas wells in the Lease Area may be fracked. AR05679 (fracking "is one of these methods [that are common practice in today's industry] that may be reasonably foreseeable for leases proposed for this sale."). But rather than fulfill its statutory duty under NEPA to analyze the impacts of fracking and consider means of mitigating those impacts, BLM simply appended a generic "White Paper" on fracking to the EA that fails to analyze the myriad impacts of the practice in the context of the Lease Area. The agency's reliance on this document violates NEPA, which mandates that an agency must do more than provide generic statements on possible environmental impacts. *See Blue Mountains*, 161 F.3d at 1213 ("general statements about 'possible' environmental effects and 'some risk'" fail the "hard look" test) (citations omitted).

The White Paper is "derived from" a document developed by the Wyoming State Office of BLM in 2013. AR05841. It describes in general and hypothetical terms what fracking is and what "operational issues" may arise as a consequence. AR05842. Though the body of scientific knowledge detailing the harms of fracking grows each year, the most recent of the White Paper's six scientific references dates from 2012. AR05851-52; *but cf.* AR60030-32 (Plaintiffs provided BLM with more recent studies on fracking's environmental, health, and public safety impacts), 05633-45 (same). Throughout the EA, BLM repeatedly refers the reader to the White Paper in lieu of providing meaningful analysis. *See, e.g.*, AR05679 ("Please refer to the Hydraulic Fracturing White Paper [Appendix E] for additional information on HF."); 05700 ("For more information on risks to groundwater from HF, refer to Appendix E."); 05877 (In response to concern that the EA fails to examine the impacts from fracking on the lease parcels, "See Appendix E."), 05880 (same).

But the White Paper, and BLM's reliance on it, do not meet NEPA's "hard look" standard. It never once refers to locations or resources specific to the Lease Area. Instead, it offers only

generalities. For example, the paper repeatedly explains that groundwater contamination depends on "site-specific factors" and "site specific conditions" such as physical properties, presence of fractures, and the stress in rock formations. AR05847. Neither the White Paper nor the EA, however, evaluates which of these "site-specific factors" occur in the Lease Area. Further, while the White Paper states that fracking uses "[a]ppreciable amounts of water (800,000–10 million gallons)" (AR05842), neither the White Paper nor the EA analyze the potential sources of water available to support fracking in the Lease Area, or the impacts of consuming those water sources. BLM identifies at least 34 springs and seeps, 3.9 miles of perennial streams, 127.9 miles of ephemeral and intermittent streams, 286 acres of swamps and march, 13,044 acres of playa, 348 acres of freshwater wetlands and 9,118 acres of lakes in the Lease Area (AR05698), but fails to consider whether any of those identified water bodies might be affected by fracking. While the EA concludes that the impact of fracking on "public health and safety, and to the quality of usable water aquifers, is directly related to the proximity of the proposed action to domestic and/or community water supplies . . . and/ or agricultural developments" (AR05851), neither it nor the White Paper identify whether there are domestic or community water supplies or agricultural activities in the Lease Area. While the White Paper notes that "Nevada is the 3rd most tectonically active state in the union," (AR05850), neither the White Paper nor the EA disclose whether active faults exist in the Lease Area, although doing so would help determine the seismic risks from fracking on the parcels. *See* AR26972 (describing studies on proximity between fracked wells and earthquakes); AR27537 (describing how increased fracking in the last decade led to an increase in small to mid-sized earthquakes); AR28231 (study of active faults and proximity to fracking, concluding that fluid injection triggered seismicity). Citing the White Paper, the FONSI confidently concludes that leasing these parcels "is not likely to affect public health or safety." AR01533.

Relying on a document in lieu of analysis fails to meet the demands of NEPA if that document does not specifically analyze impacts on the area. The facts at hand are analogous to *Kern*. There, the agency provided only a document describing the general impacts of a problematic tree

30

1  fungus. *Kern*, 284 F.3d at 1073. The EA did not analyze the effects of the fungus on specific trees in

2  the action area. *Id.* The court held that this approach was in violation of NEPA. *Id.* (reference to

3  document did not excuse BLM "from its responsibility under NEPA to perform an analysis of the

4  effects of the fungus . . . in an EIS specifically addressed to the [region the subject of the EIS]"). A

5  document an agency relies upon must "account for the specific impacts" of the proposed activity in

6  the specified area. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999).

7       The Ninth Circuit has warned against just the type of abdication of responsibility that BLM

8  engaged in here, holding that "general statements about 'possible effects' and 'some risk' do not

9  constitute a 'hard look'" under NEPA. *Blue Mountains*, 161 F.3d at 1213 (citation omitted). In *Blue*

10  *Mountains*, the Forest Service's deficient NEPA documents both acknowledged how road building

11  could lead to erosion, water quality degradation, and habitat destruction, but failed to analyze the

12  location-specific impacts or expected levels of harm. *Id.* (the EA "merely acknowledge[d]" that

13  impacts could occur). This "cursory and inconsistent treatment" of issues violated the statute. *Id.* at

14  1214, citing 40 C.F.R. § 1508.9(a) (an EA must provide "sufficient evidence and analysis"中).

15  Likewise, BLM fails to meet the obligations of NEPA by substituting analysis of impacts for an

16  attachment to the EA that "contemplates that a certain impact may occur." *Blue Mountains*, 161 F.3d

17  at 1214; *see also Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 997 (9th Cir. 2004)

18  (tiering to "general statements about the cumulative effects of logging" cannot save an EA that does

19  not contain "any specific information" about impacts). Accordingly, this Court should vacate the

20  agency's Records of Decision for the June and September 2017 sales and any leases issued in

21  reliance thereon.

22              3.  BLM Relied on Outdated and Inadequate RMPs

23       FLPMA directs BLM offices to prepare resource management plans ("RMPs") guiding the

24  multiple uses of public lands within their geographic area. 43 C.F.R. § 1610.1(b); 43 U.S.C. §

25  1712(a). Among other things, an RMP must "consider present and potential uses of the public

26  lands[,] . . . consider the relative scarcity of the values involved . . . [and] weigh long-term benefits

31

to the public against short-term benefits." 43 U.S.C. § 1712(c). Relevant here, the RMPs the agency relied on determine which land is suitable for oil and gas leasing. That an RMP determines that land is suitable for leasing, however, does not oblige the BLM to lease the land. 30 U.S.C. § 226(a); *Udall v. Tallman*, 380 U.S. 1, 4 (1965); *Western Energy Alliance v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013).

Nine parcels from the June sale, and all the parcels from the September sale, fall under the 1997 Tonopah RMP. AR05676, 05912. The Tonopah RMP opens 88 per cent of the Tonopah Assessment Area for oil and gas leasing. AR05667. The remaining parcels in the June sale are within the 1986 Shoshone-Eureka RMP. AR05677. The Eureka-Shoshone RMP states that "[a]ll areas designated by the BLM as prospectively valuable for oil and gas will be open to leasing . . . ." *Id.* In deciding whether to lease the parcels it offered, BLM took into account that the leasing of these parcels was "in conformance with the approved land use plans." AR05650 (June sale Record of Decision); 005923 (September sale Record of Decision).

These RMPs, however, were prepared so long ago that their conclusions on the impacts of oil and gas development—and therefore the lands deemed suitable for leasing—cannot reasonably be relied upon. The Tonopah RMP is 21 years old, and the Eureka-Shoshone RMP 32 years old. AR05666. Both long predate the use of modern hydraulic fracturing technologies and techniques. Neither RMP even mentions fracking. The Tonopah RMP's scenarios about oil and gas development in the area only project until 2014, pre-dating the development of fracking in Nevada. AR05676 (Tonopah RMP developed production scenario through 2014), 44014 (first fracking in Nevada occurred in March, 2014). Analysis of impacts to wetlands in the Tonopah RMP is restricted to a single conclusory statement that "mineral exploration and development along [streamside riparian areas] would adversely impact riparian zones." AR05045. The Eureka-Shoshone RMP does not evaluate the impacts of oil and gas activities on hydrologic or biological resources in the Battle Mountain District, nor does it delineate mule deer or pronghorn seasonal use areas. AR05711. The RMPs also fail to incorporate substantial new scientific information from the past two decades

32

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1  regarding effects of oil and gas development on mule deer and their habitat. *See* AR59839, 59871,
2  60145, 60790, 60809, 60991, 61002.

3       BLM's reliance on these outdated RMPs as foundational documents prevents the agency
4  from fulfilling NEPA's basic requirements. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402
5  F.3d 846, 864 (9th Cir. 2005) (agency must take a "hard look" at impacts); *see also N. Plains Res.*
6  *Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey
7  data for wildlife "too stale" thus reliance on it was arbitrary and capricious); *Lands Council v. U.S.*
8  *Forest Serv.*, 395 F.3d 1019, 1031 (9th Cir. 2004) (rejecting agency decision as arbitrary and
9  capricious because assessment lacked up-to-date evidence).

10       BLM admits that Lease Area resources are "not adequately protected under either or both
11  [RMPs]" (AR05674), and that the agency must undertake "supplemental analysis of new
12  information and changes in environmental conditions since these RMPs were approved, such as
13  increased growth, locations of special status species, identification of traditional cultural properties,
14  and recognition of other sensitive resources that were not addressed in the RMPs." AR05666. The
15  draft EA's Partial Deferral Alternative, in response, proposed withholding certain parcels from sale
16  "until the RMP is updated or amended." AR05746. But BLM never undertook any steps (such as
17  supplemental analysis or RMP amendments or revisions) that may have remedied its decision to tier
18  to inadequate documents. In doing so, the agency fails to take the required "hard look" and thereby
19  violates NEPA.

20       4.   <u>BLM Improperly Relied on Ineffective Mitigation Measures to Ignore Impacts to</u>
21          <u>Mule Deer and Pronghorn</u>

22       The Lease Area—and the lease parcels themselves—contain significant identified habitats,
23  including crucial wintering areas and migration corridors for big game species including pronghorn
24  antelope, mule deer, and desert bighorn sheep. *See, e.g.*, AR05761, 05710-11, AR19151. At least 50
25  parcels are within critical mule deer winter range, or have mule deer and/or pronghorn range or
26  migration corridors. AR05711.

33
Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1   In December 2016, Nevada Department of Wildlife's ("NDOW") eastern region

2   recommended deferral of (or, at a minimum, additional stipulations on) 28 parcels because "the

3   parcels overlap with the areas that NDOW is in the process of remapping as mule deer crucial

4   summer and winter range" or with already-mapped "crucial winter range along the Diamond

5   Range." AR06642.[6] In the draft EA, BLM proposed deferring many of these parcels from sale.[7] In

6   the final EA, however, BLM refused to defer leasing crucial mule deer summer range, winter range,

7   or movement corridors for further analysis or RMP revision. AR05713-14. Instead, in its newly-

8   added Resource Protection Alternative, BLM decided that "Timing Limitation (TL) stipulations

9   would be placed on parcels having crucial mule deer and pronghorn seasonal habitats." AR05726.

10   BLM's assumption that these stipulations prevent all significant impacts is arbitrary and

11   capricious. The stipulations do not allow BLM to prevent exploration and development on the

12   parcels. Rather, they merely restrict the time of year that initial construction work may be conducted.

13   AR05746, 05821-24. These timing stipulations regulate only initial road and well construction, but

14   not subsequent operation, maintenance, and other ongoing activities expected from oil and gas

15   production. AR05746, 05792. These stipulations fail entirely to address well-documented adverse

16   impacts to mule deer and pronghorn habitat use, behavior, survival, and reproduction from the long-

17   term placement of oil and gas infrastructure within seasonal habitats and/or migration corridors. *See,*

18   *e.g.*, 59216-459, 60776-818, 60852-61010. In the EA, BLM's analysis of impacts to mule deer and

19   pronghorn habitat, behavior, and abundance is limited to the singular statement that "[n]oise and

20   human activities associated with oil and gas exploration or development without proper seasonal

21   controls or other mitigation could also disturb or displace mule deer and pronghorn from crucial

22   winter range or migration corridors, potentially limiting population numbers." AR05715. Neither the

23   draft nor final EA provide any site-specific or quantitative analysis of the extent to which its

24

25   [6] NDOW recommended deferral of parcels 42-43, 44-46, 47-49, 52-56, 61, 66, 67, 83, 90-97, 100, 104, and 105. AR006642.

26   [7] Under the Partial Deferral Alternative, BLM proposed deferring parts of parcels 46, 47, 56, 90, 92 and 94; all of parcels 52, 93, 95-97, 100, 104 and 105. AR05662-65.

34

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

proposed measures constituted "proper seasonal controls or other mitigation," or how development

under those conditions could limit mule deer and pronghorn population numbers.

These failures cannot be attributed to an absence of data. Plaintiffs submitted extensive

scientific literature to BLM regarding impacts of oil and gas development on mule deer and

pronghorn habitat use, behavior, reproductive success, and abundance. *See, e.g.*, AR01292-97,

59216-459, 60776-818, 60852-61010. In particular, Plaintiffs pointed BLM to the recently-published

results of a seventeen-year mule deer study in Wyoming that demonstrates that oil and gas

infrastructure produces significant, long-lasting effects on mule deer population and abundance.

AR01294-95, 61002-10. Significantly, that study found that:

> Even during the last 3 years of study, when most wells were in production and
> reclamation efforts were underway, mule deer remained >1km away from well
> pads . . . . Mule deer abundance declined by 36% during the development period,
> despite aggressive onsite mitigation efforts (e.g. directional drilling and liquid
> gathering system) and a 45% reduction in deer harvest. Our results indicate
> behavior effects of energy development on mule deer are long term and may
> affect population abundance by displacing animals and thereby functionally
> reducing the amount of available habitat.

AR61002. BLM similarly ignored evidence prevented by plaintiffs that oil and gas

infrastructure can affect mule deer use of migration corridors—an impact not mitigated whatsoever

by the January through May Timing Limitation Stipulation. AR60991-61000 (study finding that

impermeable barriers to ungulate migration greatly constrain routes and ranges, and these harms

result in behavioral changes and "demographic costs").

The relevant, peer-reviewed information plaintiffs provided describes significant adverse

effects on mule deer abundance and harvest from oil and gas *infrastructure*—not initial drilling

activity—even under mitigation measures far more aggressive than those in BLM's Additional

Resource Protection Alternative. AR61002-10. BLM completely failed to consider this important

information. Instead it assumes that the Timing Limitation stipulation would be so effective at

eliminating impacts to big game that those indirect and cumulative effects 1) would not be

significant; and 2) did not even merit detailed discussion or quantification. AR05716, 05762, 01532

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1  (Singular statement in FONSI that "[t]he stipulations . . . provide adequate protection for all such

2  site-specific resources of concern"). BLM's failure to provide any reasoned analysis of impacts to

3  mule deer habitat and population, assessment of the efficacy of the relevant stipulations, or even

4  acknowledgment of the extensive scientific data contradicting BLM's assumptions violates NEPA's

5  obligation to take a "hard look" at the potential environmental impacts of the project. *See, e.g.*, *N.M.*

6  *ex rel. Richardson*, 565 F.3d at 718 (holding that BLM must consider site-specific impacts of oil and

7  gas development prior to making an irretrievable commitment of resources by issuing leases);

8  *Muckleshoot Indian Tribe*, 177 F.3d at 8111 (cursory and general statements devoid of reasoned

9  conclusions do not constitute a hard look). Reliance on mitigation measures, the efficacy of which

10  depends on factors not assessed by the agency, violates the agency's statutory obligation. *See S. Fork*

11  *Band Council of W. Shoshone of Nevada v. DOI*, 588 F.3d 718, 727 (2009).

   **C.  BLM's Conclusion that the Lease Stipulations Avoid Impacts is Arbitrary and Capricious**

   1.  The Water Resources Stipulation Does Not Protect Wetlands in the Area or Species that Rely Upon Them

16  BLM concluded that the June lease sale would have no significant impact on wetlands

17  because the Water Resources Stipulation (AR05827)—a stipulation only included in the final EA,

18  not the draft—would protect those resources. AR01533. This conclusion is arbitrary and

19  unsupported by the record. First, the Water Resources Stipulation fails to adequately to protect those

20  resources because of its limited nature and possible exceptions. Second, BLM did not apply the

21  stipulation to all parcels that the agency identified as containing sensitive water resources deserving

22  of protection. BLM's FONSI is therefore arbitrary and capricious. Further, because BLM did not

23  apply the Water Resources Stipulation to any of the September parcels, even though they all contain

24  wetlands, BLM's Determination of NEPA Adequacy for that sale is arbitrary and capricious.

25  According to the EA, wetlands in the Lease Area are "literal oases that support all life and

26  encourage biodiversity." AR05697. "Riparian and wetlands areas are the most productive and

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

important ecosystems in the [Lease Area] . . . . [T]hey contain the majority of the biodiversity and perform vital ecologic functions." AR05698. They have a greater diversity of plant and animal species than adjoining areas (*id.*), and support resident and migrating species. AR05697.

Oil and gas development poses grave risks to these riparian and wetland ecosystems. The EA concludes that "[t]he consequences of oil and gas exploration or development in wetlands and riparian areas are potentially severe, as these environments are extremely sensitive to any perturbation":

> [S]urface disturbance [from oil or gas exploration], although minor in area, would have a disproportionate effect in these environments. Road building could redirect water flows; any loss or diversion of water or instream flow can affect wetland and riparian health and impact these ecosystems. Contaminants from any accidental spillage are easily brought into solution and spread throughout the system. Human activity can affect turbidity and dissolved oxygen content, which in turn harm microbial life.

AR05701. Even indirect impacts from oil and gas production could "damage[] beyond repair" the "utterly unique" spring mounds in Big Smoky Valley. *Id.*, 05698-99.

Drilling on lease parcels may upset underground water flows, and thereby affect wetlands: "The hydrogeology that results in spring discharge is often unique and complex. For the numerous springs, seeps, and spring-fed wetlands within the deferred parcels, there would be a slight risk that drilling would lead to subsurface modification due to the possibility of interfering with groundwater flow in a fault." AR05701; *see also* AR05699-70 ("Water quality issues may arise from either underground or surface contamination. The primary cause of underground degradation would be from improperly functioning well casings. Surface activities can degrade groundwater by infiltration of contaminants, particularly from sumps and spills."). These risks prompted consideration of the Partial Deferral Alternative in the draft EA, which would have deferred all parcels containing wetlands until BLM developed No Surface Occupancy stipulations to protect wetland, floodplains and playas. AR05701-02.

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1    Yet instead of deferring the parcels as originally proposed, BLM concludes in the final EA

2    that "[a]pplication of the [Water Resources] stipulation" to "[p]arcels totaling approximately 58,000

3    acres, . . . . [w]ould generally protect water resources from all impacts." AR05702. The FONSI for

4    the June sale states that "[t]he stipulations and lease notices provide adequate protection for all such

5    site-specific resources of concern that were identified via the EA process . . . ." AR01532.

6    Consequently, according to BLM, "none of the potential effects, adverse or beneficial, are

7    significant." AR01533; *see also id.* (BLM concluding that wetlands "have been found not to be

8    adversely affected by the Additional Resource Protection Alternative with stipulations and lease

9    notices attached to the parcels.").[8]

10    BLM's conclusion runs counter to the evidence before the agency. The Water Resources

11    Stipulation does not protect the wetlands, floodplains and playas in the Lease Area. It is merely a

12    Controlled Surface Use stipulation, meaning that it does not prohibit, nor allow BLM to prohibit at

13    the drilling permit stage, all surface occupancy on a parcel. AR05702; *see also Conner v. Burford*,

14    848 F.2d at 1444 (explaining that only No Surface Occupancy stipulations prohibit lessees using the

15    surface of land; other stipulations can only impose reasonable conditions on activities).

16    A fluid mineral lease issued without a No Surface Occupancy stipulation (as is the case here)

17    confers on the lessee the right to use the lands to the extent required to drill for, and extract, oil and

18    gas. *Richardson*, 565 F.3d at 718; citing 40 C.F.R. § 3101.1-2. At best, the Water Resources

19    Stipulation potentially imposes controls on precisely when, where, and how that land is used; it does

20    not reserve to BLM the right to deny occupancy altogether. The Water Resources Stipulation

21    provides that oil and gas operations may require "special engineering design, construction and

22

23    ─────────────────
      [8] Further, the draft EA observed that "several parcels are largely or entirely composed of wetland-
24    riparian areas and playas that many wildlife species depend on," and concluded that "[o]il and gas
      development could cause disproportionate and, in some cases, potentially irreversible habitat loss to
25    these dependent species *even with stipulated protection measures*." AR63569 (emphasis added). The
      final EA, without amendment, changed this second sentence to "[o]il and gas development without
26    proper engineering controls, BMPs, and mitigation could cause disproportionate and, in some cases,
      potentially irreversible habitat loss to these dependent species." AR05714.

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

implementation measures, potentially including relocation of operations more than 200 meters to protect water resources." AR05827. Yet there is no evidence in the record that the unspecified "special design, construction or implementation measures" would avoid significant impacts to water resources. Merely requiring that an oil well be constructed in a particular manner cannot, for instance, protect against the risk of spillage. AR00173 (the risks from spillage are "increased in the several parcels that contain springs/seeps, riparian areas, floodplains, and seasonally-flooded playas."); AR05701 (contaminants from spills "are easily . . . spread throughout the [aquatic] system."). BLM's assertion that water resources will be protected is therefore is arbitrary and capricious. *S. Fork Band Council of W. Shoshone*, 588 F.3d at 727 (finding EIS inadequate where success of mitigation measures "would depend on site-specific conditions" but EIS did not analyze whether harms could in fact be avoided by potential mitigation measures). Relocation of operations on a parcel also cannot avoid impacts when, as the EA describes, certain parcels are comprised entirely of wetlands. AR05699.

Further, the Water Resources Stipulation expressly provides that lease holders may evade whatever protections it provides. An exception to the stipulation "may [] be granted when [protected] areas cannot be avoided and when engineering, best management practices, and/or design considerations are implemented to mitigate impacts to water resources." AR05827, *see also* 05753-54 ("The stipulation allows for an exception 'when areas cannot be avoided . . . .'"). The record is clear that such exceptions are likely—even inevitable. Several of the lease parcels "largely or entirely overlay a combination of water bodies, wetlands, perennial or ephemeral streams, floodplains, and/or ephemerally-flooded playas, to the extent that it would be *difficult or impossible to avoid impacts* to these hydrological features and their associated plant communities and wildlife habitats." AR05699 (emphasis added). Because BLM cannot prohibit development or surface occupancy of a parcel once leased, (*see* AR05746 (Additional Resource Protection Alternative "would not prohibit exploration and development")), development will inevitably require an exception to the stipulation which will likely result, in BLM's own admission, to impact those

39

resources. That is, the most sensitive parcels will be excepted from the very stipulation BLM asserts will protect them.

In sum, when the stipulation is applied, BLM 1) would not be able to deny all surface occupancy; and 2) may except a water resource from the protection offered by the stipulation if the area cannot be avoided. In light of the limited nature of the stipulation, BLM's conclusion that it avoids all impacts violates NEPA and the APA, as it does not "articulate[] a rational connection between the facts found and the choice made." *Ocean Advocates*, 361 F.3d at 1118 (internal citations and quotations omitted).

Beyond the fact that the Water Resources Stipulation cannot protect water resources and avoid all significant impacts, BLM simply failed to attach the stipulation to a number of parcels it identifies as containing wetlands. Parcels 10, 19, 23, 26, 46, 47, 50, 52, 67, 71, 72, 92, 93, 94, 96, 97, 103, 106 contain wetlands, floodplain, and/or seasonally-flooded playas. AR05816-17. Parcels 24 and 25 contain floodplain and playa. AR05816-17. Parcel 95 contains playa. *Id.* Parcels 100, 103, and 105 contains wetlands and playa. *Id.* Yet without explanation, BLM did not apply the Water Resources Stipulation to any of these parcels. AR05827-30. This is so despite the fact that the wetlands on parcels 10 and 19 are so significant that the Nevada Natural Heritage Program classifies them as "major wetlands." AR05698. BLM's failure to attach the Water Resources Stipulation to parcels containing resources that the agency acknowledges will be impacted by oil and gas activities leaves the FONSI unsupported by the facts. BLM's conclusion, therefore, that the lease sale will have no significant impacts is arbitrary and capricious. *Ocean Advocates*, 361 F.3d at 1118 (an agency must articulate a connection between the facts and decision made).

BLM also left the September parcels' wetlands unprotected, though they, too, contain wetlands, floodplain and playa. AR05913 (September parcels "have geographic and resource conditions that are sufficiently similar" to parcel 106 in the June sale); 05817 (parcel 106 contains wetlands, floodplain and playa). BLM did not attach the Water Resources Stipulation to any of these parcels. In the absence of any stipulation that might protect against the significant impacts to water

40

1    resources identified in the EA, BLM cannot reasonably rely on its conclusion in the June documents

2    that there would be no significant impacts to these resources. AR05702.

3          Finally, the FONSI fails to account for impacts to water resources and the species that rely on

4    those resources outside lease parcel boundaries. Rare fish habitat is located near June parcels 55 and

5    66. AR05714. A subs-species of speckled dace that may be unique to the location is found within

6    400 meters of parcel 55. AR05712. The Fish Creek Springs tui chub, a BLM Sensitive and state-

7    protected species, is found in only one water body located only 700 meters from parcel 66. *Id.* It is

8    foreseeable that these species and their habitats may be impacted by contaminants that could spill

9    and spread throughout a water system (AR05701), interference with groundwater flow from drilling

10   (*id*), and/or underground contamination (AR05699-700) from activity on a lease parcel. It is

11   reasonably foreseeable that these species may be impacted by nearby oil and gas activities. *N.M. ex*

12   *rel. Richardson*, 565 F.3d at 718 (NEPA requires timely analysis of an action's "reasonably

13   foreseeable" impacts).

14         BLM asserts that it cannot attach stipulations to protect off-parcel resources. AR05714.

15   Given the EA's conclusions that off-parcel rare fish habitat cannot be not protected by the

16   stipulation, and that oil and gas activities may impact aquatic species, BLM's Finding of No

17   Significant Impacts is unsupported by the facts. *See Helena Hunter & Anglers v. Tidwell*, 841 F.

18   Supp. 2d 1129, 1136 (D. Mont. 2009) (agency's conclusion there would be no impacts was arbitrary

19   and capricious where EA described long-term impacts to wetlands, but failed to consider whether

20   development in proximity to wetlands would have an impact)*; S. Fork Band Council of W.*

21   *Shoshone*, 588 F.3d at 726 (off-site impacts must be evaluated under NEPA, even if the activity is

22   subject to additional permitting).

23         In reaching its conclusions, an agency must "articulate[] a rational connection between the

24   facts found and the choice made." *Ocean Advocates*, 361 F.3d at 1118 (citation omitted). No such

25   rational connection exists here. The limited nature of the Water Resources Stipulation, and BLM's

26   failure to impose the stipulation on multiple parcels containing wetlands—considered in light of the

41

1   EA's acknowledgement of the serious consequences of oil and gas development in riparian areas—is

2   inconsistent with the agency's conclusion that these lease sales have no significant

3   impacts. Therefore, BLM's conclusion that the wetlands impacts are not significant is arbitrary and

4   capricious.

5                    2.    The Mule Deer Timing Limitation Stipulation Will Not Eliminate Adverse

6                          Impacts to Big Game Habitat, Behavior, and Abundance

7          An agency may not assume mitigation measures will avoid impacts when it fails to consider

8   the site-specific factors affecting the potential efficacy of those measures. *See S. Fork Band Council*

9   *of W. Shoshone*, 588 F.3d at 727. But that is what BLM did here.

10         As previously discussed (*supra* text, Section IV. B.4), BLM's determination that impacts to

11  mule deer and pronghorn will not be significant is based on its unsupported and erroneous

12  assumption that its Mule Deer Seasonal Habitat Timing Limitation Stipulation (AR05792) will avoid

13  what BLM acknowledges are foreseeable adverse, population-level effects resulting from the loss of

14  crucial summer, winter, and movement habitats. AR05715. Further, Plaintiffs submitted to BLM

15  significant new, peer-reviewed scientific research conclusively demonstrating adverse effects on

16  mule deer viability from oil and gas infrastructure, even with application of mitigation measures far

17  more aggressive than this case's Timing Limitation Stipulations. *See, e.g.*, AR01294-95, 61002-10.

18  BLM's failure to consider this contradictory and authoritative evidence, or to provide any reasoned

19  basis for its conclusion that the Timing Limitation Stipulation will avoid all adverse effects to big

20  game species and habitat, is arbitrary and capricious. *Wetlands Action Network v. U.S. Army Corps*

21  *of Eng'rs.*, 222 F.3d 1105, 1114 (9th Cir. 2000) (agency decisions must be "founded on a reasoned

22  evaluation of the relevant factors.") (citation omitted); *Save the Yaak Comm. v. Block*, 840 F.2d 714,

23  717 (9th Cir. 1988) (agency's decision reasonable only if it is "fully informed and well-considered.")

24  (citation omitted).

25

26

42

**D.  BLM Violated NEPA by Failing to Prepare an Environmental Impact Statement**

Section 102(2)(C) of NEPA requires federal agencies to prepare an environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. The bar for when an EIS is required is low: if an "EA establishes that the agency's action *may* have a significant effect upon the . . . environment," an EIS must be prepared. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 730 (emphasis in original; citation omitted); *see also LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir. 1988) ("The plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS *must* be prepared.) (emphasis in original). If an agency decides not to prepare an EIS, it must "supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mountains*, 161 F.3d at 1211.

1.   The Presence of "Significance Factors" Requires the Preparation of an EIS

In determining whether or not a proposed action "significantly" impacts the environment, BLM must consider ten factors affecting the "intensity" of the impacts. 40 C.F.R. § 1508.27(b). The presence of any one of these factors may be sufficient to require an EIS. *Ocean Advocates*, 402 F.3d at 865; *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731. The June and September lease sales implicate several of these factors, thereby warranting preparation of an EIS: 1) unique characteristics of the geographic area such as proximity to … wetlands, … or ecologically critical areas; 2) the degree to which the effects on the quality of the human environment are likely to be highly controversial; and 3) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. 40 C.F.R. § 1508.27(b)(3), (4), (5).

a.     *The action affects wetlands and ecologically critical areas*

NEPA requires agencies to consider "unique characteristics of the geographic area such as proximity to . . . ecologically critical areas" when determining whether to prepare an EIS. 40 C.F.R. § 1508.27(b)(3). Here, "several parcels are largely or entirely composed of wetland-riparian areas

43

and playas that many wildlife species depend on" (AR05714), and many more contain wetlands. AR05816-17. At least 32 lease parcels are in the same valley as spring mounds, "extremely unusual and rare hydrological feature[s]." AR05698-99, 05701. These facts alone warrant preparation of an EIS.

BLM's EA and FONSI are no substitute for a full EIS. The EA fails to adequately assess the impact of this project—and particularly the activity of fracking—on wetlands. The EA's conclusion that "[t]he consequences of oil and gas exploration or development in wetlands and riparian areas are potentially severe, as these environments are extremely sensitive to any perturbation" (AR05701) is at odds with its finding that leasing the parcels will not result in any significant impacts. AR01531. BLM's EA fails to consider the impacts to wetlands on parcels without the Water Resources Stipulation, or the impacts to wetlands in proximity to leased parcels. AR05133. As a result, BLM's conclusion that an EIS is not necessary is arbitrary and capricious, and the agency must prepare such a document to adequately address these issues. *Helena Hunters & Anglers*, 841 F. Supp. 2d at 1136 (where defendant's conclusion that wetlands would not be significantly impacted was arbitrary and capricious, an EIS was required).

### b. The action is highly controversial

A proposal is highly controversial when "substantial questions are raised as to whether a project . . . may cause significant degradation" of a resource. *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997). An EIS may also be required when there is a "substantial dispute [about] the size, nature, or effect of the" action. *Blue Mountains*, 161 F.3d at 1212. A "substantial dispute exists when evidence, raised prior to the preparation of [a] . . . FONSI, casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736. When such a doubt is raised, "NEPA then places the burden on the agency to come forward with a 'well-reasoned explanation' demonstrating why those responses disputing the EA's conclusions 'do not . . . create a public controversy.'" *Id.*

1        Here, controversy is evident. BLM concluded that the Timing Limitation Stipulations—

2   provisions that "would not prohibit exploration and development but may… restrict[] the time of

3   year work may be conducted"—would avoid all significant impacts to mule deer from oil and gas

4   development. AR05746, 01533. Yet BLM had before it scientific studies demonstrating that the

5   presence of oil and gas infrastructure (which would be allowed under the stipulations) produces

6   significant, long-lasting effects on mule deer population and abundance, and can affect mule deer

7   use of migration corridors. AR01294-95, 61002-10, 60991-61001. When Plaintiffs raised BLM's

8   failure to take such studies into account, BLM's response was only the elliptical assertion that the

9   agency "considers long term impacts to all wildlife species, including Mule Deer . . . from oil and

10   gas exploration and development." AR25551.

11        Key agencies at both the state and federal levels raised substantial concerns about the impacts

12   of oil and gas activities on certain parcels. *See* AR06645 (NDOW letter requesting deferral of parcel

13   66 because drilling activity near a spring on private land "has the potential to disrupt source waters

14   resulting in adverse impacts to spring system function and related consequences to the Fish Creek

15   Springs Tui Chub."); AR18754 (NDOW email after release of EA reiterating recommendation that

16   parcel 106 be deferred "because of its proximity to Flowing Well #7 which supports the Railroad

17   Valley tui chub;"); AR19140 (U.S. Fish and Wildlife Service recommending deferral of parcel 66 to

18   protect Fish Creek Spring tui chub found on private land near parcel). NDOW was sufficiently

19   concerned about the impacts of fracking in the Lease Area that it requested that BLM prohibit the

20   practice on parcels containing spring sources "as any compromise of hydrologic function or fouling

21   of groundwater" could impact wildlife. AR06643. These concerns, and BLM's contradictory

22   responses (its failure to analyze the impacts of fracking on the Lease Area and to restrict fracking on

23   the lease parcels, and its finding that the lease sales would not result in any significant impacts)

24   demonstrates sufficient controversy to require preparation of an EIS. *See Found. for N. Am. Wild*

25   *Sheep v. USDA*, 681 F.2d 1172, 1182 (9th Cir. 1982) (comments from state wildlife agencies and

26   biologists expressing disagreement with EA's conclusions create "precisely the type of

Pfs.' Motion for Summary Judgment & MPA in Support Thereof

1    'controversial' action for which an EIS must be prepared"). At the very least, the agencies' concerns

2    raise substantial questions about the effect of the lease sales sufficient to necessitate an EIS. *Nw.*

3    *Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997); *see also see also*

4    *Blue Mountains*, 161 F.3d at 1212 ("It is enough for the plaintiff to raise 'substantial questions

5    whether the project may have a significant effect'" to trigger an EIS).

6                    *c.    The lease sale presents highly uncertain or unknown risks*

7               An EIS must also be prepared when an action's effects are "highly uncertain or involve

8    unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). Here, BLM admits that extreme oil and gas

9    extraction techniques like fracking may be used. AR05679 (Fracking "is one of these methods that

10   may be reasonably foreseeable for leases proposed for this sale."). BLM also admits that the risks of

11   fracking are unknown. AR05847 (risk that fracking might contaminate underground water sources is

12   unknown). NEPA clearly dictates that the way to address such uncertainties is by preparing an EIS.

13   The purpose of the EIS is to "obviate the need for speculation by insuring that available data are

14   gathered and analyzed prior to the implementation of the proposed action." *Nat'l Parks &*

15   *Conservation Ass'n*, 241 F.3d at 732 (citation omitted).

16              Further, because BLM's conclusion that there would be no significant impact to mule deer

17   ignores new scientific information on the impacts of oil and gas activities on these animals, its

18   overall conclusions are rendered uncertain. *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,

19   373 F. Supp. 2d 1069, 1081 (E.D. Cal. 2004) (reliance on incomplete and outdated information

20   renders agency's conclusions uncertain). Applying information and data about impacts to mule deer

21   in the Lease Area would assist evaluating the lease sales' environmental impacts; therefore an EIS

22   should be prepared. *Blue Mountains*, 161 F.3d at 1213-14; *see also Nat'l Parks & Conservation*

23   *Ass'n*, 241 F.3d at 739 (where information is obtainable and would be of assistance in evaluating the

24   environmental impacts of a proposed action, the agency must prepare an EIS).

25

26

2.   <u>An Environmental Impact Statement is Required Before an Agency Issues</u>
<u>Surface-Occupancy Oil and Gas Leases</u>

In any event, case law is clear that an EIS must be prepared before BLM issues oil and gas leases that allow surface occupancy of the land, as the June and September leases do. *Conner v. Burford*, 848 F.2d at 1451 ("unless surface-disturbing activities may be absolutely precluded, the government must complete an EIS" before leasing). The Ninth Circuit holds that an EIS must be prepared before any "irreversible and irretrievable commitment of resources." *Envtl. Def. Fund, Inc. v. Andrus*, 596 F.2d 848, 852 (9th Cir. 1979); *accord N.M. ex rel. Richardson*, 565 F.3d at 718. Because oil and gas leases confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold," (*N.M. ex rel. Richardson*, 565 F.3d at 718, citing 40 C.F.R. § 3101.1-2), "an EIS assessing the full environmental consequences of leasing must be prepared" if the federal agency will not "retain the authority to preclude all surface disturbing activities" subsequent to issuing the leases. *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983); *see also N.M. ex rel. Richardson*, 565 F.3d at 718 (asking first whether the lease constitutes an irretrievable commitment of resources, and concluding that an oil and gas lease without an No Surface Occupancy stipulation constitutes such a commitment); *Ctr. for Biological Diversity v. U.S. DOI*, 563 F.3d 466, 480 (D.C. Cir. 2009) (EIS must be prepared before surface-occupancy leases are issued); *Conner v. Burford*, 848 F.2d at 1451 (same). Preparation of an EA in such circumstances is insufficient to meet the agency's NEPA obligations. *See Conner v. Burford*, 848 F.2d at 1441.

BLM did not retain authority to preclude all surface disturbing activities on June and September parcels, as the leases are not conditioned by No Surface Occupancy stipulations. AR05702. The "[t]iming limitations and controlled surface" stipulations imposed on some of the lease parcels do "not prohibit exploration and development." AR05746. Accordingly, BLM was required to prepare full Environmental Impact Statements for the July and September sales. In failing to do so, the agency violated NEPA.

1

2

**E.  The September Sale's Determination of NEPA Adequacy Does Not Satisfy BLM's**
    **Obligations Under NEPA**

3    For the September 2017 lease sale, BLM abdicated its fundamental NEPA obligation. Instead

4 of issuing an EA or EIS analyzing the impacts of leasing 3,680 acres for oil and gas operations,

5 BLM instead relied on a Determination of NEPA Adequacy. AR05912-20. A Determination of

6 NEPA Adequacy is not a NEPA document. Unlike an EA or an EIS, it does not analyze impacts of a

7 project. Rather, it is "an administrative convenience created by the BLM, . . . not defined in

8 NEPA or its implementing regulations . . . ." *S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d

9 1253, 1255 (D. Utah 2006), *aff'd in part, appeal dismissed in part sub nom. S. Utah Wilderness*

10 *Alliance v. Kempthorne*, 525 F.3d 966 (10th Cir. 2008). The most a Determination of NEPA

11 Adequacy can do is confirm that an action is adequately analyzed in existing NEPA document(s) and

12 is in conformance with the applicable land use plan. *Friends of Animals v. Haugrud*, 236 F. Supp. 3d

13 131, 133 (D.D.C. 2017), (citing BLM Handbook, H-1790-1 § 5.1). BLM may issue a Determination

14 of NEPA Adequacy, rather than an EA or an EIS, when "after taking the requisite 'hard look' in a

15 reevaluation, [it] determines that the new impacts will not be significant (or not significantly

16 different from those already considered)." *N. Idaho Cmty. Action Network v. U.S. Dep't. of*

17 *Transp.,* 545 F.3d 1147, 1154-55 (9th Cir. 2008)

18    For the reasons described above, the EA fails to satisfy the requirements of NEPA. The two-

19 decade old Tonopah RMP (the RMP that applies to the September sale) and June 2017 lease sale EA

20 do not provide any meaningful analysis of the environmental impacts that could be expected from oil

21 and gas drilling in the Battle Mountain District broadly, and in Railroad Valley (where the

22 September parcels are located) in particular. *See supra*, IV.B.1. The EA and its associated RMP fail

23 to adequately analyze the impacts of fracking. *See supra*, IV.B.2. Accordingly, BLM's

24 Determination of NEPA Adequacy, which relied on the adequacy of the EA and its associated

25 documents, is arbitrary and capricious. *Ocean Advocates*, 361 F.3d at 1118 (action is arbitrary and

26

48

capricious if it fails to consider relevant factors, or articulate a rational connection between the facts and the agency's conclusion).

## V.      CONCLUSION

For the above-stated reasons, Plaintiffs' Motion for Summary Judgment should be granted, BLM's EA, FONSI, and Determination of NEPA Adequacy should be vacated and remanded to the agency, and all leases issued pursuant to the June 13, 2017 and September 12, 2017 lease sales should be voided.


DATED: June 22, 2018          Respectfully submitted,


/s/ Julie Cavanaugh-Bill
_____
JULIE CAVANAUGH-BILL (NV Bar No. 11533)
Cavanaugh-Bill Law Offices, LLC
401 Railroad Street, Suite 307
Elko, Nevada 89801
Tel: (775)753-4357
Email: Julie@cblawoffices.org



_____
CLARE LAKEWOOD (CA Bar No. 298479),
*pro hac vice*
MICHAEL SAUL (CO Bar No. 30143),
*pro hac vice*
VICTORIA BOGDAN TEJEDA (CA Bar No. 317132),
*pro hac vice*
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7121
Email: clakewood@biologicaldiversity.org

Attorneys for Plaintiffs Center for Biological Diversity and Sierra Club

1

2

**CERTIFICATE OF SERVICE**

3

I certify that on June 22, 2018, I filed the foregoing Notice of Motion, Motion and

4

Memorandum of Points and Authorities Thereof via the CM/ECF system which will provide

5

electronic service to all counsel of record.

6

7

DATED: June 22, 2018

8

9

10

11

12

_____

13

CLARE LAKEWOOD

14

Attorney for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

Pfs.' Motion for Summary Judgment & MPA in Support Thereof