JEFFREY H. WOOD
Acting Assistant Attorney General
LUTHER L. HAJEK, CO Bar No. 44303
JOHN S. MOST, VA Bar No. 27176
Trial Attorneys
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St., S. Terrace – Suite 370
Denver, CO 80202
Telephone: (303) 844-1376
Fax: (303) 844-1350
Email: luke.hajek@usdoj.gov

STEVEN W. MYHRE
Acting United States Attorney
District of Nevada
HOLLY A. VANCE
Assistant United States Attorney
100 W. Liberty Street, Ste. 600
Reno, NV 89501
Ph. 775-784-5438
Email: Holly.A.Vance@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) Case No: 3:17-cv-00553-LRH-WGC |
| Plaintiffs | ) ) **DEFENDANTS' MOTION FOR** |
| v. | ) **SUMMARY JUDGMENT AND** ) **MEMORANDUM IN SUPPORT OF** ) **MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES BUREAU OF LAND MANAGEMENT, et al, | ) **AND IN OPPOSITION TO PLAINTIFFS'** ) **MOTION FOR SUMMARY JUDGMENT** ) |
| Defendants. | ) ) |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 1

    I.    Legal Background ................................................................................ 1

        A.    National Environmental Policy Act ........................................ 1

        B.    Oil and Gas Leasing on Public Lands ..................................... 3

    II.    Factual Background ............................................................................ 5

STANDARD OF REVIEW ............................................................................. 10

ARGUMENT ................................................................................................... 11

    I.    BLM Took a Hard Look at the Environmental Impacts of the Lease Sales in Accordance with NEPA ............................................ 11

        A.    BLM Did Not Improperly Postpone Analysis of the Impacts of Development ............................................................ 11

        B.    BLM Took a Hard Look at the Impacts of Fracking ............. 14

        C.    BLM Did Not Rely on Stale Data in Approving the Lease Sales ............ 18

        D.    BLM Appropriately Assessed Mitigation Measures for Mule Deer and Pronghorn Antelope in Compliance With NEPA, and the Mitigation Measures Will Avoid Significant Impacts to Those Species ................................................................................... 20

    II.    BLM's Conclusion that Lease Stipulation Will Avoid Significant Impacts to Water Resources Was Neither Arbitrary Nor Capricious ..................................... 25

        A.    The Record Reflects a Thorough Consideration of Impacts and Protective Measures ................................................................. 26

        B.    Plaintiffs' Contention That the Stipulations Do Not Protect Wetlands Lacks Merit ............................................................. 30

    III.    BLM Was Not Required to Prepare an Environmental Impact Statement for the Lease Sales ................................................................................ 33

        A.    BLM Reasonably Concluded that the Significance Factors Did Not Mandate the Preparation of an Environmental Impact Statement ........... 33

i

B.   BLM Has Complied with Its Obligations Under NEPA Prior to Issuance of the Leases that May Result in Surface Disturbance ............. 36

IV.   BLM's Determination of NEPA Adequacy for the September Lease Sale Complied with NEPA ........................................................................ 36

V.   Even if the Court Finds that A NEPA Violation Occurred, It Should Not Vacate the Results of the Lease Sales ................................................. 38

CONCLUSION ................................................................................................. 40

ii

# TABLE OF CONTENTS

**CASES**

*Akiak Native Cmty. v. U.S. Postal Serv.*,
  213 F.3d 1140 (9th Cir. 2000) ................................................................. 28

*Alaska Envtl. Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ................................... 16, 17, 24, 26, 33, 47

*Amigos Bravos v. U.S. Bureau of Land Mgmt.*,
  Nos. 6:09-cv-00037-RB-LFG; 6:09-cv-00414-RB-LFG,  2011 WL 7701433 (D.N.M. Aug. 3, 2011) ................................................................................................. 6

*Anderson v. Evans*,
  371 F.3d 475 (9th Cir. 2004) ................................................................... 43

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ................................................................... 4

*Bay Neighborhood Council v. Karlen*,
  444 U.S. 223 (1980) .................................................................................. 2

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
  524 F.3d 938 (9th Cir. 2008) ................................................................... 28

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ........................................................... 23, 44

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012) ................................................................... 51

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ..................................................................... 4

*Center for Biological v. Bureau of Land Management*,
  937 F. Supp. 2d 1140 (N.D. Cal. 2013) ............................... 18, 20, 21, 24

*Checkosky v. SEC*,
  23 F.3d 452 (D.C. Cir. 1994) ................................................................... 51

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971) ................................................................................ 13

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ................................................................. 28

*Cold Mountain v. Garber*,
  375 F.3d 884 (9th Cir. 2004) ................................................................... 46

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,

iii

No. 08-CV-01624-WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012) ........................ 52

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
    819 F. Supp. 2d 1193 (D. Colo. 2011) ........................................................................ 52

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ............................................................ 14, 15, 16, 52

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
    451 F.3d 1005 (9th Cir. 2006) ........................................................ 29, 30, 31, 34

*Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
    681 F.2d 1172 (9th Cir. 1982) ........................................................................ 46

*Friends of Animals v. Haugrud*,
    236 F. Supp. 3d 131 (D.D.C. 2017) ................................................................ 49

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
    No. 3:15-CV-0057-LRH-WGC, 2015 WL 555980 (D. Nev. Feb. 11, 2015) .................... 49, 50

*Greenpeace Action v. Franklin*,
    14 F.3d 1324 (9th Cir. 1993) ................................................................ 29, 45

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ........................................................................ 51

*In re Solerwitz*,
    848 F.2d 1573 (Fed. Cir. 1988) ................................................................ 48

*Kern v. U.S. Bureau of Land Management*,
    284 F.3d 1062 (9th Cir. 2002) ........................................................................ 22

*Klamath-Siskiyou Wildlands Center*,
    387 F.3d 989 (9th Cir. 2004) ........................................................................ 23

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ........................................................................................ 4

*Land Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ........................................................................ 26

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................................ 13

*McFarlane v. Kempthorne*,
    545 F.3d 1106 (9th Cir. 2008) ........................................................................ 13

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
    177 F.3d 800 (9th Cir. 1999) ........................................................ 23, 33, 34

*Nat'l Parks and Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ........................................................ 29, 45, 46

iv

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
    565 F.3d 683 (10th Cir. 2009) ............................................................ 14, 17, 33, 48

*Northern Cheyenne Tribe v. Norton*,
    503 F.3d 836 (9th Cir. 2007) ............................................................ 52

*Northern Plains Resource Council v. Surface Transportation Board*,
    668 F.3d 1067 (9th Cir. 2011) ............................................................ 26

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ............................................................ 12

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ............................................................ 13

*Occidental Eng'g Co. v. Immigration and Naturalization Serv.*,
    753 F.2d 766 (9th Cir.1985) ............................................................ 14

*Ocean Advocates v. U.S. Army Corps of Engineers*,
    402 F.3d 846 (9th Cir. 2005) ............................................................ 27

*ONRC Action v. Bureau of Land Mgmt.*,
    150 F.3d 1132 (9th Cir. 1998) ............................................................ 12

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
    377 F.3d 1147 (10th Cir. 2004) ............................................................ 5

*River Runners for Wilderness v. Martin*,
    593 F.3d 1064 (9th Cir. 2010) ............................................................ 13

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)............................................................ 2, 28, 31

*Save the Yaak Committee v. Block*,
    840 F.2d 714 (9th Cir. 1988) ............................................................ 36, 37, 38, 39, 40, 42

*South Fork Band Council of Western Shoshone of Nevada v. Dep't of the Interior (South Fork Band)*,
    588 F.3d 718 (9th Cir. 2009) ............................................................ 42, 43

*Swanson v. U.S. Forest Serv.*,
    87 F.3d 339 (9th Cir. 1996) ............................................................ 4

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*,
    608 F.3d 592 (9th Cir. 2010) ............................................................ 16, 25, 34

*Village of Los Ranchos v. Marsh*,
    956 F.2d 970 (10th Cir. 1992) ............................................................ 47

*W. Watersheds Project v. U.S. Bureau of Land Mgmt.*,
    774 F. Supp. 2d 1089 (D. Nev. 2011)............................................................ 25

*Wetlands Action Network v. U.S. Army Corps of Eng'rs,*
   222 F.3d 1105 (9th Cir. 2000) ............................................ 28, 29, 34, 44

*Wilderness Ass'n v. Fry,*
   408 F. Supp. 2d 1032 (D. Mont. 2006) ...................................... 52

**STATUTES**

*Administrative Procedure Act,*
   5 U.S.C. §§ 701-706 ...................................................... 12

*Mineral Leasing Act,*
   30 U.S.C. §§ 181–287 ................................................... 4-7

*Natural Environmental Policy Act*
   42 U.S.C. §§ 4321-4370h ................................................ 1-2

**RULES**

Fed. R. Civ. P. 56(a) ...................................................... 10

**REGULATIONS**

Council on Environmental Quality, Regulation for Implementation of of the National Environmental Policy Act,
   40 C.F.R. pts 1501.3 - 1508.28 ....................... 2, 3, 4, 6, 12, 16, 21, 33-35, 37

Bureau of Land Management, Department of Interior, Planning, Programming, and Budgeting,
   43 C.F.R. pts. 1601.0-5 - 1610 ......................................... 3, 4

Bureau of Land Management, Department of Interior, Minerals Management, Oil and Gas Leasing,
   43 C.F.R. pts. 3100.0-3 - 3162 ............................... 3, 4, 12, 23, 40

**OTHER AUTHORITIES**

Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews. U.S. Department of Interior, Bureau of Land Management, (last checked August 21, 2018). IM 2018-034 https://www.blm.gov/policy/im-2018-034

Nevada Oil and Gas Lease Sales, U.S. Department of Interior, Bureau of Land Management, (last checked August 21, 2018). https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/nevada.

Nevada State Office, U.S. Department of Interior, Bureau of Land Management, (last checked August 21, 2018), https://www.blm.gov/office/battle-mountain-district-office.

## INTRODUCTION

The United States Bureau of Land Management ("BLM"); Ryan Zinke, in his official capacity as Secretary of the Interior; and Brian Steed, exercising the authority of the Director of the BLM, (collectively "Federal Defendants"), hereby move for summary judgment and oppose Plaintiffs' Motion for Summary Judgment ("Pls. Mem.") (ECF No. 45). The Plaintiffs have failed to meet their burden of demonstrating that BLM violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, in authorizing the June 2017 and September 2017 Nevada oil and gas lease sales.

To support the June lease sale, BLM prepared a thorough and detailed environmental assessment analyzing the environmental impacts associated with the oil and gas development that would occur on leased parcels. BLM considered the impacts to wildlife, water resources, and other resources that could result from the activities associated with oil and gas development and reasonably analyzed those impacts. In response to comments received on its draft environmental assessment, BLM added additional protective measures in a revised environmental assessment, which were incorporated into BLM's decision approving the lease sale. BLM reasonably concluded that the additional protections established in the revised environmental assessment would avoid significant impacts to the environment due to the oil and gas leases. For the September lease sale, BLM relied on its prior analysis prepared for the June lease sale, and reasonably concluded that the impacts of oil and gas development from the three parcels offered in the sale would not have significant environmental impacts.

In sum, BLM has reasonably analyzed the environmental impacts of leasing the parcels at issue in the June and September 2017 lease sales, in accordance with NEPA, and therefore summary judgment should be granted to Defendants.

## BACKGROUND

### I.   Legal Background

#### A.   National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is

1

made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA is procedural in nature. "[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.* at 350 (citing *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227 (1980)). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson*, 490 U.S. at 351.

To meet these dual purposes, NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3. The Council on Environmental Quality's ("CEQ") regulations implementing NEPA provide guidance as to the nature and content of an EIS. *See* 40 C.F.R. § 1502. Those regulations direct the preparer to include an analysis of alternatives to the proposed action in an EIS, *see id.* § 1502.14, and further instruct that the document should include discussions of direct, indirect, and cumulative impacts, *id.* §§ 1502.16 (a)-(b), 1508.7, 1508.8, 1508.25(c), as well as means to mitigate adverse environmental impacts from the proposed action. *Id.* § 1502.16(h). Not every federal action or proposal, however, requires an EIS. CEQ's regulations provide that an agency may prepare an environmental assessment ("EA") to determine whether the impacts of an action will be significant, and if not, the agency may prepare a finding of no significant impact ("FONSI"). *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13.

For large or complex plans and programs, CEQ's regulations allow an agency to analyze environmental impacts in phases through a tiered NEPA process. *See* 40 C.F.R. § 1502.20. An agency may tier its analysis to a prior NEPA analysis, meaning that the prior analysis is incorporated by reference. 40 C.F.R. § 1508.28. Tiering is appropriate when an agency first develops a general plan or program and then plans a site-specific project to implement that plan. 40 C.F.R. § 1508.28(a). "Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for

2

1    decision at each level of environmental review . . . ." *Id.* § 1502.20.  Tiering is appropriate either

2    in situations where an agency is developing a general plan or program to be followed by site-

3    specific projects implementing the plan or where an agency is evaluating the impacts of a

4    specific project at various stages of the project's development.  40 C.F.R. § 1508.28(a)-(b).

5           In reviewing the sufficiency of an agency's NEPA analysis, a court should evaluate

6    whether the agency has presented a "'reasonably thorough discussion of the significant aspects

7    of the probable environmental consequences.'"  *California v. Block*, 690 F.2d 753, 761 (9th Cir.

8    1982) (citation omitted).  "The reviewing court may not 'fly speck' an EIS and hold it

9    insufficient on the basis of inconsequential, technical deficiencies." *Ass'n of Pub. Agency*

10   *Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997) (citation

11   omitted); *see also Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996).  A reviewing

12   court is not to "substitute its judgment for that of the agency."  *Block*, 690 F.2d at 761.  Rather,

13   "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental

14   consequences, the review is at an end."  *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21

15   (1976)).

16          **B.      Oil and Gas Leasing on Public Lands**

17          The Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181–287, authorizes the Secretary of

18   the Interior to offer certain federal minerals for lease, including oil and gas.  The Secretary has

19   delegated this authority to BLM for onshore minerals.  *See* 43 C.F.R. § 3100.0-3.  To implement

20   the MLA, BLM promulgated regulations that govern leasing and development of federal onshore

21   oil and gas on public lands and federal mineral estates.  *See* 43 C.F.R. Parts 3100-3180.

22          BLM employs a three-stage decision-making process for managing public lands for oil

23   and gas leasing and development.  *See Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d

24   1147, 1151–52 (10th Cir. 2004).  First, BLM broadly assesses the presence of minerals and other

25   resources on public lands through land-use planning, which includes determining areas open to

26   and closed to potential oil and gas development and determining, for open areas, what

27   conservation stipulations should apply to future leases.  43 C.F.R. § 1601.0-5(n).  The resource

28   management plans ("RMPs") that result from this process guide future decision making but do

3

not authorize specific projects, unless expressly stated.  *See* 43 C.F.R. § 1601.0-5(n).  The RMPs developed by BLM are supported by EISs prepared in accord with NEPA.  The EISs provide an analysis of the potential environmental impacts of oil and gas leasing and development and other resource impacts, 43 C.F.R. § 1601.0-6, based on reasonably foreseeable development scenarios.  Once BLM issues an RMP, subsequent, more specific decisions implementing specific projects must conform to the plan.  43 C.F.R. § 1610.6-3(a).

In the second stage of resource development, BLM State Offices perform NEPA and other analyses and hold competitive oil and gas lease sales.  30 U.S.C. § 226(b)(1)(A); *see* 43 C.F.R. Subpart 3120; 43 C.F.R. § 3120.1-2(a).  Typically, for each oil and gas lease sale, BLM prepares an EA which "tiers" to the EIS prepared at the RMP stage.  *See* 40 C.F.R. § 1508.28 (NEPA regulations on tiering).  Lands that may be offered for leasing include: lands formerly subject to oil and gas leases that have terminated, expired, been canceled or relinquished; lands selected by the authorized officer; lands where federal mineral resources are being drained by the development of connected non-federal resources; and lands identified in "expressions of interest" from the public. 43 C.F.R. § 3120.1-1(a)-(f).  Once BLM identifies parcels to be offered and completes required analysis, it holds a competitive lease sale, where the parcels are auctioned and sold to the highest qualified bidder.  *Id.* §§ 3120.5-1, 3120.5-3.  Forty-five days in advance of sales, BLM state offices post notices on agency webpages, and in the responsible district or field offices, which include lists of offered parcels and their stipulations.  *See* 43 C.F.R. § 3120.4-2.  Any interested party may protest the offering of a parcel for sale within ten days of posting of the notice.  *See* IM 2018-034 (available at https://www.blm.gov/policy/im-2018-034 (last checked August 21, 2018).

The third stage of resource development occurs following lease issuance, when BLM determines whether, and under what conditions, it will approve specific development proposals. 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1 (2017).  Before an oil and gas operator may undertake any drilling or surface disturbance, it must submit an application for a permit to drill ("APD"), at which point BLM completes additional environmental review to ensure NEPA compliance and imposes any necessary conditions on its approval.  *See* 43 C.F.R. § 3162.3-1; *see also Amigos*

1    *Bravos v. U.S. Bureau of Land Mgmt.*, Nos. 6:09-cv-00037-RB-LFG; 6:09-cv-00414-RB-LFG,

2    2011 WL 7701433 *5 (D.N.M. Aug. 3, 2011) (discussing the leasing and development process

3    and noting BLM's authority to "impose any necessary conditions of approval" at the APD stage).

4    **II.    Factual Background**

5          On June 13 and 14, 2017, and September 12, 2017, BLM held quarterly oil and gas lease

6    sales pursuant to the MLA, 30 U.S.C. § 226(b)(1)(A), for 106 parcels of land (195,600 acres),

7    and three parcels of land (3,680 acres), respectively, within the Battle Mountain District, Nevada.

8    AR 1395, 1312, 5887.  In the June sale, BLM sold three parcels competitively (parcels 35, 36,

9    and 106), and four more parcels the next day, non-competitively (parcels 33, 34, 38, and 41).

10    AR 1402.[1]  Parcels not sold for lease remain available for sale non-competitively for up to two

11    years beginning the day after the sale.  AR 1401.[2]  All three of the parcels offered in September

12    were competitively sold.  AR 5894.  The Center for Biological Diversity and the Sierra Club

13    protested both lease sales.  AR 1268 (May 25, 2017), AR 5986 (July 24, 2017). BLM dismissed

14    the protests by decisions in June and September, 2017. AR 25543 (June 12, 2017), AR 6059

15    (September 13, 2017).

16          BLM's NEPA analysis for the June 2017 sale, on which the agency also relied for its

17    September 2017 sale, commenced formally in November 2016, when resource specialists

18    undertook field visits, as part of a NEPA scoping effort, and began coordination with nearby

19    Native American tribes and the Nevada Department of Wildlife ("NDOW").  AR 5670.  On

20    January 5, 2017, BLM published a Preliminary Environmental Assessment, referred to here and

21    in BLM's decision document, AR 5649, as the "draft EA."  AR 63513.  The draft EA included

22    an alternatives analysis that identified three possible actions: the proposed action (*i.e.*, leasing of

23    all 106 proposed parcels), the required "no action" alternative, and a Partial Deferral alternative,

24    intended to protect resources not protected by existing stipulations and restrictions in the

25

---

26    [1] The results of the lease sales are available at: https://www.blm.gov/programs/energy-and-

27    minerals/oil-and-gas/leasing/regional-lease-sales/nevada.

28    [2] Although the information is not available from BLM's website, BLM has leased an additional
28 parcels non-competitively since the June 2017 lease sale.

1   governing RMPs.  AR 63531-52.  BLM made the draft EA available for a 30-day comment

2   period beginning on January 5, 2017.  AR 5671.

3          On April 25, 2018, BLM published the final EA, referred to simply as "the EA."  *See* AR

4   5649, 5651-5886.  The EA included the proposed action, the "no action" alternative, a Partial

5   Deferral alternative, and a new Additional Resource Protection ("Resource Protection")

6   alternative.  AR 5674-75.  The Partial Deferral alternative was identical to the proposed action

7   "except that parcels or parts of parcels would be proposed for deferral [from leasing,] pending

8   develop[ment of] stipulations for an updated RMP that would address resources that are not

9   adequately protected under either or both of the [currently] governing RMPs, or otherwise

10  resolving the concerns."  AR 5674.[3]  Under the new Resource Protection alternative, BLM

11  would apply new stipulations and lease notices for protection of wildlife habitat, water resources,

12  and areas with steep slopes to the parcels that would be deferred from leasing under the Partial

13  Deferral alternative.  AR 5659, 5671, 5675.  The EA noted that the Resource Protection

14  alternative benefitted more acreage than the Partial Deferral alternative.  AR 5702.

15         Within the context of these alternatives, the EA analyzes the effects of the lease sale,

16  including, to the extent feasible at the lease stage, possible future exploration and development

17  activities, as well as the cumulative effects of the lease sale when added to all past, present, and

18  reasonably foreseeable future actions within potentially affected area.  AR 1532, 5682, 5755.

19  The EA reflects the agency's consideration of historical data, as well as the knowledge and

20  expertise of BLM resource specialists, which is based in part on field inspections and review of

21  databases and file information. AR 5659.  The Resource Protection alternative includes

22  stipulations for pronghorn antelope seasonal habitat, a timing limitation for mule deer seasonal

23  habitat, a lease notice for mule deer migration corridors, a new stipulation for slopes greater than

24  30% stipulation, and a new water resources stipulation, among other things.  AR 5671, 5674

25  (describing the alternatives BLM considered and their stipulations), 5791 (Appendix B:

26  ─────────────────

27  [3] Stipulations and lease notices inform prospective lessees of important resources associated with

28  particular parcels, identify protective measures, and ensure that necessary protective measures
    are applied when development activity is proposed.  AR 1531-32 (FONSI).

Stipulations and Lease Notices, applicable to specific parcels under all three action alternatives), 5808 (Appendix C: Stipulations, Timing Limitations, and Lease Notices for the Partial Deferral alternative and the Resource Protection alternative).

All offered parcels, including the parcels sold at or following the June sale and those sold at the September sale, are subject to lease notices for threatened and endangered, sensitive, and special status species that allow BLM to disapprove activity on a lease if it is likely to result in jeopardy to a listed species or to adversely modify designated or proposed critical habitat.  AR 5794.  In addition, the notices provide that BLM will not approve ground-disturbing activity that may affect listed species until Endangered Species Act ("ESA") obligations are met.  *Id.*  For species not listed under the ESA, the lease notices provide protection by allowing modification during the development stage, when lessees submit APDs, to prevent the need to list a species.  *Id.*  The parcels also include lease notices for Migratory Birds, Cultural Resources and Tribal Consultation, Mining Claims, and Fire.  AR 5794, 5795, 5799, 5800.  The EA also included stipulations to protect Greater Sage-Grouse and its habitat.  AR 5801-5807.

In addition to affording considerable wildlife protections, the Resource Protection alternative was also designed to conserve important water resources and it sought to avoid degradation of steep slopes through a variety of protective measures.  It did so through two new controlled surface use stipulations.  AR 5819-5833.  The first of these, the new water resources stipulation, was developed to prevent or limit adverse impacts to important water resources, such as rivers, streams, flood plains, playas, wetlands, springs, and seeps and to maintain proper functioning of these water resources, chiefly by establishing protective buffers around important water resources.   AR 5827.  The second stipulation included provided various protections for slopes greater than 30%, intended to maintain soil stability and prevent erosion or slope failure, and to promote successful site reclamation.  AR 5832.

For all of the action alternatives analyzed in the June 2017 lease sale, BLM's Reasonably Foreseeable Development ("RFD") scenario[4] estimated that potential exploration and production on leases within the Battle Mountain District as a whole[5]—not just the lease parcels proposed in the June 2017 sale—would involve the development of 25 oil and gas wells and the disturbance of, at most, 65-100 acres of public land.  AR 5677-5678.

The EA also analyzed the effects of hydraulic fracturing.  AR 5679, 5700, *see also* AR 5841 (App. E).  Used in the United States since the 1940s, hydraulic fracturing "cracks" existing formations and allows hydrocarbons to flow more readily, making unconventional oil production more attractive economically.  AR 5679, 5841.  In its discussion of anticipated activities, BLM explained the predictable sequence of events for each phase of typical oil and gas development. AR 5678.  The agency noted that, during development of a lease, one of the anticipated effects of hydraulic fracturing is the use of surface or groundwater during operations (AR 5679, 5699-5702, 5752, *and see* AR 5841, App. E).  The EA noted that negative effects to groundwater from use of improper, unsuitable, or inadequate well construction materials and practices could occur. AR 5700; see AR 5679 (mitigation for hydraulic fracturing), and AR 5846.  In addition the EA noted that use of fracturing for enhancing oil recovery may also result in geologic hazards such as earthquakes (AR 5743, 5850), and spills, including discharge to navigable waters (AR 5850-5851).  A lessee or operator that seeks to develop and operate a well during the APD stage is subject to various controls by the BLM (AR 5699-5700, 5841, 5851, 13955 (Onshore Order 1, 72 Fed. Reg. 10,308 (Mar. 7, 2007)), 13970 (Onshore Order 2, 53 Fed. Reg. 46,798 (Nov. 18, 1988)), and 14090 (Onshore Order 7, 58 Fed. Reg. 47,354 (Sept. 8, 1993)) and the State of Nevada (AR 5680, 5699, 5700 (by BLM regulation--Onshore Order #1--all lessees and operators must comply with applicable state laws on federal leases), and 5852).

---

[4] An RFD scenario is a projection of future potential oil and gas activities and surface disturbance based on actual past activities, estimated over the next 10 years.  AR 5676, 5680.

[5] The Battle Mountain District of BLM Nevada is comprised of approximately 10.5 million acres of public land. *See* https://www.blm.gov/office/battle-mountain-district-office (last visited on August 22, 2018).

8

1          Wells that are hydraulically fractured are closely monitored from construction of the well

2   casing, to flowback of the water and proppant mix, to the capture of gas emissions, if any, and

3   disposal of wastewater from the hydraulic fracturing process itself.  AR 5841-42.  While

4   groundwater withdrawals in Nevada are largely for agricultural use (77%), six to seven percent

5   of all statewide water withdrawal is used for mining, including oil and gas extraction.  AR 5843.

6   And, while water demand for domestic use, wildlife, and recreation is increasing in the state (AR

7   5844), the EA explains that increased statewide demand—particularly municipal and industrial

8   demand—will be met by increased conservation, use of alternative sources (such as reused  or

9   reclaimed water, or greywater), purchases, leases or other water transfers, or by new

10  groundwater appropriations.  *Id.*

11         On June 6, 2017, BLM issued a FONSI, in which it found that the June 2017 sale would

12  not significantly affect the quality of the human environment and therefore an EIS was not

13  required.  AR 1531.  The agency concluded that the selected action (*i.e.*, the Resource Protection

14  alternative) was consistent with the governing RMPs and included appropriate protective

15  measures to avoid and minimize environmental impacts.  AR 1531-32.  As the decision record

16  for the June 2017 lease sale noted, BLM found that the  selected action would not result in

17  unnecessary or undue degradation of the public lands and that the requirements of applicable

18  laws and administrative policies had been met.  AR 5648-5649. While a lease holder is permitted

19  to use as much of the leased land as necessary to explore for oil and gas within lease boundaries,

20  BLM's decision explains that any future development activity would be subject to stipulations

21  and BLM's approval of surface disturbing activities after additional environmental review.  *Id.*

22         In support of the September 2017 lease sale, BLM prepared a Determination of NEPA

23  Adequacy ("DNA"), which recognized that the three offered parcels were included in an area

24  designated as open to oil and gas development and noted that one of the parcels was located

25  adjacent to parcel 106, offered and sold in the June 2017 lease sale, and that the other two parcels

26  were located nearby. AR 5913.  Based on its determination that the three parcels have

27  geographic and resource conditions similar to parcel 106, a conclusion based on field visits to the

28  parcels, AR 5921, and that the three parcels would therefore be subject to the same stipulations

and lease notices as parcel 106, BLM determined, consistent with agency policy regarding the use of DNAs, that the environmental review in the June 2017 EA was sufficient to support the September 2017 lease sale. *Id.*  Like the June parcels, all three parcels were offered with lease notices for Endangered Species, Migratory Birds, Cultural Resources, Mining Claims, and Fire. AR 5917-5919.  BLM posted the DNA on its website for a two-week public comment period in June 2017, but no comments were received. AR 5923.

### STANDARD OF REVIEW

The Court's review of the Plaintiff's NEPA, FLPMA, and NHPA claims is governed by the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *See ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998).  Under the APA, agency decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under this standard is "'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'"  *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  An agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarlane v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citation and quotation marks omitted); *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (explaining that the role of the reviewing court is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").  The APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

10

1    Summary judgment is appropriate if there are no genuine issues of material fact and the

2    moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In APA actions,

3    however, the Court's review is based on the agency's administrative record.  *See Lujan v. Nat'l*

4    *Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990).  Thus, the Court's role is not to resolve factual

5    issues, but rather to determine whether the agency's record supports the agency's decision as a

6    matter of law under the APA's arbitrary and capricious standard of review.  *See Nw. Motorcycle*

7    *Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review

8    of a final agency determination under the [APA]; therefore, resolution of this matter does not

9    require fact finding on behalf of this court.  Rather, the court's review is limited to the

10   administrative record."); *see also Occidental Eng'g Co. v. Immigration and Naturalization Serv.*,

11   753 F.2d 766, 769 (9th Cir.1985) (In an APA case, "the function of the district court is to

12   determine whether or not as a matter of law the evidence in the administrative record permitted

13   the agency to make the decision that it did.").

14                                          **ARGUMENT**

15   **I.    BLM Took a Hard Look at the Environmental Impacts of the Lease Sales in**
     **       Accordance with NEPA**

16

17         **A.    BLM Did Not Improperly Postpone Analysis of the Impacts of Development**

18         Contrary to Plaintiffs' assertions, BLM did not ignore the potential impacts of

19   development, and it analyzed such impacts in an appropriate level of detail at the lease stage.

20   Plaintiffs' arguments simply misstate the EA and the relevant law.

21         Plaintiffs argue that BLM failed to analyze the impacts of development in violation of the

22   requirement to analyze environmental impacts when the agency makes an "irretrievable

23   commitment of resources" towards permitting development activities to occur.  *See* Pls. Mem. at

24   26 (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 717-18

25   (10th Cir. 2009)); *see also Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988).  As Plaintiffs

26   point out, BLM may not avoid a NEPA analysis at the leasing stage leases that may involve

27   surface occupancy.  *See Conner*, 848 F.2d at 1451.  Plaintiffs assert that BLM "refus[ed] to

28

                                                11

analyze impacts at the leasing stage," Pls. Mem. at 26, but their arguments simply

mischaracterizes the EA.

To support their misguided argument that BLM has avoided analyzing the impacts of oil

and gas development at the lease stage, Plaintiffs omit the relevant language from the EA.  Stated

without omissions, the paragraph of the EA quoted in their brief states:

> An EA must analyze and describe the direct effects and indirect effects of the
> proposed action and alternatives on the quality of the human environment.  Direct
> effects "are caused by the action and occur at the same time and place," while
> indirect effects "are caused by the action and are later in time or farther removed
> in distance, but are still reasonably foreseeable" (40 CFR 1508.8).  There would
> be no direct impacts from issuing new oil and gas leases because leasing does not
> directly authorize ground disturbing activities.  *However, if a lease is sold, the*
> *lessee retains certain irrevocable rights.*  For example, according to 43 CFR §
> 3101.1-2, once a lease is issued to its owner, that owner has the "right to use as
> much of the lease lands as is necessary to explore for, drill for, mine, extract,
> remove and dispose of the leased resource in the leasehold" subject to specific
> nondiscretionary statutes and lease stipulations.  Thus, a lease sale makes the
> offered parcels available to indirect effects (occurring at a later time).  This
> chapter addresses those indirect effects.  If an APD is received for a leased parcel,
> additional site-specific, project specific NEPA analysis would address direct and
> indirect effects of any action and alternatives proposed at that time.

AR 5682 (emphasis added).  Accordingly, Plaintiffs are simply incorrect that BLM has

misconstrued its obligation to conduct a NEPA analysis at the lease stage.

The additional examples from the EA that Plaintiffs point to likewise cherry-pick

statements relating to the impacts of issuing a lease (which has no environmental effects of its

own), while ignoring associated statements regarding the impacts of later development of the

leases.  Plaintiffs argue, for example, that the EA says the lease sale itself will have no direct

impacts on water resources.  Pls. Mem. at 26 (citing AR 5699)  But they omit statements on the

same page regarding the indirect effects of issuing the leases, which include the impacts of

development of the leases.  *See*, *e.g.*, AR 5699 ("Subsequent development of a lease may result

in long and short term alterations to the hydrologic regime depending upon the location and

intensity of development.").  For the analyses of other resources, they likewise ignore the EA's

analysis of the impacts of development.  *See* AR 5709-10 (analyzing the impacts of oil and gas

development on vegetation); AR 5686-92 (analyzing the impact of oil and gas development on

12

1   climate change); AR 5713-17 (analyzing the impacts of oil and gas development on wildlife);

2   AR 5743-46 (analyzing the impacts of oil and gas development on geology and minerals).

3   Accordingly, Plaintiffs' argument is factually incorrect and therefore must be rejected.

4          Moreover, BLM has analyzed the impacts of oil and gas development to an appropriate

5   degree at the leasing stage.  Plaintiffs are correct that the BLM cannot avoid analyzing the

6   impacts of development at the leasing stage.  *See* Pls. Mem. at 27-28 (citing *Conner*, 848 F.2d at

7   1450-51).  But that does not mean that BLM was required by NEPA to analyze in detail the

8   impacts of developing particular sites, because the details of which sites will be developed are

9   not known at the leasing stage.  At the time of a leasing decision, BLM does not know which

10  sites will be developed and it has no development plans before it, and therefore it is appropriate

11  for BLM to leave the analysis of specific development plans to a later stage.  *See N. Alaska*

12  *Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006) (BLM was not required to conduct

13  a "parcel by parcel examination of potential environmental effect" to support a decision to offer

14  a large area for oil and gas leasing); *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the*

15  *Interior*, 608 F.3d 592, 600 (9th Cir. 2010) ("BLM, in some cases, may adapt its assessment of

16  environmental impacts when the specific locations of an exploration project's activities cannot

17  reasonably be ascertained until some time after the project is approved.").

18         Indeed, in *Northern Alaska*, the Ninth Circuit clarified its prior ruling in *Conner* and

19  addressed the very point that Plaintiffs are arguing here.  *Northern Alaska* involved BLM's

20  decision to offer a large are in northern Alaska—the Northwest Planning Area—for oil and gas

21  leasing.  457 F.3d at 973.  Relying on *Conner*, the Plaintiffs argued that BLM was required to

22  analyze the impacts of developing particular parcels before approving the area for leasing.  *Id.* at

23  976.  The Ninth Circuit explained, however, that on the issue of whether the analysis of

24  particular parcels is required by NEPA, "*Conner* is of no assistance to plaintiffs, for we did not

25  discuss the degree of site specificity required in the EIS."  *Id.*  The court went onto explain that

26  "NEPA applies at all stages of the process" and "[a]ny later plan for actual exploration will be

27  subject to a period of review before being accepted, rejected or modified by the Secretary."  *Id.*

28  at 977.  Therefore, the court concluded that at the time the decision was made to lease the area,

1  "the government was not required to do a parcel by parcel examination of potential

2  environmental effects."  *Id.*  Further, "[s]uch analysis must be made at later permitting stages

3  when the sites, and hence more site specific effects, are identifiable."  The Tenth Circuit is in

4  accord.  *See Richardson*, 565 F.3d at 718.  Thus, BLM was permitted by NEPA to defer the

5  analysis of specific parcels until later stages of development.[6]

6      Accordingly, Plaintiffs are simply incorrect that BLM refused to analyze the impacts of

7  oil and gas development, and BLM's analysis was sufficient to comply with NEPA.

8      **B.    BLM Took a Hard Look at the Impacts of Fracking**

9      BLM took a hard look at the impacts of fracking, and its analysis of the potential

10  environmental impacts of using such drilling techniques in the development of leases was

11  sufficient at the lease sale stage.

12      In the EA, BLM explains that hydraulic fracturing or "fracking" is a common technique

13  used by the oil and gas industry to extract oil and natural gas.  AR 5679.  The process involves

14  using pressurized fluid to open factures in the oil- or gas-bearing formations.  *Id.*  A "proppant"

15  (usually sand) is used to keep fractures open and enhance the flow of oil and gas from the

16  formation to the wellbore.  *Id.*  It is a process that was developed in the 1940s and has been in

17  use since the 1950s.  Modern, multi-stage fracking uses a considerable amount of water.  The EA

18  estimates that 800,000 to 10,000,000 gallons of water can be used during the fracking process.

19  *Id.*  The EA states that for four wells developed in Nevada using fracking techniques, up to

20  350,000 gallons of water were consumed per well.  *Id.*  In order to mitigate the environmental

21  impacts of fracking, a number of techniques may be used.  These include proper cementing of

22  the annulus (space between the well casing and the wall of the well bore) to prevent fluid from

23  leaking, containing fracking fluids in tanks or lined pits, and disposing of fracking fluids through

24  underground injection, treatment and reuse, or other methods.  *Id.*  The EA also explains that the

25

26

27

28

[6] *Center for Biological Diversity v. Bureau of Land Management*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013) is distinguishable because, in that case, BLM did not sufficiently analyze the impacts of fracking at the lease stage, not because site-specific analysis was required.  *See id.* at 1157-58. The case is discussed in section I.B, *infra*.

14

State of Nevada has adopted standards for the regulation of fracking that are stricter than federal requirements and would apply to fracking operations in the state.  AR 5680.

BLM also prepared, and attached to the EA as Appendix E, a Hydraulic Fracturing White Paper ("White Paper").  AR 5841.  The White Paper was initially written by BLM's Wyoming State Office and later was modified for leasing in Nevada.  *Id.*  The White Paper contains a detailed analysis of fracking techniques, water consumption, potential impacts on water resources, potential seismic impacts, and spill prevention and response.  AR 5841-52.  It explains that fracking may be used to drill wells either vertically, horizontally, or directionally, and the well depth may vary from greater than 10,000 feet to less than 1,000 feet.  AR 5842.  The amount of water consumed varies depending on the depth of the well:  50,000 to 300,000 gallons are needed for shallow wells and 800,000 to 10 million gallons may be needed for deeper wells.  *Id.*  Drilling fluids are 95-99% water and also contain a small percentage of chemical additives, as well as proppant.  AR 5842-43.  Nevada Division of Minerals regulations require the reporting of the chemicals used in fracking and the amounts within 60 days of the completion of the fracking operations.  AR 5843.

The White Paper analyzes the availability of water for purposes of fracking.  *Id.*  Water withdrawals for all purposes are projected to increase nine percent statewide in 2020 due to an increasing population and increased economic activity.  *Id.*  Surface water supplies in the Nevada are nearly fully appropriated, and remaining water sources are in basins farther from urban centers.  AR 5843-44.  Any water used for fracking is subject to Nevada's laws governing property rights to and the use of water.  AR 5844.  Water used in fracking may come from various sources, including sources outside of the state, purchased irrigation water, treated waste water, water produced from oil and gas production, and recycled drilling water.  AR 5844-45.

As explained in the White Paper, fracking techniques may have environmental impacts to water resources.  AR 5846.  Impacts may be caused by the leaks or spills of chemical or oil products from wells, pipelines, or storage tanks.  *Id.*  Such leaks or spills could impact groundwater aquifers, particularly if they are within 100 feet of the surface and the geology is permeable or connected to a surface water system though existing fractures.  *Id.*  Impacts to

1   groundwater may occur due to improper well design or poor casing, the transport of fracking

2   fluid from the target strata along natural rock fractures, and the potential opening or extension of

3   existing fractures caused by the pressurized injection of fracking fluid.  AR 5847.  Fracking also

4   may have impacts on seismic activity.  AR 5850.  The White Paper explains that Nevada is the

5   third most tectonically active state in the country and that there have been 63 earthquakes with a

6   magnitude of at least 5.5 since the 1850s.  *Id.*  It also notes that, although seismic activity

7   induced by oil and gas activity is rare in comparison to the overall amount of oil gas

8   development activity, such activity is likely to have caused seismic activity in 13 states,

9   including Nevada.  *Id.*  A study by the National Academy of Sciences conducted in 2012 found

10  that fracking does not pose a high risk of seismic events.  *Id.*  BLM expressly stated that an

11  analysis of the potential for drilling at particular sites leading to seismic activity would be

12  analyzed when BLM considers applications for permits to drill.  *Id.*

13           Despite BLM's analysis of fracking and the potential environmental impacts of fracking,

14  Plaintiffs claim that the analysis in the EA was insufficient.  Their primary argument is that BLM

15  was not permitted to rely on the White Paper because it was not a NEPA document.  *See* Pls.

16  Mem. at 30.  But Plaintiffs are incorrect that BLM may not rely on the White Paper to meet its

17  obligations under NEPA.  CEQ's regulations expressly allow agencies to incorporate documents

18  by reference.  *See* 40 C.F.R. § 1502.21.  The regulations merely require that "[t]he incorporate

19  material be cited in the [NEPA document] and its content briefly described."  *Id.*  BLM clearly

20  did so.  AR 5679.  Moreover, the objection to reliance on the White Paper is particular

21  unfounded here given that it was drafted by BLM—in other words, BLM was not relying on the

22  analysis of another entity.

23           Plaintiffs argue that the circumstances here are similar to those in *Kern v. U.S. Bureau of*

24  *Land Management*, 284 F.3d 1062 (9th Cir. 2002), but that is not the case.  In *Kern*, the plaintiffs

25  challenged a resource management plan and argued that the EIS for the plan did not sufficiently

26  analyze the impacts of fungus on a type of cedar.  *See id.* at 1071-72.  The EIS contained

27  virtually no analysis of the impacts of the fungus and instead referred to previously prepared

28  guidance that was not subject to NEPA review.  *Id.* at 1067-68.  Under those circumstances,

16

1   where the EIS contained virtually no discussion of impacts caused by the fungus and merely

2   referred to previously issued guidance, BLM could not rely on tiering to the guidance to satisfy

3   its NEPA obligations.  *Id.* at 1073.  But the circumstances are different here because BLM is not

4   "tiering" within the meaning of 40 C.F.R. § 1508.28; instead, it is incorporating by reference a

5   document that it prepared for the EA at issue here.  The White Paper is an appendix to the EA

6   and, as such, was available for a public comment period along with the draft EA.  *See* AR 5671

7   (EA), 63677 (draft EA).  And the public, including the Center for Biological Diversity, submitted

8   comments regarding the analysis of fracking in the EA.  AR 5877-78.  Accordingly, the problem

9   identified in *Kern*—tiering to a document that never went through a NEPA process—does not

10  apply here.[7]

11       Plaintiffs also argue that the analysis in the EA is insufficient because it is too general.

12  *See* Pls. Mem. at 31 (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208,

13  1213 (9th Cir. 1998).  *Blue Mountains* involved the authorization of a timber sale, after which

14  logging can proceed without further approval from the agency.  *See* 161 F.3d at 1210.  In the

15  context of the approved timber sale, the court found the analysis of the impacts of erosion and

16  increased sediment from logging to be insufficient.  *Id.*  at 1213.[8]  But an oil and gas lease sale is

17  different.  As discussed above, the sale itself does not allow any immediate development to

18  occur; instead, actual development occurs after BLM's approval of an application for drilling

19  permits—a decision process that it itself subject to additional NEPA analysis.  *See* Background,

20  section I.B, *supra*.  It is also not known where and when development will occur.  *See id.*

21  Therefore, courts have allowed agencies to provide more general NEPA analysis and to defer

22  more detailed, site-specific analyses to a later stage, when BLM is considering whether to

23

24

25  [7] In *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800 (9th Cir. 1999), the court
    found that the agency had not sufficiently analyzed cumulative impacts and that a prior EIS,

26  which the agency tiered to, did not consider the impacts of the challenged action and therefore
    could not be relied upon for its analysis of cumulative impacts.  *Id.* at 810-11.  No such

27  circumstances are present in this case.

28  [8] *Klamath-Siskiyou Wildlands Center*, 387 F.3d 989 (9th Cir. 2004), likewise involved timber
    sales, *id.* at 992, and therefore provides no guidance here.

approve drilling permits.  *See N. Alaska*, 457 F.3d at 977 ("[W]e conclude that the government was not required at this stage to do a parcel by parcel analysis of potential environmental effects. Such effects are currently unidentifiable, because the parcels likely to be affected are not yet known.").

Finally, *Center for Biological Diversity v. Bureau of Land Management*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013) is distinguishable.  The EA in that case projected that only one exploratory well would be drilled within the lease sale area and contained only a minimal analysis of fracking.  *Id.* at 1148.  The EA also stated that fracking was "not relevant to analysis of impacts . . . because the reasonable foreseeable development scenario anticipates very little (if any) disturbance to the human environment." *Id.* (quoting the EA for the lease sale).  *Id.*  BLM acknowledge that the use of fracking generally in the country had increased, but it refused to analyze the potential impacts of fracking on the area subject to the lease sale, asserting instead that "these issues are outside the scope of this EA because they are not under the authority or within the jurisdiction of the BLM." *Id.* at 1155-56 (quoting the administrative record).  The circumstances of this case are distinguishable because BLM has not refused to analyze the impacts of fracking and has analyzed the potential impacts of fracking to a reasonable degree at the lease sale stage.

Accordingly, BLM's analysis of the potential impacts of fracking complied with NEPA.

### C.   BLM Did Not Rely on Stale Data in Approving the Lease Sales

BLM conducted an appropriate analysis of potential impacts based on recent information before approving the lease sales, and therefore Plaintiffs' argument that BLM relied on outdated analyses is without basis.  *See* Pls. Mem. at 31-33.  While it is true that the Tonopah RMP was issued in 1997 and the Shoshone-Eureka RMP was issued in 1986, *see* AR 4933-5572, 24796-25098, BLM did not simply stand on the analysis in the EISs associated with the RMPs before making a decision to offer the leases at issue.  Instead, it conducted additional analysis of more recent information in the EA before making a leasing decision.

Plaintiffs argue that the EISs for the Tonopah and Shoshone-Eureka RMPs did not contain a sufficient analysis of the impacts of hydraulic fracturing, impacts to wetlands from the

current leases, and impacts to mule deer and its habitat. *See* Pls. Mem. at 32-33. The EA, however, does analyze those issues, and as discussed elsewhere, the analysis in the EA on those subjects is sufficient to comply with NEPA. *See* section I.B, *supra*, sections I.D and II.B, *infra*. The Court should review both the EISs for the RMPs and the lease sale EA to determine whether, taken together, they provide sufficient NEPA coverage. *See W. Watersheds Project v. U.S. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1099 (D. Nev. 2011) ("Only where neither the general nor the site-specific documents address significant issues is environmental review rejected.") (citing *Te-Moak Tribe*, 608 F.3d at 602-07). Because BLM's EA analyzed the environmental impacts of the lease sale in the EA, BLM complied with NEPA.

The cases they cite offer no basis for finding the NEPA analysis for the lease sale to be insufficient. In *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011), the Ninth Circuit found that reliance on ten-year old aerial surveys of wildlife species was insufficient to comply with NEPA. *Id.* at 1086-87. But in that case, the agency had not conducted a more recent EA to update its analysis. Moreover, unlike the approval of the construction of a railroad line in that case, for which there would be no further opportunity for additional NEPA review, here there will be additional site-specific analysis to support BLM's evaluation of applications for permits to drill before ground-disturbing activity will occur. *See N. Alaska*, 457 F.3d at 977 ("Any later plan for actual exploration will be subject to a period of review before being accepted, rejected or modified by the Secretary."). *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) is likewise distinguishable. There, the court found that Forest Service had failed to sufficiently analyze the impacts of a watershed restoration project on a species of trout because the fish count data was six years old. *Id.* at 1031. Just as in *Northern Plains*, however, a more recent NEPA analysis had not been done and there would be no additional opportunity for NEPA review before the project was carried out. *See id.* at 1024-25.[9]

---

[9] *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) merely states NEPA's "hard look" standard. *See id.* at 864.

19

In an effort to discredit BLM's analysis, Plaintiffs again mischaracterize the EA.  They claim that BLM admits that supplemental analysis of impacts was required.  *See* Pls. Mem. at 33 (quoting AR 5666).  But what the EA says is:  "The oil and gas parcels addressed in this EA cannot be considered for leasing without supplemental analysis of new information and changes in environmental conditions since these RMPs were approved . . . ."  AR 5666.  That analysis was done in the EA.  Once again twisting the language of the EA, Plaintiffs argue that BLM admits that the lease areas are "not adequately protected under either or both [RMPs]."  Pls. Mem. at 33 (quoting AR 5674).  Plaintiffs quote from a section of the EA discussing the partial deferred alternative, which proposes deferral pending the development of stipulations "that would address resources that are not adequately addressed in the RMPs."  AR 5674.  The EA does not say that all resources are not adequately protected, as Plaintiffs imply, and, as discussed below, the analysis of mitigation in the EA satisfied NEPA.

Accordingly, the Plaintiffs have failed to demonstrate that BLM has failed to sufficiently analyze the impacts of its leasing decision.

### D.   BLM Appropriately Assessed Mitigation Measures for Mule Deer and Pronghorn Antelope in Compliance With NEPA, and the Mitigation Measures Will Avoid Significant Impacts to Those Species

BLM appropriately analyzed mitigation measures to protect mule deer and pronghorn antelope, in full compliance with NEPA.  Specifically, BLM evaluated the scientific literature and required stipulations to protect mule deer and pronghorn antelope from significant environmental impacts.  Plaintiffs have failed to demonstrate that the analysis was inadequate, and they also have failed to show that the mitigation measures will be inadequate to avoid significant impacts to mule deer and pronghorn.

NEPA requires only that mitigation be developed and analyzed to a reasonable degree. *Robertson*, 490 U.S. at 357-58; *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 950 (9th Cir. 2008); *see also Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121-22 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).  In order to meet the requirements of NEPA, "mitigation must be discussed in sufficient detail to ensure that

20

environmental consequences have been fairly evaluated." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (internal quotations and citation omitted). While CEQ's NEPA regulations specifically require an EIS to separately discuss mitigation, *see* 40 C.F.R. §§ 1502.14(f), 1502.16(h), there is no corresponding provision for EAs. *See* 40 C.F.R. § 1508.9 (defining "environmental assessment."). Indeed, while an EA may discuss mitigation, there is no requirement that it do so at all. *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1147 (9th Cir. 2000).

An agency may employ mitigation to reduce or offset the effects of an action to below a significant level and properly make a finding of no significant impacts. *See*, *e.g.*, *Wetlands Action Network*, 222 F.3d at 1121 ("In evaluating the sufficiency of mitigation measures, we focus on whether the mitigation measures constitute an adequate buffer against the negative impacts that result from the authorized activity to render such impacts so minor as to not warrant an EIS."); *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1993); *Nat'l Parks and Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001). An agency may find "that the mitigation measures would render any environmental impact resulting from the [action] insignificant." *Wetlands Action Network*, 222 F.3d at 1122. Similarly, an agency may incorporate mitigation into the project design so that significant impacts are avoided, rather than mitigated after the project is developed. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006).

Here, BLM sufficiently analyzed mitigation in compliance with NEPA. The EA explains that pronghorn and mule deer are found in the lease area. AR 5711. The EA further explains that pronghorn and mule deer may be impacted by development activities, and that in order to avoid such impacts, if there were proposals to develop particular leased parcels, "additional site-specific mitigation measures and [best management practices] would be included in the proposal or attached as [conditions of approval] for each proposed activity, which would be analyzed under their own additional site-specific NEPA analysis with consultation with NDOW and [FWS]." AR 5713. Further, BLM required a lease stipulation to protect mule deer, which is listed in Appendix B to the EA. AR 5713-14, 5792. The stipulation prohibits all surface activity

21

1   from January 15 through May 15.  AR 5792.  The geographic boundaries of the timing limitation

2   may only be modified if the authorized BLM officer, after consultation with NDOW, determines

3   that the area no longer contains mule deer winter habitat or that the action would not harm mule

4   deer or its habitat.  *Id.*  The dates of the timing restriction may only be modified if new

5   information becomes available demonstrating that the dates for mule deer winter habitat are

6   inaccurate with respect to a particular lease parcel.  *Id.*

7        BLM also analyzed alternative mitigation to protect mule deer and pronghorn.  In one

8   alternative, 104,668 acres would have been deferred to avoid the disturbing wildlife.  AR 5716.

9   In another alternative, which was later adopted, BLM analyzed additional protections for

10  wildlife, which included new stipulations to protect mule deer and pronghorn.  *Id.*; *see also* AR

11  1531 (FONSI referring to the Additional Resource Protection Alternative); AR 5648 (June 2017

12  decision record referring to stipulations in the EA).  The stipulations associated with the

13  Additional Resource Protection Alternative are described in Appendix C.2. to the EA.  AR 5820-

14  33.  As to mule deer, the new stipulation makes an additional 11 parcels subject to the January to

15  May timing restriction and also requires a notice for 45 parcels that surface activities may be

16  restricted between November 1 and April 30 to protect deer migration corridors.  AR 5822-25.

17  As to pronghorn, the new stipulation places a timing restriction on parcels with pronghorn

18  habitat that prohibits surface activity from November 1 through April 30.  AR 5821.

19       BLM's analysis of mitigation more than satisfied its procedural obligations under NEPA,

20  and the measures BLM ultimately adopted will avoid significant impacts to mule deer and

21  pronghorn that development on the leases otherwise may have caused.  Plaintiffs' arguments are

22  belied by the record and contrary to the applicable case law.  For example, Plaintiffs point to a

23  December 8, 2016 e-mail from NDOW recommending that certain parcels be deferred pending a

24  remapping of mule deer summer and winter habitat by NDOW.  AR 6642.  But BLM was not

25  required by NEPA to adopt any specific mitigation measures, including the deferral of lease

26  parcels.  *See Robertson*, 490 U.S. at 353 ("[I]t would be inconsistent with NEPA's reliance on

27  procedural mechanisms—as opposed to substantive, result-based standards—to demand that

28  presence of a fully developed plan that will mitigate environmental harm before an agency can

22

act.").  Furthermore, NDOW later revised its request and recommended instead that timing restrictions be placed on certain parcels to protect crucial winter habitat for mule deer and pronghorn and to protect mule deer migration corridors.  AR 6644-45 (NDOW February 2, 2017 letter), 19150-51 (NDOW February 27, 2017 e-mail).  And, as the record demonstrates, BLM ultimately adopted seasonal protections as recommended by NDOW.  The record also explains that BLM can impose appropriate conditions of approval on drilling permits as necessary to avoid or mitigate impacts to mule deer and pronghorn if and when lessees seek permission for such drilling activities.  AR 5713.  By adopting stipulations to protect mule deer and pronghorn seasonal habitat, based on input from NDOW, and through its ongoing regulatory authority at the drilling permit stage, BLM has more than adequately demonstrated that significant impacts to mule deer and pronghorn will be avoided and the issuance of FONSI was justified.  *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 1015-16 (finding that the Forest Service had taken the requisite "hard look" under NEPA by incorporating mitigation measures into a timber project and upholding the agency's FONSI).

Plaintiffs, nevertheless, insist that the timing restriction on surface activities in mule deer winter habitat is inadequate to avoid significant environmental impacts.  *See* Pls. Mem. at 34-35. Relying on a report prepared by the Wyoming Game and Fish Department ("WGFD"), titled *Recommendations for Development of Oil and Gas Resources Within Important Wildlife Habitats* (April 2010), AR 59216, Plaintiffs point out that WGFD recommends that oil and gas development not exceed one well pad per square mile within crucial mule deer winter habitat. AR 59248.  Well placement, however, is more appropriately addressed if and when a lessee seeks a permit to drill, at which point BLM will have ample regulatory authority and discretion to impose additional protections as may prove necessary.  *See* 43 C.F.R. § 3101.1-2 (authorizing BLM to require "reasonable measures . . . to minimize adverse impacts to other resource values").  The WGFD also recommends certain habitat treatments but, here again, these would be specific to particular locations and BLM retains discretion and authority to address those needs at the drilling permit stage, as necessary.  AR 59249.  Finally, the WGFD recommends a seasonal restriction from November 15 through April 30, during which activities would be

1   minimized, AR 59248, but the Nevada lease sales already contain a similar stipulation

2   prohibiting all surface activity from January 15 through May 15.  AR 5792.  In short, Plaintiffs

3   have failed to demonstrate that BLM's stipulations for the Nevada lease sales are inconsistent

4   with the WGFD's recommendations.  Moreover, none of the parcels sold competitively at the

5   June or September lease sales contained mule deer habitat.

6        Plaintiffs also cite other studies regarding the effects of oil and gas development on mule

7   deer.  *See* AR 60776-89, 60852-81.  In one study, the researchers found that increases in

8   residential and oil and gas development had a negative impact on mule deer populations.  AR

9   60787.  Another study found that mule deer tend to avoid drilling well pads.  AR 60859-60.  But

10  the study recognized that avoidance of drilling in the winter months could mitigate impacts to

11  mule deer, AR 60860, and an existing stipulation already prohibits drilling in crucial mule deer

12  habitat during the winter.  AR 5822-23.  The study also recommended lower densities of drilling

13  pads, AR 60860, but here again, BLM can address the spacing of well pads and develop further

14  mitigation to address the impacts of drilling and related infrastructure when it receives

15  applications for permit to drill.  AR 5713.  *See also* Pls. Mem. at 35 (citing AR 61002) (relying

16  on second study for proposition that mule deer avoid drilling infrastructure and may have

17  reduced abundance during drilling periods, but ignoring existing stipulations and BLM's ongoing

18  regulatory authority at the permitting stage).

19       Plaintiffs argue that BLM's obligation to take a "hard look" at impacts to mule deer

20  required it to analyze more specific stipulations that would apply to site-specific oil and gas

21  development.  Pls. Mem. at 36 (citing *Richardson*, 565 F.3d at 718).  Plaintiffs once again mis-

22  read the case law.  In *Richardson*, the Tenth Circuit cited with approval the Ninth Circuit's ruling

23  in *Northern Alaska* finding that environmental analysis of oil and gas development was not

24  required "when environmental impacts were unidentifiable until exploration narrowed the range

25  of likely drilling sites").  *Richardson*, 565 F.3d at 718 (citing *N. Alaska*, 457 F.3d at 977-78).

26  The Tenth Circuit went on to explain that, in *Richardson*, "[c]onsiderable exploration [had]

27  already occurred on parcels adjacent to [the leased parcel]" and the record revealed that the

28  lessee had "concrete plans to build approximately 30 wells" on the leased parcel.  *Id.* at 718.

24

1    That is in stark contrast to this case where no drilling plans were before BLM at the time it

2    decided to offer the parcels for leasing.  Because there were no such plans, an analysis of

3    mitigation for site-specific development plans was not required here.[10]  Accordingly, Plaintiffs

4    have failed to demonstrate that the analysis of impact to mule deer and pronghorn and measures

5    to mitigate those impacts at the lease stage was insufficient to comply with NEPA.

6        Plaintiffs separately argue that the timing restriction in mule deer winter habitat will not,

7    in fact, avoid impacts to big game.  Pls. Mem. at 42.  More specifically, they seize on BLM's

8    conclusion that the timing restriction on surface use during the winter months in mule deer

9    habitat will not "avoid all adverse effects to big game species and habitat."  *Id.*  That, however, is

10   not the standard.  As discussed above, BLM has reasonably developed and analyzed mitigation

11   to ensure that significant impacts to big game species, including mule deer and pronghorn, will

12   be avoided.  *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 1015; *Wetlands Action Network*, 222 F.3d at

13   1122.[11]  That satisfies NEPA, and provides adequate grounds for BLM's FONSI.

14       Accordingly, Plaintiffs have failed to demonstrate that BLM's analysis of mitigation

15   measures for mule deer and pronghorn violated NEPA.

16   **II.    BLM's Conclusion that Lease Stipulation Will Avoid Significant Impacts to Water
         Resources Was Neither Arbitrary Nor Capricious**

17

18       Plaintiffs assail BLM's conclusion that certain stipulations protecting surface and ground

19   water would reduce and mitigate the impacts of fluid mineral development, arguing, despite

20   abundant record evidence to the contrary, that these stipulations "do not protect" the resources.

21   _____

22   [10] Plaintiffs fail to explain why the Ninth Circuit's ruling regarding cumulative impacts in

23   *Muckleshoot Indian Tribe*, 177 F.3d at 811, is relevant here.  And while the Ninth Circuit has
     required agencies to provide an assessment of the effectiveness of mitigation measures in an EIS,

24   *see South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of the Interior*,
     588 F.3f 718, 727 (9th Cir. 2009), it has not required the same for EAs.

25   [11] *Wetlands Action Network* does not support Plaintiffs' arguments.  *See* 222 F.3d at 1121-22

26   (upholding the Corps' analysis of mitigation and a FONSI).  Plaintiffs have failed to explain how
     *Save the Yaak Committee v. Block*, 840 F.2d 714 (9th Cir. 1988) is relevant here.  The central

27   issue in that case—whether the Forest Service was required to analyze the impacts of timber
     sales along with the impacts of constructing a road to facilitate timber harvest, *id.* at 719-20—is

28   not present in this case.

Pls. Mem. at 36.  This is patently incorrect.  As explained in the two subsections that follow, BLM appropriately examined impacts to water resources and the expected effects of associated protective measures and it reasonably concluded that significant impacts would be avoided. Plaintiffs' contentions to the contrary lack merit.

**A.      The Record Reflects a Thorough Consideration of Impacts and Protective Measures**

BLM's assessment of impacts to water resources is reflected principally in three documents: (i) the Final EIS for the Tonopah RMP (AR 4953)[12] (ii) the EA for the June 2017 lease sale (AR 5651), and (iii) the water resources stipulation, No. NV-B-10-B-CSSSU, which BLM applied to leased parcels containing significant water resources, including rivers, streams, flood plains, playas, wetlands, springs, and seeps.  AR 5827.

The Tonopah RMP designated as "open to fluid mineral leasing" approximately 5.4 million acres of public land.  AR 4994.  It imposed seasonal restrictions on leasing activities on 72,400 acres of seasonal wildlife habitat and imposed non-surface occupancy stipulations on 50,245 acres.  *Id*.  In Chapter 4 of the FEIS supporting the RMP, BLM examined environmental impacts of activities and uses "in terms of change which could occur" if the RMP were adopted. AR 5037.  This included examination of impacts to a wide range of resources, including air and water, wildlife, vegetation, riparian habitats, and cultural resources, as well as impacts to known uses of the affected lands, including recreation, livestock grazing, development of locatable and fluid minerals, and development of rights-of-way and utility corridors.

As relevant here, the EIS includes sections specifically dedicated to watersheds, vegetation, riparian habitats, and wildlife habitats, among other things.  With respect to

---

[12] The leased parcels at issue in this case are located in both the Tonopah and Shoshone-Eureka RMP planning areas. AR 5661.  The Shoshone-Eureka Final EIS provided that "[a]ll areas designated by the BLM as prospectively valuable for oil and gas will be open to leasing except as modified by other resources," AR 24960, although it did not address fluid mineral leasing in the detail of the Tonopah EIS due to lack of interest in such leasing at the time.  The RMPs for these two planning areas are currently undergoing revision and will be replaced by a single EIS for the Battle Mountain District.  AR 5674.

1   watersheds, the EIS considered and disclosed that fluid mineral development would cause "short

2   term loss of soil cover, and a subsequent increase in erosion potential."   AR 5038.   It also

3   considered and disclosed that soil compaction "would occur wherever vehicle use is

4   concentrated." *Id*.   In addition, the EIS explained that most long-term impacts of fluid mineral

5   development would be "reduced or eliminated by minimizing disturbed areas, using best-

6   available construction techniques [and] by mitigating disturbance through soil stabilization and

7   revegetation." *Id*.   Importantly, such controls are best designed and implemented not at the land

8   use planning or leasing stage, but at the permitting stage, when, and if, lessees have sought

9   authorization to proceed with fluid mineral development and when the agency has before it

10  specific lease-development proposals that can be meaningfully evaluated and adjusted as

11  necessary to protect resources.

12           As to vegetation, the EIS considered and disclosed that oil and gas development would

13  produce short term impacts from surface-disturbing activities, including increased soil erosion,

14  small losses in forage, and visual impacts.  It noted, in addition, that reclamation and

15  revegetation were expected to minimize these effects.  AR 5040.  With respect to wildlife, the

16  EIS explained that adverse impacts could be expected, including habitat fragmentation due to

17  road construction and other forms of habitat degradation, as well as harassment of species, noting

18  however that seasonal restrictions would minimize impacts.  AR 5042.  With respect to riparian

19  habitats, the EIS noted that just 29% of the identified riparian zones are in areas deemed to have

20  high potential for fluid mineral development, while 40% are in areas deemed to have low

21  potential.  AR 5046.  It indicated that development "along these streams" would cause adverse

22  impacts, but that these zones would be "given protection by the standard terms and conditions

23  applied to leasable minerals" and by the use of "no-surface occupancy stipulations" in designated

24  areas.  AR 5045-5046.[13]

25

26  _____

27  [13] *See also* AR 5791-5807 (Appendix B to the June 2017 EA, reflecting the standard stipulations
    and lease notices as of 2017), AR 5808-5819 (Appendix C.1, reflecting the no-surface-

28  occupancy stipulations and controlled surface use stipulations that would apply to the Partial
    Deferral Alternative).

1    The protections noted in the EIS were enhanced in this case by application of the water

2   resources stipulation to portions of specified parcels, as more fully discussed below.  Before

3   turning to these, Federal Defendants first address the impacts considered in the EA for the June

4   2017 lease sale.  As an initial matter, the EA was based on "current resource and land use

5   information and the management framework developed in the [governing RMPS]" which were

6   supported by the Tonopah and Shoshone-Eureka EISs.  The EA was prepared following an

7   "assessment of potential environmental impacts" by an "interdisciplinary team . . . of resource

8   specialists."  AR 5659.  The team considered "historical data and personal knowledge of the

9   areas involved, conducted field inspections, and reviewed existing databases and file information

10   to assess potential effects, and whether parcels should be eliminated from leasing."  *Id*.

11    In the draft EA, the agency examined three alternatives: the proposed action (leasing all

12   proposed parcels), no action (leasing none), and the Partial Deferral alternative, under which

13   parcels with important water or other resources would be deferred to a future quarterly lease sale,

14   to allow time for an "RMP update [which] would provide new stipulations."  *Id*.  These parcels

15   totaled approximately 105,000 acres.   After further consideration, the agency added a fourth

16   alternative to the EA—the Resource Protection alternative.  AR 5659.

17    As the EA explained, the Resource Protection alternative would allow BLM to avoid

18   deferral of parcels through application of new protective stipulations, including the water

19   resources stipulation and a stipulation for parcels with slopes greater than 30%.  AR 5702; *see

20   also* AR 5820-5833 (Appendix C.2, reflecting new timing limitation stipulations and new

21   controlled surface use stipulations that would apply under the Resource Protection alternative).

22   The water resources stipulation included in Appendix C.2 was applied to parcels totaling 58,000

23   acres, while the stipulation for slopes greater than 30% was applied to parcels totaling 72,000

24   acres.  *Id*.

25    The EA reflects BLM's recognition that surface and ground water are fundamental

26   components of ecosystem health, particularly in the arid and semi-arid Battle Mountain District,

27

28

28

AR 5697, and that the springs, seeps, wetlands and perennial springs "form literal oases that support all life and encourage biodiversity." *Id*. These water resources, BLM explained, "play an important role in wildlife habitat and in the food chain for wildlife taxa," supporting both resident and migratory species. *Id*. The agency also noted that riparian and wetland areas "are the most productive and important ecosystems" in BLM's Battle Mountain District.

The EA's recognition and disclosure of the importance of these water resources was balanced by an equal emphasis on impacts to these resources and the mitigation and project controls intended to promote their long-term protection. The EA noted possible long- and short-term alterations to the hydrologic regime "depending on the location and intensity of development," and the fact that clearing, grading and soil stockpiling can alter "overland flow and natural groundwater recharge patterns." AR 5699. BLM also noted that "several of the proposed lease parcels . . . largely or entirely overlay a combination of water bodies," such that it would be "difficult or impossible to avoid impacts to these hydrological features and their associated plant and wildlife habitats." *Id*. It added, however, that BLM can "move a proposed well site up to 200 meters at its discretion to mitigate impacts," and further that the "Clean Water Act may necessitate relocating the well further." *Id*.

Finally, and most importantly, significant additional protections are afforded by the new water resources stipulation, which were applied to some or all of 43 of the offered parcels. AR 5827. The stipulation "avoid[s] impacts" to identified 100-year flood plains and playas; to areas within 500 feet of perennial waters, springs, wells, wetlands, and riparian areas, on either side; and to areas within 100 feet of the inner gorge of ephemeral channels, also on either side. AR 5827. They also provide that "[s]urface disturbing activities may require special engineering design, construction and implementation measures, potentially including relocation of operations more than 200 meters to protect water resources." *Id*. Although, as Plaintiffs point out, exceptions are possible, the stipulations make clear that BLM may only grant exceptions (1) "if an environmental review determines that the action, as proposed or otherwise restricted, *does not affect* the resource, or could be conditioned so as to not negatively impact the water resources identified;" and (2) in circumstances where areas cannot be avoided, if BLM requires that

1  "engineering, best management practices, [or] design considerations are implemented to mitigate

2  impacts to water resources." *id*. (emphasis added).  *Id.*  Exceptions are also allowed for

3  environmentally beneficial actions, such as those "designed to enhance the long-term utility or

4  availability of the riparian habitat." *Id.*[14]

5        How the stipulations would ultimately operate in a given site-specific setting could not be

6  meaningfully determined at the leasing stage, because it was unknown, at the time of the leasing

7  decision and prior to the lease sale: (1) what parcels would be sold, (2) whether development of

8  parcels sold would ultimately be pursued; and (3) if development is pursued, how the lessee

9  would propose to proceed.  These considerations only serve to underscore the lack of merit in

10  Plaintiffs' specific objections, as discussed below.

11     **B.    Plaintiffs' Contention That the Stipulations Do Not Protect Wetlands Lacks
             Merit**

12

13        As discussed, BLM dutifully examined and disclosed in the EA numerous adverse

14  impacts to water resources, but it also explained why conditions, stipulations, best management

15  and engineering practices, and the exercise of agency discretion and technical expertise at the

16  permitting stage (*i.e.*, upon BLM receipt of APDs) would minimize or eliminate those impacts.

17  Plaintiffs' arguments concerning water resources, on the other hand, focus almost exclusively on

18  the impacts, while ignoring the protective measures.  They argue, based on a hand-selected set of

19  adverse impacts that suit them, that the challenged decision must therefore be arbitrary.  The

20  Court should reject these hollow contentions.

21

22

23

24  [14] Waiver of stipulations is also permissible, but only upon BLM approval of a site-specific study
    "by a qualified hydrologist or engineer" finding that certain rigorous conditions are met,
25  including that:  "the areas proposed for surface occupancy after construction would: 1) pass the
    10-year peak flow event without erosion, 2) pass the 25-year peak flow without failed
26  infrastructure, 3) pass the 50-year peak flow event without failure (when surface occupancy is
    planned for greater than 50 years), 4) not impede 100-year peak flow events, 5) not negatively
27  impact springs or wells, and 6) any wetlands impacted could be restored to their original function
    post occupancy."  AR 5827.
28

1    Plaintiffs' argument that the water resources stipulation "fails to adequately protect those

2    resources because of its limited nature and possible exceptions," Pls. Mem. at 36, lacks merit for

3    various reasons.  First, the stipulation is not "limited" in nature, as the discussion above, and the

4    record itself, demonstrate.  As noted, the stipulation imposes a 1,000-foot protective buffer

5    surrounding perennial waters, springs, wells, wetlands, and riparian areas (*i.e.*, 500 feet on either

6    side), and a 200-foot buffer around ephemeral channels (*i.e.*, 100 feet on either side).  As the EA

7    explained, "application of the stipulation would generally protect water resources from all

8    impacts."  AR 5702.  Second, the fact that the stipulation allows for exceptions does not mean it

9    is not protective, nor does it justify an order vacating the challenged decision *at the leasing*

10   *stage*.  Plaintiffs essentially ask the Court to anticipate that exceptions would be allowed

11   indiscriminately or inappropriately at the APD stage, should the parcels containing these

12   resources be leased and development authorization sought.  The Court should not assume that

13   BLM's course, at the APD stage, would be to disregard its stated intention to apply technical

14   expertise and judgment in protecting water resources.  BLM clearly recognizes that these

15   resources, which represent "less than one percent" of the total area offered for sale, AR 5698, are

16   vital elements of the ecologic system and worthy of protection.  Plaintiffs offer no valid reason to

17   upset this plan at the leasing stage, through an order vacating the decision and voiding the leases.

18   Further environmental analysis will occur at the permitting stage, in which opportunities for

19   public participation will afford Plaintiffs ample opportunity to challenge any permitting decision

20   that they believe improperly applies, or makes exception to, the water resources stipulation.

21       Plaintiffs also contend that the Court should vacate the decision and void the leases

22   because the stipulation has not been applied to all parcels, thus rendering the FONSI

23   unsupported, but the record does not support this extreme course.  The purpose of the Resource

24   Protection alternative was to protect the parcels that would have been deferred under the Partial

25   Deferral alternative (encompassing 105,000 acres or approximately 53% of the "original

26   nominated acreage," AR 5674), not to apply the stipulation to all parcels.  To this end, the

27   Resource Protection alternative called for application of various new stipulations to parcels

28   encompassing 130,000 acres.  *See* AR 5702 (applying the new water resources stipulation to

approximately 58,000 acres); *id.* (applying the new stipulation for slopes greater than 30% to approximately 72,000 acres). *Id.* Plaintiffs' criticism of the FONSI is unsupported, and contrary to BLM's reasonable conclusion that the leasing decision would not cause significant impacts and that further site-specific analysis would occur at the APD stage. Plaintiffs inappropriately ignore the nature and purpose of the three-stage oil and gas development process.

Finally, Plaintiffs' reliance on *South Fork Band Council of Western Shoshone of Nevada v. Department of the Interior* (*South Fork Band*), 588 F.3d 718 (9th Cir. 2009) is unavailing. That case involved a challenge to approval of a gold-mining and ore-processing operation that would result in creation of an 850-acre mining pit, in a complex hydrologic zone, that would need to be continuously dewatered over the ten-year life of the mine. The Ninth Circuit reversed the District Court's conclusion that plaintiffs were unlikely to succeed on the merits of one of their NEPA claims. In particular, the Ninth Circuit faulted the agency for not discussing the effectiveness of mitigation measures for the mine dewatering activities, explaining that an "essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective." *Id.* at 727. It found inadequate the agency's statement that "[f]easibility and success of mitigation would depend on site-specific conditions and details of the mitigation plan" and noted that "[n]othing whatsoever is said about whether the anticipated harms could be avoided by any of the listed mitigation measures." *Id.* The holding is inapposite here because Plaintiffs do not contend that BLM failed to assess the effectiveness of mitigation measures. More importantly, the objective in this case is to meticulously avoid hydrologic zones, through a process that allows BLM to control the placement of well pads and other infrastructure. The objective in *South Fork Band* was to construct the mining pit in the hydrologic zones, where the gold ore was located.

BLM's decision to authorize the lease sale was well reasoned and fulfills NEPA's twin objectives of informed decision making and informed public participation. Plaintiffs' arguments to the contrary should be rejected.

**III.    BLM Was Not Required to Prepare an Environmental Impact Statement for the Lease Sales**

BLM was not required to prepare an EIS for the lease sales.  Plaintiffs' argue that an evaluation of the significance factors, as well as the Ninth Circuit's decision in *Conner*, required an EIS at the lease sale stage.  Neither argument has merit.

**A.    BLM Reasonably Concluded that the Significance Factors Did Not Mandate the Preparation of an Environmental Impact Statement**

BLM's conclusion that the issuance of the leases would not cause significant impacts was reasonable.  In reaching this conclusion, BLM was not required to show that no harm to the environment would occur, but only that the harm would not be significant.  *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004).  CEQ's NEPA regulations establish factors that an agency should consider in determining whether the environmental impacts of an action will be significant.  *See* 40 C.F.R. § 1508.27.  In the FONSI, BLM reasonably explained that the expected development of approximately 25 wells over the lifetime of the leases would not result in widespread environmental impacts.  AR 1532.  Plaintiffs, nevertheless, claim that three of the significance factors demonstrate that an EIS was required.  In fact, they do not, and each is addressed below.

*Effects on wetlands and ecologically critical areas.*  As discussed in section II, *supra*, the water resources stipulation is sufficient to protect against significant impacts and has been applied to the appropriate parcels, including parcels containing "spring mounds" which by themselves, according to Plaintiffs, provide sufficient reason to prepare an EIS.  Pls. Mem. at 44.  The stipulation would impose a 500-foot buffer around these rare hydrologic features—features BLM plainly recognized as worthy of protection.  AR 5698 (noting that "preservation for the purpose of future study to facilitate proper management is essential").  In addition, impacts from the use of hydraulic fracturing will be mitigated using a number of methods, including the sealing of wellbores, the recovery of fracking fluid, and disposing of fracking fluids through underground injection, treatment and reuse, or other methods, as well as through mitigation measures required by the State of Nevada.  AR 5679-80; *see* section I.B, *supra*.  Given the

33

1  stipulations in place to protect resources and that BLM has the authority to impose conditions of

2  approval when issuing drilling permits, BLM reasonably concluded that impacts to the

3  environment would not be significant.  *See Wetlands Action Network*, 222 F.3d at 1122

4  (upholding a FONSI for a Corps Permit).

5      *Controversy.*  Plaintiffs claim that the lease sales are "highly controversial."  *See* 40

6  C.F.R. § 1508.27(b)(4).  An action is highly controversial if there is a "substantial dispute

7  [about] the size, nature, or effect of the major Federal action rather than the existence of

8  opposition to a use."  *Blue Mountains Diversity Project*, 161 F.3d at 1212 (citation omitted).  The

9  fact that some groups oppose an action does not make it highly controversial; rather, there must

10  be an "outpouring of public protest" in order for this factor to apply.  *Nat'l Parks Conservation*

11  *Ass'n*, 241 F.3d at 736 (quoting *Greenpeace Action*, 14 F.3d at 1334.  The action here is not

12  highly controversial.  BLM received about a dozen comment letters on the EA, most of them

13  from state and federal agencies.  AR 5871.[15]

14      Plaintiffs note that NDOW submitted a comment letter expressing concerns about parcel

15  66 (which was not sold).  AR 6645; *see also* AR 19140 (noting similar Fish and Wildlife Service

16  comments).  Both comments noted possible impacts to the Fish Creek Springs Tui Chub.

17  However the comments were transmitted long before the water resources stipulation had been

18  developed and included in the Resource Protection alternative, *see* AR 1531, 5647-48, and

19  Plaintiffs neglect to advise the Court that these comments were made not on the final EA, but on

20  the draft EA.  *See* AR 5873-74 (EA, App. H, addressing the comments from NDOW and FWS

21  regarding the tui chub).  Moreover, these can hardly be characterized as presenting a "substantial

22  dispute" about the effect of the leasing decision.  The same is true with NDOW's comments on

23  parcel 106, *see* AR 18754, sent four days later, which noted that the stipulations required by the

24  governing RMPs do not provide adequate protection to the Railroad Valley Tui Chub.  BLM

25  clearly recognized the inadequacy of RMP stipulations, which is precisely why it proposed

26

27

28  [15] BLM also received 8,000 form letters or e-mails sent from the WildEarth Guardians website.
    AR 5871.

1    deferral of these tracts in the draft EA, and why it later imposed the restrictions of water

2    resources stipulation on these parcels, through selection of the Resource Protection alternative.

3    AR 1531, 5647-48.

4          BLM also received only a handful of protest letters regarding the June lease sale, all from

5    environmental advocacy groups.  *See* AR 1196-1267, 1268-1311, 25570-77.  This degree of

6    opposition does not render an action highly controversial.  *See Cold Mountain v. Garber*, 375

7    F.3d 884, 893 (9th Cir. 2004) ("[T]he existence of opposition does not automatically render a

8    project controversial.").  This is simply not a case in which the agency "received numerous

9    responses from conservationists, biologists, and other knowledgeable individuals, all highly

10   critical of the EA."  *Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182

11   (9th Cir. 1982).  In fact, NDOW stated that it "appreciate[d] that the majority of [its] scoping

12   comments were considered in the EA's development."  AR 6644.  Thus, the decision to issue the

13   leases was not highly controversial.

14         *Highly uncertain or unknown risks.*  Contrary to Plaintiffs' assertions, *see* Pls. Mem. at

15   46, this is not an action that involves uncertain or unknown risks.  *See* 40 C.F.R. § 1508.27(b)(5).

16   Plaintiffs claim that the impacts of fracking are uncertain, but as explained in the EA, fracking

17   techniques have been used since 1950.  AR 5679.  The EA acknowledges that fracking may pose

18   certain risks, but those risks are not unknown.  AR 5846-47.  These risks can be minimized

19   through the implementation of appropriate conditions at the drilling permit stage.  AR 5679-80.

20   Plaintiffs claim that uncertainties regarding the impacts of fracking could be addressed by

21   "insuring that available data are gathered and analyzed."  Pls. Mem. at 46 (quoting *Nat'l Parks &*

22   *Conservation Ass'n*, 241 F.3d at 732).  But they do not explain what data could be gathered prior

23   to the development of specific proposals to drill in particular areas on the leaseholds.  Likewise,

24   potential impacts to mule deer and pronghorn can be analyzed in more detail and mitigation

25   measures can be developed to avoid and minimize such impacts if development is proposed on

26   parcels with pronghorn or mule deer habitat.  But Plaintiffs have failed to demonstrate that it

27   would be useful, at the lease stage, to develop mitigation for impacts that may never occur if

28   development is not proposed in mule deer or pronghorn habitat.  Moreover, they have failed to

35

demonstrate that impacts to mule deer or pronghorn from oil and gas development are highly uncertain or carry unknown risks.

In sum, Plaintiffs have failed to demonstrate that CEQ's significance factors warrant the preparation of an EIS.

**B.**     **BLM Has Complied with Its Obligations Under NEPA Prior to Issuance of the Leases that May Result in Surface Disturbance**

Plaintiffs are incorrect that BLM was required by the Ninth Circuit's decision in *Conner* to prepare an EIS to support the lease sale.  *See* Pls. Mem. at 47.  The issue here is not whether a NEPA analysis was required for the lease sale—Defendants agree that it was—but rather the nature of the NEPA analysis that was required.  In *Village of Los Ranchos v. Marsh*, 956 F.2d 970 (10th Cir. 1992) the Tenth Circuit upheld BLM's issuance of an EA for a lease sale after concluding that the lease sale itself would not have immediate environmental impacts.  956 F.2d at 972-73.  And as the Ninth Circuit explained in the *Northern Alaska* case, BLM may prepare appropriate NEPA analyses to support applications for drilling activities.  457 F.3d at 976 ("*Conner* is of no assistance to plaintiffs, for we did not discuss the degree of site specificity required in the EIS.").  And while the Ninth Circuit found in *Conner* that an EA and FONSI was insufficient to support a lease sale for the sale of non-NSO leases, *see In re Solerwitz,* 848 F.2d 1573, 1848-51 (Fed. Cir. 1988), the circumstances here are different because BLM also is relying on the EISs prepared in conjunction with the Tonopah and Shoshone-Eureka RMPs.  *See* AR 4953-5379, 24796-25029, 25355-42.

Accordingly, Plaintiffs are incorrect that NEPA automatically requires an EIS at the lease sale stage.  Certainly, BLM is required to comply with NEPA, but the degree of that obligation depends on the degree of information regarding potential site-specific development that is available at the time of the leasing decision.  *Richardson*, 565 F.3d at 717.  Here, BLM was unaware of any site-specific development plans at the time of its leasing decision, and therefore there was no obligation to prepare an EIS analyzing such effects.  *Northern Alaska*, 457 F.3d at 717-18.

1

2

### IV. BLM's Determination of NEPA Adequacy for the September Lease Sale Complied with NEPA

3

4

Plaintiffs claim BLM abdicated its NEPA obligations by not performing new NEPA

5

analysis for the three parcels offered and sold in September 2017.  Pls. Mem at 48.  This is

6

incorrect.  New NEPA analysis was not required because BLM properly concluded that the

7

impacts of leasing and developing the three parcels were adequately considered in the EA for the

8

June 2017 sale.  Consistent with its NEPA policy handbook,[16] BLM explained this conclusion in

9

a "determination of NEPA adequacy" or "DNA."  AR 5912-5920.  The DNA was posted on

10

BLM's website on June 7, 2017, and finalized on June 21, 2017, but no comments were

11

received.

12

It is well settled that when an agency is unable to identify any prior, relevant

13

environmental analysis, it may either proceed directly to the preparation of an EIS or it may first

14

prepare an EA, to determine if expected effects of the action are "significant" and thus require

15

preparation of an EIS.  *See* 40 C.F.R. § 1501.4.  However, where BLM determines that a

16

proposed action is "essentially similar to" an earlier action, Ex. 1 at 23, one that has already been

17

analyzed in an existing NEPA document, then it may prepare a DNA and forego further NEPA

18

analysis.  *See Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 132-33 (D.D.C. 2017)

19

(discussing BLM's NEPA Handbook, H-1790-1).  To issue a DNA, the court explained,

20

> officials must complete an accompanying worksheet, answering a list of
> questions, such as: whether "the geographic and resource conditions are
> sufficiently similar to those analyzed in the existing NEPA documents," and
> whether "the existing analysis [is] valid in light of any new information or
> circumstances."

21

22

*Id*. at 133 (citing the BLM NEPA Handbook, H-1790-1, at 23).  The record demonstrates that

23

BLM has done so.

24

This court previously considered a challenge to BLM's use of a DNA, in connection with

25

a 2014 gather of wild horses.  In *Friends of Animals v. U.S. Bureau of Land Mgmt*., No. 3:15-

26

27

---

28

[16] *See* Ex. 1 (excerpts of BLM's NEPA Handbook, H-1790-1).

37

CV-0057-LRH-WGC, 2015 WL 555980 (D. Nev. Feb. 11, 2015), the Court concluded, on a motion for preliminary injunction, that plaintiffs were likely to succeed on the merits of their challenge.  Although the Court concluded that use of a DNA was improper, it did so because the 2014 gather and the 2010 gather (for which an EA had been completed) were simply too dissimilar.  The Court explained that the 2010 gather was "far narrower in scope than the current proposed roundup" and further that the proposed gather "far exceeds the intensity and scope of what was proposed under the 2010 EA."  *Id*. at *3.

Analogous circumstances do not exist here.  The September 2017 lease sale involved just three parcels and less than 3,700 acres.  It was thus was an action of considerably less "intensity and scope" than the June lease sale, which involved almost 196,000 acres.  *Id*.  More importantly, BLM appropriately determined in its DNA that the three September parcels were either adjacent to or very near parcel 106, a parcel "specifically considered" in the EA for the June 2017 lease sale.  Further, BLM determined that the three September parcels have "geographic and resource conditions that are sufficiently similar, and would be subject to the same stipulations and lease notices" as parcel 106.  AR 5913.  Plaintiffs make no attempt to identify distinctions between the parcels, or variations in resource conditions, or any other factor that makes analysis of impacts for the June sale different in some meaningful way from those associated with the September sale.  Instead, their argument makes a single charge of error: that the DNA is improper because the EA relied upon is inadequate, for reasons stated elsewhere in Plaintiffs' brief.  Pls. Mem. at 48.  Because the EA fully satisfies the agency's NEPA obligations, as demonstrated throughout this brief, Plaintiffs fail to identify any error at all in BLM's use of a DNA.

## V. Even if the Court Finds that A NEPA Violation Occurred, It Should Not Vacate the Results of the Lease Sales

If the Court finds that BLM violated NEPA with respect to the June or September 2017 lease sales, it should not set aside the lease sales and resulting leases, but instead should suspend the leases.  Plaintiffs ask that the EA, FONSI, and DNA be "vacated and remanded."  Pls. Mem. at 49.  They do not specifically mention the leases that have been issued, but insofar as the Court

38

1   deems it necessary to consider those leases, it should not vacate them, as that would be an

2   unnecessarily harsh remedy and would impact the rights of lessees who are not before the Court.

3   For that reason, courts have often suspended leases in such circumstances rather than issuing

4   relief that would have the effect of voiding them.  The Court should do the same here.

5   Alternatively, if the Court finds a NEPA violation, Defendants request that the Court provide an

6   opportunity for additional briefing regarding an appropriate remedy.

7          In arguing for vacatur, Plaintiffs seem to assume that vacatur follows automatically from

8   a NEPA violation.  It does not.  While vacating an agency's decision may be appropriate in

9   particular circumstances, it is by no means a presumptive remedy.  "Whether agency action

10   should be vacated depends on how serious the agency's errors are and the disruptive

11   consequences of an interim change that may itself be changed."  *Cal. Cmtys. Against Toxics v.*

12   *U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (internal quotation marks and citation omitted).

13   "[W]hen equity demands," an agency's decision may "be left in place while the agency follows

14   the necessary procedures."  *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.

15   1995).  In light of BLM's analysis of the environmental impacts of oil and gas development

16   arising from the June and September 2017 lease sales, Defendants do not believe that there are

17   any serious deficiencies in the NEPA analysis, and if the Court finds a violation of NEPA, any

18   such deficiency could be readily address through additional NEPA analysis.

19          Further, the vacatur of the lease sales, and therefore the leases that were issued as a result

20   of those sales, would have significant disruptive consequences for the lessees.  Declaring the

21   lease sale void would terminate the lease rights of lessees who expended significant effort and

22   funds to obtain those rights.  Such a result is not required by NEPA or the APA.  In order to

23   avoid the unjust result of stripping lessees of their lease rights, the Ninth Circuit has on several

24   occasions sanctioned a remedy that fell short of vacating an oil and gas lease sale.  In *Conner*,

25   the Ninth Circuit, after finding that BLM had violated NEPA with respect to the non-NSO leases

26   at issue, modified the district court's order to make clear that the leases were not set aside and

27   instead enjoined surface-disturbing activity pending compliance with NEPA and the ESA.  848

28   F.2d at 1460-61; *see also id.* at 1461 n. 50 ("By modifying the district court order in this case, we

39

1    avoid the unnecessarily harsh result of completely divesting the lessees of their property

2    rights.").  Similarly, in *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007), the

3    Ninth Circuit upheld a partial injunction for coalbed methane development pending the

4    preparation of additional NEPA analysis.  *See id.* at 842-44.  Other court decisions are in accord.

5    *See Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (suspending,

6    rather than rescinding, leases issued in violation of NEPA and other statutes); *Colo. Envtl. Coal.*

7    *v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011) (staying leases issued

8    pursuant to an EA and FONSI), *am. on reconsideration*, No. 08-CV-01624-WJM-MJW, 2012

9    WL 628547 (D. Colo. Feb. 27, 2012).  BLM has the authority to suspend leases to protect natural

10   resources.  *See* 43 C.F.R. § 3103.4-4(a).  If the Court finds a violation, it should order lease

11   suspension rather than vacatur to avoid depriving lessees who are not before the Court of their

12   lease rights.

13        Alternatively, if the Court finds a NEPA violation, Defendants request the opportunity to

14   provide further briefing before the Court makes a decision regarding remedy.  As discussed

15   above, the remedy analysis will depend on the nature of the legal violations found by the Court

16   and the disruptive consequences of vacating the leasing decisions.  More information on both of

17   those points may be available after the Court issues a merits ruling, and therefore further briefing

18   may be helpful to the Court in deciding on an appropriate remedy.  Because the Court's

19   consideration of whether to vacate BLM's decision will depend on the seriousness of the legal

20   violations found by the Court and equitable considerations, the Court should wait until it has

21   resolved the merits issues and given the parties an opportunity to submit evidence regarding the

22   equities before making a decision whether to vacate.  Therefore, Defendants respectfully request

23   that, if the Court finds a legal violation, the parties be provided an opportunity to submit separate

24   briefs regarding an appropriate remedy.

25                                **CONCLUSION**

26        For the foregoing reasons, summary judgment should be granted in favor of Defendants

27   on all claims.

28        Dated: August 22, 2018                    Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General

*/s/ Luther L. Hajek*
LUTHER L. HAJEK, CO Bar No. 44303
Trial Attorneys
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St., S. Terrace – Suite 370
Denver, CO 80202
Telephone: (303) 844-1376
Fax: (303) 844-1350
Email: luke.hajek@usdoj.gov

*/s/ John S. Most*
JOHN S. MOST, VA Bar No. 27176
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 616-3353
Fax: (202) 305-0506

STEVEN W. MYHRE
Acting United States Attorney
District of Nevada
HOLLY A. VANCE
Assistant United States Attorney
100 W. Liberty Street, Ste. 600
Reno, NV 89501
Ph. 775-784-5438
Email: Holly.A.Vance@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing DEFENDANTS' MOTION FOR

SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF MOTION FOR

SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR

SUMMARY JUDGMENT was made through the Court's electronic filing and notice system

(CM/ECF).

Dated: August 22, 2018.          */s/ Luther L. Hajek*_____
                                  LUTHER L. HAJEK
                                  Trial Attorney