JULIE CAVANAUGH-BILL (NV Bar No. 11533)
Cavanaugh-Bill Law Offices, LLC
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, Nevada 89801
Tel: (775)753-4357
Email: Julie@cblawoffices.org

CLARE LAKEWOOD (CA Bar No. 298479), *pro hac vice*
MICHAEL SAUL (CO Bar No. 30143), *pro hac vice*
Center for Biological Diversity
1212 Broadway, # 800
Oakland, CA 94612
Tel: (510) 844-7121
Email: clakewood@biologicaldiversity.org

Attorneys for Plaintiffs
Center for Biological Diversity and Sierra Club

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, and SIERRA CLUB<br> Plaintiffs,<br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT; RYAN ZINKE, in his capacity as Secretary of the Department of the Interior; and BRIAN STEED, in his capacity as Acting Director of the Bureau of Land Management,<br>Defendants. | Case No. 3:17-cv-00553<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

I.      INTRODUCTION   ...................................................................................................7

II.     ARGUMENT ...........................................................................................................7

A.     BLM Did not Take the Requisite Hard Look at the Impacts of Fracking ........................7

   1.     BLM Unlawfully Postponed Analysis of Impacts .................................................7

   2.     BLM Failed to Take a Hard Look at Fracking ......................................................9

   3.     BLM Relied on Outdated and Inadequate RMPs ...............................................11

   4.     BLM Improperly Relied on Ineffective Mitigation Measures and Thereby
          Ignored Impacts to Mule Deer and Pronghorn ...........................................12

B.     BLM'S Conclusion that the Water Resources and Mule Deer Timing Stipulations
       Avoid All Significant Impacts is Arbitrary and Capricious........................................15

C.     BLM Is Required to Prepare an EIS for the Lease Sales ...........................................18

   1.     The Presence of "Significance Factors" Requires the Preparation of an EIS..................18

   2.     An EIS is Required for Surface-Occupancy Oil and Gas Leases ......................................22

D.     BLM's Determination of NEPA Adequacy Fails to Comply with NEPA....................................24

III.    COURT SHOULD ORDER ADDITIONAL BRIEFING ON REMEDY ....................................25

IV.     CONCLUSION...........................................................................................................26

2

# TABLE OF AUTHORITIES

**Cases**

*Allina Health Servs. v. Sibelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ........................................................... 26

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ........................................................... 26

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (1998) ........................................................... 10, 11, 24

*Camp v. Pitts*,
  411 U.S. 138 (1973) ........................................................... 26

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................... 26

*Cold Mountain v. Garber*,
  375 F.3d 884 (9th Cir. 2004) ........................................................... 21

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ........................................................... 8, 22, 23

*Ctr. for Biological Diversity & Sierra Club v. BLM*,
  937 F. Supp.2d 1140 (2013) ........................................................... 9, 11, 23, 24

*Curtis v. Loether*,
  415 U.S. 189 (1974) ........................................................... 26

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ........................................................... 25

*Found. for N. Am. Wild Sheep v. U.S. Dep't Agric.*,
  681 F.2d 1172 (9th Cir. 1982) ........................................................... 19, 20

3

*Friends of Animals v. Haugrud*,

   236 F. Supp. 3d 131 (D.D.C. 2017) ............................................................. 25

*Friends of Animals v. U.S. Bureau of Land Management*,

   No. 3:15-CV-0057-LRH-WGGC, 2015 WL 555980 (D. Nev. Feb. 11, 2015) ........................... 24

*Greenpeace Action v. Franklin*,

   14 F.3d 1324 (1992) ............................................................................ 19

*Helena Hunter & Anglers v. Tidwell*,

   841 F. Supp. 2d 1129 (D. Mont. 2009) ....................................................... 19

*In re Solerwitz*,

   848 F.2d 1573 (Fed. Cir. 1988) .............................................................. 24

*Kern v. BLM*,

   284 F.3d 1062 (9th Cir. 2002) ............................................................... 10

*Lands Council v. Forester of Region One of the United States Forest Serv.*,

   395 F.3d 1019 (9th Cir. 2004) ............................................................... 12

*Los Ranchos De Albuquerque v. Marsh*,

   956 F.2d 970 (10th Cir. 1992) ............................................................... 23

*Marsh v. Oregon Natural Resources Council*,

   490 U.S. 360 (1989) .......................................................................... 21

*Motor Vehicle Mfrs. Ass 'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,

   463 U.S. 29 (1983) ........................................................................... 13

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,

   668 F.3d 1067 (9th Cir. 2011) ............................................................... 12

*N.M. ex rel. Richardson v. BLM*,

   565 F.3d 683(10th Cir. 2009) .......................................................... 7, 8, 15, 23

*Nat'l Parks Conservation Ass'n v. Babbitt*,

   241 F.3d 722 (Ninth Circuit 2001) ......................................................... 19, 20, 22

4

*Neighbors of Cuddy Mt. v. U.S. Forest Serv.,*

173 F.3d 1372 (9th Cir. 1998) ................................................... 15

*Northern Alaska Environmental Center v. Kempthorne,*

457 F.3d 969, 973 (9th Cir. 2006) ..................................... 8, 9, 23

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.,*

117 F.3d 1520 (9th Cir. 1997) ................................................... 19

*Ocean Advocates v. U.S. Army Corps of Engineers,*

361 F.3d 1108 (9th Cir. 2004) ............................................. 15, 16

*Or. Natural Desert Ass'n v. BLM,*

625 F.3d 1092 (9th Cir. 2010) ............................................. 13, 14

*Reno Air Racing Ass'n, Inc. v. McCord,*

452 F.3d 1126 (9th Cir. 2006) ................................................... 26

*S. Utah Wilderness All. v. Norton,*

457 F. Supp. 2d 1253 (D. Utah 2006) ...................................... 25

*San Luis & Delta-Mendota Water Auth. v. Jewell,*

747 F.3d 581 (9th Cir. 2014) ..................................................... 13

*Seattle Audubon Soc'y v. Espy,*

998 F.2d 699 (9th Cir. 1993) ............................................... 15, 21

*SEC v. Chenery Corp.,*

318 U.S. 80 (1943) ..................................................................... 26

*Sierra Club v. Peterson,*

717 F.2d 1409 (1983) .............................................................. 9, 23

*South Fork Band Council of Western Shoshone of Nevada v. DOI,*

588 F.3d 718 (2009) ............................................................. 17, 18

*Wetlands Action Network v. U.S. Army Corps of Eng'rs,*

222 F.3d 1105 (9th Cir. 2000) ....................................... 18, 19, 25

**Statutes**

5

5 U.S.C. § 706(2)(A) ................................................................................. 26

**Regulations**

40 C.F.R. § 1502.21 .................................................................................. 10

40 C.F.R. § 1508.27(b)(3) ........................................................................ 18

40 C.F.R. § 1508.9 ..................................................................................... 9

43 C.F.R. § 3101.1 ............................................................................... 8, 14

43 C.F.R. § 3101.2 ............................................................................... 8, 14

**Other Authorities**

BLM Handbook H-1790-1 at § 5.1.3 ........................................................ 25

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

Defendants fail to establish that the Bureau of Land Management ("BLM") met its basic procedural obligations under NEPA when it decided, in June and September 2017, to lease parcels of land in its Battle Mountain District Office area for oil and gas development. BLM improperly failed to analyze the environmental impacts of fracking, and relied on outdated and inadequate RMPs and ineffective mitigation measures. Consequently, it arbitrarily and capriciously concluded that there will be no significant impacts from the lease sales. The law is clear that the agency was required to prepare an EIS for these sales; its failure to do so is contrary to the demands of NEPA. Because of the deficiencies in the underlying EA, BLM's Determination of NEPA Adequacy for the September sale violates NEPA also.

## II.    ARGUMENT

### A.  BLM Did not Take the Requisite Hard Look at the Impacts of Fracking

#### 1.   BLM Unlawfully Postponed Analysis of Impacts

Defendants offer two arguments in defense of their contention that BLM "analyzed . . . impacts in an appropriate level of detail at the lease stage," Defs. Br. At 11, neither of which excuses BLM's failure to assess foreseeable impacts prior to an irretrievable commitment of resources. *See N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir. 2009). First, BLM argues that plaintiffs have overlooked statements by BLM acknowledging that foreseeable development activities will have indirect effects on resources including hydrology, vegetation, climate, and wildlife. Defs. Br. at 12-13. Plaintiffs, however, do not dispute BLM's acknowledgment that leasing will foreseeably result in unavoidable indirect impacts, and indeed quote multiple such acknowledgments in their opening brief. Pls. Br. at 26-27 (quoting AR05709, 05713). Plaintiffs' argument is not, as Defendants appear to suggest, that BLM has denied that there will be any foreseeable indirect impacts from leasing. Rather, it is that BLM, as detailed in Plaintiffs' opening brief, has improperly failed to engage in any meaningful analysis of those impacts on particular lands, waters, and affected wildlife species.

7

1   Second, Defendants argue that the admitted NEPA requirement to analyze impacts at the

2   leasing stage "does not mean that BLM was required by NEPA to analyze in detail the impacts of

3   developing particular sites, because the details of which sites will be developed are not known at the

4   leasing stage." Defs. Br. at 13. Defendants cite *Northern Alaska Environmental Center v.*

5   *Kempthorne,* 457 F.3d 969, 973, 977 (9th Cir. 2006) to argue that the Ninth Circuit "clarified"

6   *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) and somehow limited BLM's obligation to

7   consider impacts of foreseeable development on particular parcels prior to leasing. Defs. Br. at 13-

8   14. Defendants' argument, however, improperly overlooks the key reasoning behind the Ninth

9   Circuit's holding in *Northern Alaska*. There, in a case involving a completed Environmental Impact

10  Statement for a leasing program across vast areas of Alaska, the court reasoned:

11      Plaintiffs place principal reliance on *Conner*, but we do not believe it advances their

12      position in this case. <u>Here the leases are more like the "non NSO [No Surface</u>

13      <u>Occupancy] leases" in *Conner*. The government can condition permits for drilling on</u>

14      <u>implementation of environmentally protective measures, and we assume it can deny a</u>

15      <u>specific application altogether if a particularly sensitive area is sought to be</u>

16      <u>developed and mitigation measures are not available.</u> The government cannot,

17      however, consistent with current statutory imperatives, forbid all oil and gas

18      development in Alaska's NWPA. The leasing program thus does constitute an

19      irretrievable commitment of resources. An EIS is undeniably required, and, indeed

20      one has been prepared.

21  *N. Alaska*, 457 F.3d at 976 (emphasis added). Here, unlike the non-NSO leases in *Conner*

22  and the court's assumption in *Northern Alaska*, BLM retains neither the authority to prohibit

23  all surface occupancy, nor the authority to deny drilling altogether in particular areas. *See* 43

24  C.F.R. § 3101.1-2; *Richardson*, 565 F.3d at 718 ("Because BLM could not prevent the

25  impacts resulting from surface use after a lease issued, it was required to analyze any

26  foreseeable impacts of such use before committing the resources."); *Sierra Club v. Peterson*,

27  8

28      Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1  717 F.2d 1409, 1415 (D. C. Cir. 1983) (concluding that an agency may wait to evaluate

2  environmental impacts until after the leasing stage if it lacks information necessary to

3  evaluate them, "provided that it reserves both the authority to *preclude* all activities pending

4  submission of site-specific proposals and the authority to *prevent* proposed activities if the

5  environmental consequences are unacceptable"). *Northern Alaska* thus reinforces, rather than

6  undermines, BLM's obligation to evaluate impacts *before* making irretrievable commitments.

7       Finally, contrary to Defendants' suggestion, Plaintiffs are not arguing that BLM must engage

8  in a well-by-well assessment of yet-unknown precise individual well sites at the leasing stage.

9  Rather, Plaintiffs are simply seeking to enforce the established principle that agencies must engage

10  in *some* meaningful assessment of foreseeable impacts to affected resources "at the 'earliest possible

11  time' to allow for proper consideration of environmental values . . . ." *Ctr. for Biological Diversity v.*

12  *BLM*, 937 F. Supp.2d 1140, 1152 (N.D. Cal. 2013). BLM may delay to the permitting stage

13  evaluation of impacts that depend on the precise number and siting of well sites and other

14  infrastructure. Where, as here, however, it has relinquished authority to prevent surface disturbance

15  or forbid drilling altogether, it may not avoid disclosing and analyzing at the leasing stage those

16  impacts—including risks to ground and surface water and foreseeable loss of wildlife habitat—that

17  are irretrievably authorized by the act of leasing.

18       **2.  BLM Failed to Take a Hard Look at Fracking**

19       Defendants' effort to characterize the EA's analysis of fracking as sufficient to meet the

20  demands of NEPA falls short. Defendant quotes from a single page of the EA, to describe *how*

21  fracking occurs (Defs. Br. at 14, citing to AR50679), and finishes with a conclusory statement that

22  the state of Nevada has adopted standards for the regulation of fracking. AR05680. But these

23  recitations do not amount to the required analysis of the "environmental impacts of the proposed

24  action." 40 C.F.R. § 1508.9. They are but a cursory acknowledgement of the possibility of impacts,

25  analogous to the statements found in *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d

26  1208, 1213 (9th Cir. 1998) to be insufficient to meet the requisite "hard look" that NEPA requires.

27  9

28                     Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1    Rather than analyze the impacts of fracking, or reasonable alternatives to address those

2    impacts, the EA simply refers readers to the appended White Paper. AR05679; 05700; 05877.

3    Plaintiffs do not dispute that BLM may incorporate material into an EA by reference.[1] 40 C.F.R.

4    § 1502.21. But that is not what BLM did here. Instead, it relied on the White Paper in lieu of

5    undertaking the analysis that NEPA requires. *Kern v. BLM,* 284 F.3d 1062 (9th Cir. 2002) is on

6    point. In that case, rather than analyze "the likely impact" of timber sales upon a fungus affecting the

7    Port Orford Cedar, the EIS only referred to the fungus and the Cedar "in a brief reference to the

8    [BLM's Port Orford Cedar Management] Guidelines," which did not analyze the impact of timber

9    sales on the spread of the fungus. *Id.* at 1072-73. Reference to another document prepared by BLM

10   did not excuse BLM "from its responsibility under NEPA to perform an analysis of the effects of the

11   fungus . . . in an EIS specifically addressed to the [region the subject of the EIS]." *Id.* at 1703. Here,

12   reference to the White Paper, which does not analyze the impacts of fracking in the Lease Area, does

13   not excuse BLM from its obligation to undertake that analysis. Moreover, the White Paper does not

14   even purport to fulfill BLM's obligation under NEPA to consider a reasonable range of alternatives.

15   The courts are clear that general statements about "possible" effects and "some risk" do not

16   satisfy the requirements of NEPA. *Blue Mts. Biodiversity Project*, 161 F.3d at 1213. But such

17   general statements about the possible impacts of fracking are all that the White Paper contains.

18   Defendants' recitation from the White Paper of non-specific information about how fracking is

19   conducted and what kinds of risks it poses (Defs. Br. at 15) cannot remedy the deficiencies of the

20   EA. The White Paper contains no analysis of what the risks and impacts of fracking might be in the

21   context of the Lease Area and the particular lands, waters, and wildlife at risk. *See* Pfs. Mem. at 29-

22   30. Nor is the fact that *Blue Mountains Biodiversity Project* involved agency action after which no

23   further environmental analysis was required as a basis for distinguishing the case. BLM made an

24

25   _____

     [1] Though Plaintiffs note that material that is appended to an environmental analysis is not ordinarily
26   considered to be "incorporated by reference." *See* Forty Most Asked Questions Concerning CEQ's
     National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,034 (Mar. 23, 1981)
27   ("[T]he material which is incorporated by reference does not accompany the EIS.").
     10
28                                    Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1  "irretrievable commitment of resources" when it offered surface occupancy leases for sale; therefore

2  analysis of all reasonably foreseeable impacts must occur before that sale. *Richardson*, 565 F.3d at

3  716-18; *see also Ctr. for Biological Diversity*, 937 F. Supp. 2d at 1157-58 (finding agency's attempt

4  to defer analysis of impacts of fracking until it received site-specific proposals to drill was contrary

5  to NEPA). Like the EA in *Center for Biological Diversity*, the analysis here has an "unreasonable

6  lack of consideration of how fracking could impact development of the disputed parcels." *Id.* at

7  1157. That the EA in that case "projected that only one exploratory well would be drilled within the

8  lease sale area" is no basis for distinguishing that case. *See* Defs. Br. at 18. The fact that the EA at

9  issue here predicts that *more* wells will be drilled (AR05677 (projecting 30-well development), and

10  that any of them may be fracked (AR05679 ("[fracking] is one of these methods that may be

11  reasonably foreseeable for leases") only makes BLM's failure to take a hard look at the impacts of

12  fracking more egregious.

13      Defendants' assertion, unsupported by any authority, that the White Paper was prepared for

14  the EA at issue in this case, and that it was therefore open to comment, is baseless.[2] The White Paper

15  itself states that it was prepared "for the State of Nevada" (AR05841) and was appended to an EA

16  prepared by BLM's Ely District office in December, 2015, which pre-dates the Battle Mountain

17  District EA at issue here. Pfs. RJN at Ex203-13 (Ely District EA, Appendix F: Hydraulic Fracturing

18  White Paper).[3]

19          **3.  BLM Relied on Outdated and Inadequate RMPs**

20  Defendants do not attempt to argue that the Tonopah RMP and the Shoshone-Eureka RMP

21  adequately analyze the impacts of fracking and oil and gas drilling on the Lease Area. Defs. Br. at

22  18-19. In light of BLM's admission in the EA that the Lease Area "cannot be considered for leasing

23  without supplemental analysis of new information and changes in environmental conditions since

24

25  [2] Such assertion is also inconsistent with Defendants' assertion that the White Paper was "modified
    for leasing in Nevada." Defs. Br. at 15.

26

27  [3] The White Paper attached to the Ely District 2015 EA has some slight differences in formatting to
    the White Paper appended to the EA at issue in this case, though the content is the same.

    11

28                      Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1    these RMPs were approved" (AR05666), Defendants argue only that the analysis of impacts in the

2    EA ameliorates the inadequacy of the RMPs. Defs. Br. at 18. Plaintiffs do not, as Defendants

3    suggest, mischaracterize the text of the EA. Defs. Br. at 20. BLM admitted that the RMPs prepared

4    for the Lease Area do not adequately protect resources in the area, and a supplemental analysis was

5    therefore required. In the words of the BLM staff preparing the EA, "the 'Best Available Science'

6    and the RMP are not operating in the same temporal plane." AR23899. However, for the reasons set

7    out in above and below, the analysis in the EA is insufficient to meet the demands of NEPA. The

8    RMPs do not protect the parcels, and the stipulations attached are insufficient to save them from

9    impacts. To the extent that BLM relied on the RMPs in making its findings and holding the lease

10   sale, therefore, the staleness of the RMPs renders BLM's reliance arbitrary and capricious. *Lands*

11   *Council v. Forester of Region One of the U.S. Forest Serv.*, 395 F.3d 1019, 1031 (9th Cir. 2004)

12   (reliance on six-year-old fish count data prevented accurate analysis); *N. Plains Res. Council, Inc. v.*

13   *Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) (ten-year old survey data for wildlife "too

14   stale" thus reliance on it was arbitrary and capricious).

15            **4.   BLM Improperly Relied on Ineffective Mitigation Measures and Thereby**

16                 **Ignored Impacts to Mule Deer and Pronghorn**

17            Defendants argue that BLM's analysis of big game mitigation measures satisfies NEPA.

18   Defs. Br. at 20-21. Although Defendants cite numerous cases discussing generally agencies'

19   authority to incorporate and evaluate mitigation measures in NEPA decisions, they avoid

20   confronting the core of Plaintiffs' argument—that BLM has refused to acknowledge or consider

21   robust scientific evidence that the very mitigation measures they are relying upon are ineffective.

22            As an initial matter, Defendants' description of the big game mitigation stipulation adopted

23   in Alternative B is misleading. Defendants contend that the lease stipulation "prohibits all surface

24   activity from January 15 through May 15." Defs. Br. at 21-22. The record is clear that the

25   stipulation, however, prohibits only *initial drilling activity*—it neither prohibits the operation of a

12

1   well nor requires the removal of infrastructure during the winter season once a well is established.

2   AR05746, 05792, 05821-24.

3         Defendants' brief contends that "BLM sufficiently analyzed mitigation in compliance with

4   NEPA," Defs. Br. at 21, but does not actually point to any such analysis in the record. Defendants

5   point only to the fact that BLM "ultimately adopted seasonal protections as recommended by

6   NDOW," Defs. Br. at 23 (citing AR05713), and that BLM could potentially subsequently adopt

7   additional "conditions of approval" at the stage of reviewing individual drilling permits. Defendants

8   do not and cannot, however, identify any actual analysis or consideration by the agency of the

9   comments, protests, and supporting documentation submitted by Plaintiffs detailing unavoidable,

10  well-documented impacts to mule deer and pronghorn from oil and gas development *despite* use of

11  timing stipulations and conditions of approval.

12        Defendants then go on to argue that the shortcomings of its mule deer and pronghorn

13  mitigation measures are distinguishable from the recommendations of other state wildlife agencies

14  and peer-reviewed scientific studies, and that unavoidable impacts to mule deer winter habitat might

15  potentially be mitigated further by subsequent measures at the drilling permit application stage.

16  Defs. Br. at 23-24. These post-decisional distinctions and contingencies raised by counsel, however,

17  cannot be substituted for what the agency did—or did not—actually analyze prior to authorizing

18  leasing. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir.

19  2014) ("[W]e will not allow the agency to supply post-hoc rationalizations for its actions . . . ."); *Or.*

20  *Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1120 (9th Cir. 2010) ("'It is well established that an

21  agency's action must be upheld, if at all, on the basis articulated by the agency itself.'") (*citing Motor*

22  *Vehicle Mfrs. Ass 'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 50 (1983)). Counsel's attempts

23  to piece together, after the fact, a series of hypothetical future situations, under which BLM's

24  wildlife stipulations *might* be rendered adequate to alleviate significant impacts to deer and

25  pronghorn, are no substitute for the agency's actual analysis of those stipulations *prior to*

26  commitment to leasing and ensuing rights to surface use. *See Or. Natural Desert Ass'n*, 625. F.3d at

27

28  13

                   Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1  1120 (rejecting justification for BLM failure to consider relevant resources first advanced in

2  litigation and never articulated in EIS).

3      Defendants' brief further misrepresents the scope of BLM's retained authority when it asserts

4  that "BLM can address the spacing of well pads and develop further mitigation to address the

5  impacts of drilling and related infrastructure when it receives applications for permit[s] to drill."

6  Defs. Br. at 24. BLM's fluid mineral leasing regulations, however, expressly provide as follows:

7          A lessee shall have the right to use so much of the leased lands as is necessary to
          explore for, drill for, mine, extract, remove and dispose of all the leased resource in a
8          leasehold subject to: Stipulations attached to the lease; restrictions deriving from
          specific, nondiscretionary statutes; and such reasonable measures as may be required
9          by the authorized officer to minimize adverse impacts to other resource values, land
          uses or users not addressed in the lease stipulations at the time operations are
10         proposed. . . . At a minimum, measures shall be deemed consistent with lease rights
          granted provided that they do not: require relocation of proposed operations by more
11         than 200 meters; require that operations be sited off the leasehold; or prohibit new
          surface disturbing operations for a period in excess of 60 days in any lease year.
12

13  43 C.F.R. § 3101.1-2. Although these regulations allow for some "reasonable measures," such as 60-

14  day timing provisions or 200-meter relocations of operations, it is far from clear as to whether BLM

15  could actually limit the number or density of well pads on a given site absent explicit retained

16  authority in a lease stipulation.

17      In summary, the bare fact that BLM has adopted limited stipulations applicable to initial

18  drilling in big game habitat cannot substitute for an actual assessment of those mitigation measures,

19  nor justify the conclusion that these measures avoid significant harm. Simply listing mitigation

20  measures without analysis is inconsistent with the "hard look" requirement of NEPA. *Neighbors of*

21  *Cuddy Mt. v. U.S. Forest Serv.*, 173 F.3d 1372, 1380 (9th Cir. 1998) ("Mitigation must be discussed

22  in sufficient detail to ensure that environmental consequences have been fairly evaluated . . . . A

23  mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by

24  NEPA.") (internal citations omitted). This shortcoming is exacerbated where, as here, the agency has

25  not only refused to analyze the effectiveness of relied-upon mitigation measures, but also has refused

26  to address or respond to contrary evidence before it. *See Seattle Audubon Soc'y v. Espy*, 998 F.2d

27  14

28                                      Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

699, 704 (9th Cir. 1993) (agency violated NEPA's "hard look" requirement by failing to address in any meaningful way scientific uncertainty created by a new report).

### B. BLM'S Conclusion that the Water Resources and Mule Deer Timing Stipulations Avoid All Significant Impacts is Arbitrary and Capricious

Contrary to Defendants characterization, Plaintiffs do not argue that the FONSI is unsupported because BLM did not apply the Water Resources stipulation to "all parcels." Defs. Br. at 31. Rather, Plaintiffs' point is that Defendants failed to "articulate[] a rational connection between the facts found and the choice made." *Ocean Advocates v. U.S. Army Corps of Engineers*, 361 F.3d 1108, 1118 (9th Cir. 2004) (citation omitted). The agency made a FONSI on the basis that the Water Resources Stipulation will avoid all impacts, when the record is clear that: (1) the Stipulation was not applied to all parcels containing water resources; (2) the Stipulation cannot protect off-parcel water resources from reasonably foreseeable impacts identified in the EA; and (3) the Stipulation does not protect on-parcel water resources, because some parcels will have to be excepted from the Stipulation because impacts cannot be avoided. The FONSI is therefore arbitrary and capricious. Defendants' conclusory statement that "BLM's reasonable conclusion that the leasing decision would not cause significant impacts" (Def. Dr. at 32) is unsupported by the record; and their assertion that "further site-specific analysis would occur at the APD stage" ignores the evidence of impacts already in the record, and that the lease sale is the point of irretrievable commitment of resources. *Richardson*, 565 F.3d at 718.

If, as Defendants assert, the purpose of the Resource Protection alternative was "to protect the parcels that would have been deferred under the Partial Deferral alternative" (Defs. Br. at 31), BLM failed to achieve its purpose. The fact that the stipulation imposes buffers of between 100 and 500 feet from the edge of water resources (Defs. Br. at 31) does nothing to protect the 24 parcels in the June sale that BLM identifies as containing wetlands, to which the Water Resources Stipulation is not attached. Cf: AR05827-30 (parcels with Water Resources Stipulation) and AR05816-17

15

(parcels containing wetlands). Defendants' opposition offers no defense to BLM's failure to attach the stipulation to parcels containing wetlands.

Defendants also fail to address Plaintiffs' argument that BLM has no basis for its conclusion that that the Water Resources Stipulation protects water resources on parcels to which the stipulation was attached. The situation is analogous to that in *Ocean Advocates*, 361 F.3d at 1125. There, the Corps violated NEPA when, despite acknowledging concerns that increased tanker traffic could increase the risk of an oil spill, the Corps concluded without "a fully informed and well-reasoned basis for failing to give more careful attention to the potential for increased traffic," that a proposed oil refinery dock extension would result in a *reduction* in the risk of oil spills. *Id*. Here, because the stipulation cannot be applied to protect off-parcel resources (AR05714), it does nothing to protect water bodies and rare fish species that are not located on a lease parcel, but which may reasonably foreseeably be impacted by oil and gas drilling activities. AR05714 (rare fish habitat near parcels 55 and 66); AR05712 (possibly unique sub-species of speckled dace within 400 meters of parcel 55; and BLM Sensitive and state-protected Fish Creek Springs tui chub found in only one location, 700 meters from parcel 66); AR05701 (contaminants may spill and spread throughout a water system); AR05699-700 (oil and gas activity may interfere with groundwater flow or groundwater recharge patterns). The conclusion in the EA that "[a]pplication of the stipulation would generally protect water resources from all impacts" AR05702 is therefore without the requisite "well-reasoned basis," (*id*), and renders the FONSI arbitrary and capricious.

The Water Resources Stipulation does not even necessarily protect wetlands on parcels to which it is applied. The stipulation provides that "[a]n exception [to the stipulation] may … be granted where areas cannot be avoided and when engineering, best management practices, and/or design consideration are implemented to mitigate impacts to water resources." AR05827. "[B]est management practices" and unspecified mitigation measures cannot avoid all significant impacts when "several of the proposed lease parcels… largely or entirely overlay a combination of water bodies," such that it would be "difficult or impossible to avoid impacts to these hydrological features

16

1    and their associated plant and wildlife habitats" (AR05699), and BLM cannot prohibit all

2    development on a parcel once leased. AR05702; 05746.

3           Further, the EA fails to analyze the effectiveness of "special design, construction or

4    implementation measures" where impacts cannot be avoided. AR05827. The EA states only that

5    "[a]pplication of the stipulation would generally protect water resources from all impacts."

6    AR05702. And in that respect, this case is analogous to *South Fork Band Council of Western*

7    *Shoshone of Nevada v. DOI*, 588 F.3d 718 (9th Cir. 2009). There, the EIS at issue contained no

8    evaluation of the effectiveness of proposed mitigation measures—"[n]othing whatsoever [was] said

9    about whether the anticipated harms could be avoided by *any* of the listed mitigation measures," and

10   thereby failed to constitute a hard look. *Id.* at 726. Here, the EA contains no analysis whatsoever

11   about the effectiveness of mitigation measures to be applied when impacts cannot be avoided.

12   Plaintiffs are not asking the court to "*anticipate* that exceptions would be allowed indiscriminately or

13   inappropriately at the APD stage" (Defs. Br. at 31 (emphasis added))—the record itself clearly

14   shows that exceptions *will* be *required* at the leasing stage. Consequently, BLM's conclusion that

15   there will be no significant impacts to water resources as a result of the lease sales in question is

16   arbitrary and capricious.

17          Defendants' only argument against why *South Fork Band*, 588 F.3d at 726-27 does not apply

18   appears to be that the holding of that case—that agencies must provide an assessment of the

19   effectiveness of mitigation measures—applies only to Environmental Impact Statements, not

20   Environmental Assessments. Defs. Br. at 25 n.10. Although *South Fork Band* certainly involved an

21   Environmental Impact Statement, Defendants offer no reason why that decision's basic reasoning—

22   "[a] mitigation discussion without at least *some* evaluation of effectiveness is useless" in

23   determining whether impacts can be avoided—should not apply to all NEPA decision-making

24   processes. *Id.* Moreover, in this particular case, BLM has relied on the assumed efficacy of the Mule

25   Deer Timing and Water Resources Stipulations to reach the conclusion that all significant impacts

26

27   17

28                              Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1  will be avoided. BLM cannot avoid preparation of an EIS by relying on mitigation assumptions that

2  would be plainly impermissible *in* an EIS.

3       **C.  BLM Is Required to Prepare an EIS for the Lease Sales**

4            **1.  The Presence of "Significance Factors" Requires the Preparation of an EIS**

5       *Wetlands and ecologically critical areas are left unprotected by the Water Resources*

6  *Stipulation*: In evaluating whether impacts are significant such that an EIS is required, an agency

7  must consider "[u]nique characteristics of the geographic area such as proximity to . . . wetlands." 40

8  C.F.R. § 1508.27(b)(3). Although the Lease Area contains hundreds of acres of wetlands, swamps

9  and marshes, lakes, and playas—"literal oases [of] life" that are "the most productive and important

10  ecosystems [i]n the Battle Mountain District" (AR05697, 05698)—Defendants say that no EIS is

11  required because the Water Resources Stipulation "is sufficient to protect against significant impacts

12  and has been applied to the appropriate parcels." Defs. Br. at 33. But Defendants fail to address the

13  fact that impacts may result from the lease sales because the Water Resources Stipulation was not

14  applied to many parcels containing wetlands, the Water Resources Stipulation cannot protect off-

15  parcel resources, and exceptions to the Water Resources Stipulation will need to be granted, which

16  will necessarily result in impacts that the EA does not analyze. *See supra,* at II.B.

17       *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000)

18  had a fact pattern entirely different to the one at hand. The project at issue there, to fill certain

19  wetlands, was to be mitigated by the creation of new freshwater wetlands. Unlike here, the EA

20  "considered numerous reports, studies, and comments which evaluated the feasibility of the

21  freshwater wetland system … the biological needs of the native habitat and wildlife of the region,

22  water quality issues related to the project, the drainage, watershed characteristics, water levels of the

23  area, and possible flooding that may be associated with the freshwater system" that demonstrated the

24  agency took the requisite "hard look" at impacts making a FONSI. *Id.* at 1120-21. The situation here

25  is more analogous to the situation in *Helena Hunter & Anglers v. Tidwell*, 841 F. Supp. 2d 1129 (D.

26  Mont. 2009), where the court concluded that an EIS was required for a project to build a facility

27

28  18

               Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

adjacent to wetlands because "[t]he EA contains no consideration whether [the project's] 'proximity to . . . wetlands' will cause impacts even though the [project] would not be constructed inside the wetland area," and the EA "repeatedly discuss[ed] the possibility that the facility is in an area important for wildlife linkage." *Id.* at 1136, 1137.

*The Lease Sales are Highly Controversial:* Defendants imply that the action is not highly controversial because BLM received "about a dozen" comment letters on the EA. Defs. Br. at 34. If, as Defendants asserts, there must be an "outpouring of public protest" in order for a sale to be highly controversial, the approximately 8,000 letters and e-mails sent by individual members of the public through a conservation group's portal surely meets that bar. *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1334 (9th Cir. 1992)); AR05871. But the number of comments alone does not determine whether an action is controversial. Rather, the test is whether there are "substantial questions … raised as to whether a project . . . may cause significant degradation" of a resource (*NW. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997)), or whether "a substantial dispute exists when evidence, raised prior to the preparation of [a] . . . FONSI, casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736. Comments from wildlife agencies are "precisely the type of 'controversial' action for which an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982). In response to the draft EA, Nevada Department of Wildlife ("NDOW") and the U.S. Fish and Wildlife Service ("FWS") both raised substantial concerns about the impacts of oil and gas activities on certain parcels.

Those concerns were not, contrary to Defendants' assertions, addressed in the final EA. NDOW requested that parcels 66 and 106 be deferred from leasing because oil and gas development on those parcels may impact state-protected, BLM sensitive, and federally threatened fish species

19

that rely on nearby water sources. AR06645; AR18754. FWS also requested deferral of parcel 66.[4]

AR19140. Defendants mislead the court in stating that BLM addressed these concerns by

"impos[ing] the… water resources stipulation on these parcels." Defs. Br. at 34-35. The Water

Resources Stipulation was not applied to Parcel 66 or 106. AR05828-30 (list of parcels to which the

Water Resources Stipulation is attached). Accordingly, NDOW's and FWS' concerns were left

unaddressed, rendering the lease sales controversial. Further, the evidence before BLM about the

effectiveness of the Timing Limitation Stipulations cast serious doubt upon the reasonableness of

BLM's conclusion that the Timing Limitation Stipulations would avoid all impacts to mule deer. *See*

supra, at II.A.4. BLM failed to respond to that data, and thereby failed to "come forward with [the]

'well-reasoned explanation' demonstrating why" there is no controversy, as NEPA requires. *Nat'l*

*Parks & Conservation Ass'n*, 241 F.3d at 736.

        Defendants assert that this case, unlike *Foundation for North American Wild Sheep*, is

"simply not a case in which the agency 'received numerous responses from conservationists,

biologists, and other knowledgeable individuals, all highly critical of the EA." Defs. Br. at 35, citing

*Found. for N. Am. Wild Sheep*, 681 F.2d at 1182. But that case did not turn on the volume of

opposition—indeed, the court did not even state the number of comments in opposition received. In

the context of determining whether the project was controversial, the court only referred specifically

to comments from the California State Department of Natural Resources and the California State

Department of Fish and Game, "expressing disagreement with the EA's conclusion." *Id.* Here, state

and federal agencies, federally-registered tribes, conservation groups and the Eureka County Board

of Commissioners expressed concern about the impacts of oil and gas activities. AR18754; 05871-

86. Defendants misquote NDOW to suggest that NDOW supported the EA, because "the majority of

[NDOW's] scoping comments were considered in the EA's development." Defs. Br. at 35. In fact,

NDOW stated that "the majority of [NDOW's] scoping comments were considered in the EA's

---

[4] Defendants imply that impacts to parcel 66 are irrelevant because the parcel was not sold at auction. But that parcel remains available for purchase, without further agency action or analysis, until June, 2019. AR1401.

20

1   development *and are reflected in the Partial Deferral Alternative.*" AR06644 (emphasis added).

2   NDOW specifically referred to deferral of parcels from sale (along with timing limitations and lease

3   notices) as a mechanism to "protect key habitats." AR06644. The alternative that BLM selected, the

4   Additional Resource Protection Alternative, does not defer any parcels proposed for deferral under

5   the Partial Deferral Alternative. AR05659. NDOW's comments cannot be understood as supporting

6   BLM's final EA.

7          Finally, Defendants rely on *Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004) for the

8   proposition that the "degree of opposition [to the June lease sale] does not render an action highly

9   controversial." Defs. Br. 35. Defendants overstate the holding of that case. The court in *Cold*

10  *Mountain* held that "the existence of opposition does not automatically render a project

11  controversial." *Id*. at 893. In that case, comments opposing the project did not mention the issue that

12  appellants asserted was controversial. *Id*. In contrast, here, the nature of the opposition establishes

13  clearly that the lease sales are controversial. Plaintiffs provided peer-reviewed, empirical scientific

14  studies demonstrating that the Timing Limitation Stipulations relied upon demonstrably would not

15  avoid significant impacts to mule deer from oil and gas activities. AR01294-95; 60991-61001;

16  61002-10. State and federal agencies requested that BLM not lease parcels to avoid impacts to water

17  resources and aquatic species. Although the Ninth Circuit has held that "[i]t would not further

18  NEPA's aims for environmental protection to allow [an agency] to ignore reputable scientific

19  criticisms that have surfaced . . . ." *Seattle Audubon Soc'y*, 998 F.3d at 704 (*citing Marsh v. Oregon*

20  *Natural Resources Council*, 490 U.S. 360, 370-74 (1989), that is precisely what BLM did.

21          *The Lease Sales Present Uncertain and Unknown Risks:* In response to Plaintiffs' argument

22  that BLM failed to analyze the impacts of fracking on the Lease Area, despite acknowledging that

23  such impacts are unknown (AR05847), BLM again argues that it need not fulfil its duties under

24  NEPA because "risks can be minimized" through subsequent analysis. Defs. Br. at 35. Again, this

25  approach of "approve now and ask questions later is precisely the type of environmentally blind

26  decision-making NEPA was designed to avoid." *Conner*, 848 F.2d at 1451.

27

28  21

1    Analysis of readily available data in an EIS would assist in addressing the uncertainties and

2    unknown risks. For instance, BLM was provided with extensive scientific studies on the impacts to

3    mule deer of oil and gas activities subject to timing limitations, which it failed to address. *Supra* at

4    II.A.4. Further, the EA fails to disclose whether there are any active faults in the Lease Area, though

5    such information would help determine the seismic risks from fracking on the parcels. *See* AR28231

6    (study of active faults and proximity to fracking, concluding that fluid injection triggered

7    seismicity). Though the EA identified the water bodies in the Lease Area (AR05698), it failed to

8    analyze the impacts of fracking on the quantity or quality of water in the Lease Area. Because

9    information addressing these impacts is obtainable and would be of assistance in evaluating the

10    impacts of selling oil and gas leases in the Lease Area, BLM must prepare an EIS. *Nat'l Parks &*

11    *Conservation Ass'n*, 241 F.3d at 739.

12    Finally, the mere fact that some fracking techniques have been used since 1950 (Defs. Br. at

13    35) does not mean that fracking does not present uncertain and unknown risks to the Lease Area.

14    Fracking today utilizes high pressure, multi-stage techniques that are much different to early

15    fracking efforts. AR05841; 44658 (modern slick-water hydraulic fracturing different to the technique

16    developed in the 1940s).

17    **2.   An EIS is Required for Surface-Occupancy Oil and Gas Leases**

18    Recent case law is well settled—because the sale of a surface occupancy oil and gas lease is

19    the point at which there is an "irretrievable commitment of resources," "substantial questions

20    regarding the government's ability to adequately regulate activities" remain, and an EIS must

21    therefore be prepared. *Conner*, 848 F.2d at 1463; *see also Sierra Club*, 717 F.2d at 1412-15;

22    *Richardson,* 565 F.3d at 718. Defendants rely only on *Los Ranchos De Albuquerque v. Marsh*, 956

23    F.2d 970 (10th Cir. 1992) to establish that an EA is sufficient, but completely misstate the facts and

24    significance of that case. The court there did not uphold "BLM's issuance of an EA for a lease sale,"

25    (Defs. Br. at 36), but rather an EA prepared by the U.S. Army Corps of Engineers for the

26    construction of a bridge. *Id.* at 972. The decision stands only for the proposition that the arbitrary

27    

28    

22

Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1   and capricious standard is applied to review an agency's decision not to prepare an EIS, which

2   Plaintiffs do not dispute. *See* Pfs. Mem. at 23.

3          Defendants cite *Northern Alaska* out of context to suggest that it stands for the proposition

4   that BLM may prepare something less than an EIS. Defs. Br. at 36. *Northern Alaska*—where there

5   government had prepared an EIS—does not undermine the holdings of *Conner*. Rather, the court

6   held that *Conner* was of no assistance to plaintiffs who sought a "parcel by parcel" analysis, because,

7   although *Conner* held that an EIS is required for an oil and gas lease sale, it did not address the

8   degree of specificity such an EIS requires. *N. Alaska*, 457 F.3d at 976. Plaintiffs here do not seek a

9   parcel-by-parcel analysis. *See supra* at II.A.1. *Conner* rejected the very argument that defendants

10  make here—that the "uncertain and speculative nature of oil exploration makes preparation of an

11  EIS untenable until lessees present precise, site-specific proposals for development." *Conner*, 848

12  F.2d at 1450. The court found that "the government's inability to fully ascertain the precise extent of

13  the effect of mineral leasing… is not… a justification for failing to estimate what those effects might

14  be before irrevocably committing to the activity." *Id.*

15         Defendants further argue that the lease sales do not require an EIS because BLM "rel[ied] on

16  the EISs prepared in conjunction with the Tonopah and Shoshone-Eureka RMPs." This argument

17  was specifically rejected in *Center for Biological Diversity*, 937 F. Supp. 2d 1140. There, as here,

18  defendants argued they need not prepare an EIS for a lease sale because "the EA was tiered to the

19  regional management plan for the general area encompassing the lease sale", even though the RMP

20  EIS contained "no explicit mention of fracking at all." *Id.* at 1156-57. The court found that

21  "[b]ecause the PRMP/FEIS does not address these concerns that are specific to these 'new and

22  significant environmental impacts,' [of fracking] further environmental analysis was necessary." *Id.;*

23  *see also Blue Mts. Biodiversity Project*, 161 F.3d at 1214 (existence of a programmatic EIS does not

24  obviate the need for any future project-specific EIS without regard to nature of magnitude of

25  project). Like the RMP in *Ctr. for Biological Diversity*, the Tonopah and the Shoshone-Eureka

26  RMPs do not even mention fracking. The Eureka-Shoshone RMP EIS does not even mention the

23

1  impacts of conventional oil and gas activities on hydrologic or biological resources, or identify mule

2  deer and pronghorn seasonal use areas. AR05711.

3        Finally, Plaintiffs assume Defendants' cite to *In re Solerwitz*, 848 F.2d 1573 (D.C. Cir. 1988)

4  is in error as the pincite does not exist and the case, being about attorney discipline, is irrelevant.

5        **D.  BLM's Determination of NEPA Adequacy Fails to Comply with NEPA**

6        In an effort to defend BLM's deficient Determination of NEPA Adequacy ("DNA"),

7  Defendants twist the only case they rely upon, attempting to give it significance it does not have.

8  *Friends of Animals v. U.S. Bureau of Land Management*, No. 3:15-CV-0057-LRH-WGGC, 2015

9  WL 555980 (D. Nev. Feb. 11, 2015) does not stand for the proposition that so long as the subsequent

10  proposed activity is of lesser "intensity and scope" than the action analyzed in the EA, the DNA is

11  valid. *Friends of Animals* stands only for the proposition that an agency cannot rely on a DNA when

12  the subsequent activity is of greater intensity or scope. Plaintiffs do not contend that the September

13  lease sale of three parcels is of greater intensity or scope than the June sale of 106 parcels. Rather,

14  the problem, which Defendants fail completely to address, is that the defects infecting the EA by

15  extension infect the DNA. Because the EA unlawfully postponed analysis of impacts (Pfs. Mem. at

16  26-28) and failed to take a hard look at the impacts of fracking (*see* Pfs. Mem. at 29-31), the DNA,

17  which relied on the adequacy of the EA and the FONSI, is arbitrary and capricious.

18        Most egregiously, BLM concluded that the June FONSI supports the DNA (AR05922), even

19  though wetlands on the September sale parcels are completely unprotected. A determination of

20  NEPA adequacy is "confirm[ation] that 'an action is adequately analyzed in existing

21  NEPA document(s).'" *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 133 (D.D.C. 2017). The

22  EA acknowledges that wetlands may be impacted by oil and gas drilling. AR05827-30 ("[t]he

23  consequences of oil and gas exploration or development in wetlands and riparian areas are

24  potentially severe, as these environments are extremely sensitive to any perturbation"). The parcels

25  in the September sale contain wetlands. AR05913 (September parcels have "geographic and

26  resource conditions that are sufficiently similar" to June parcel 106); AR05817 (parcel 106 contains

27  24

28                                  Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1    wetlands, floodplain and playa). Yet the Water Resources Stipulation was not applied to Parcel 106.

2    AR05827-30. Relying on the FONSI, BLM did not conduct any additional analysis of impacts to

3    wetlands. Consequently, the DNA is not "founded on a reasoned evaluation of the relevant factors"

4    (*Wetlands Action Network v. U.S. Army Corps of Eng'rs.*, 222 F.3d 1105, 1114 (9th Cir. 2000)), and

5    BLM thereby violated the obligations imposed by NEPA.

6         To the extent that Defendants point out that no comments were received on the DNA (Defs.

7    Br. at 37) to imply that Plaintiffs have waived their rights to challenge the Determination is

8    irrelevant. A party "challenging an agency's compliance with NEPA must 'structure [its]

9    participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to

10   allow the agency to give the issue meaningful consideration." *DOT v. Pub. Citizen*, 541 U.S. 752,

11   764-65 (2004) (citations omitted). Plaintiffs already alerted BLM to the deficiencies in the EA upon

12   which Determination relies. The DNA itself is not a NEPA document, but an "administrative

13   convenience" not defined in NEPA or its implementing regulations. *S. Utah Wilderness All. v.*

14   *Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006); BLM Handbook H-1790-1 at § 5.1.3. It defies

15   reason that BLM can forego any NEPA process for the September sale, then argue that Plaintiffs

16   have waived their rights by failing to participate in a non-existent NEPA process.

17   **III.    COURT SHOULD ORDER ADDITIONAL BRIEFING ON REMEDY**

18        Defendants' argument that this Court should suspend, but not vacate, BLM's unlawfully-

19   issued leases is both premature and incorrect. If the Court should conclude the EA, DNA, and

20   FONSI were issued in violation of NEPA, Plaintiffs concur with Defendants' request that the Court

21   provide an opportunity for additional briefing regarding an appropriate remedy. Plaintiffs do not, as

22   Defendants assert, "assume that vacatur follows automatically from a NEPA violation" in every

23   instance. Defs. Br. at 39. Vacatur is, however, clearly the presumptive remedy under the APA, which

24   directs that a "reviewing court *shall* . . . hold unlawful and *set aside* agency action, findings, and

25   conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

26   accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added). The Supreme Court has explained

27   25

28                                 Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ

1  that if an agency's decision "is not sustainable on the administrative record made, then the

2  [agency's] decision *must be vacated* and the matter remanded to [the agency] for further

3  consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (emphasis added) (citing *SEC v. Chenery*

4  *Corp.*, 318 U.S. 80 (1943)); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14

5  (1971) ("[i]n all cases agency action *must be set aside* if the action was 'arbitrary, capricious, an

6  abuse of discretion, or otherwise not in accordance with law'" (quoting 5 U.S.C. § 706(2)(A)

7  (emphasis added)); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir.

8  2001) ("[A plaintiff who] prevails on its APA claim . . . is entitled to relief under that statute, which

9  normally will be a vacatur of the agency's order.") Because vacatur is the presumptive, statutory

10  remedy under the APA, any departure from that presumptive remedy would amount to equitable

11  relief to the agency acting unlawfully. *See Curtis v. Loether*, 415 U.S. 189, 194–97 (1974)

12  (distinguishing "legal rights and remedies" created by statute from "equitable relief"). The burden

13  thus is on the defendant agency to show why "equity demands" anything less than vacatur of the

14  unlawful agency action. *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1139 (9th Cir.

15  2006) (a party asserting an equitable defense "must show" that it satisfies all elements of the

16  defense; *see also Allina Health Servs. v. Sibelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (evaluating

17  and rejecting government arguments that vacatur was inappropriate). Because the burden should fall

18  on Defendants to show the existence of compelling equities that overcome the presumption that

19  unlawful agency action should be vacated, Plaintiffs concur that such an argument should be based

20  on additional briefing, not the conclusory assertions in Defendants' brief.

21  **IV.    CONCLUSION**

22       Plaintiffs are entitled to summary judgment on their claims, This Court should find that

23  Defendants failed to comply with NEPA before holding the June 13, 2017, and September 12, 2017

24  lease sales, and order further briefing on remedy.

25

26

27

28

26

DATED: September 12, 2018          Respectfully submitted,


                                   __/s/_____
                                   JULIE CAVANAUGH-BILL (NV Bar No. 11533)
                                   Cavanaugh-Bill Law Offices, LLC
                                   401 Railroad Street, Suite 307
                                   Elko, Nevada 89801
                                   Tel: (775)753-4357
                                   Email: Julie@cblawoffices.org




                                   _____
                                   CLARE LAKEWOOD (CA Bar No. 298479),
                                   *pro hac vice*
                                   MICHAEL SAUL (CO Bar No. 30143),
                                   *pro hac vice*
                                   Center for Biological Diversity
                                   1212 Broadway, Suite 800
                                   Oakland, CA 94612
                                   Phone: (510) 844-7121
                                   Email: clakewood@biologicaldiversity.org

                                   Attorneys for Plaintiffs Center for Biological Diversity
                                   and Sierra Club

27

# CERTIFICATE OF SERVICE

I certify that on September 12, 2018, I filed the foregoing Reply in Support of Motion for Summary Judgment; and Response in Opposition to Defendants' Cross-Motion for Summary Judgment, via the CM/ECF system which will provide electronic service to all counsel of record.

DATED: September 12, 2018

_____

CLARE LAKEWOOD

Attorney for Plaintiffs

Pfs.' Reply ISO MSJ; Response in Opp. to Defs.' Cross-MSJ