JEFFREY H. WOOD
Acting Assistant Attorney General
LUTHER L. HAJEK, CO Bar No. 44303
JOHN S. MOST, VA Bar No. 27176
Trial Attorneys
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th St., S. Terrace – Suite 370
Denver, CO 80202
Telephone: (303) 844-1376
Fax: (303) 844-1350
Email: luke.hajek@usdoj.gov

STEVEN W. MYHRE
Acting United States Attorney
District of Nevada
HOLLY A. VANCE
Assistant United States Attorney
100 W. Liberty Street, Ste. 600
Reno, NV 89501
Ph. 775-784-5438
Email: Holly.A.Vance@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) |
| Plaintiffs | ) ) Case No: 3:17-cv-00553-LRH-WGC |
| v. | ) **DEFENDANTS' REPLY IN SUPPORT OF** |
| UNITED STATES BUREAU OF LAND MANAGEMENT, et al, | ) **MOTION FOR SUMMARY JUDGMENT** ) ) |
| Defendants. | ) ) |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

    I.     BLM Took a Hard Look at the Environmental Impacts of the Lease Sales in Accordance with NEPA ....................................................................................... 1

          A.     BLM Did Not Improperly Postpone Analysis of the Impacts of Development ................................................................................. 1

          B.     BLM Properly Analyzed the Impacts of Fracking ...................................... 4

          C.     BLM Did Not Rely on Stale Data in Approving the Lease Sales ............... 8

          D.     BLM Properly Analyzed Mitigation Measures to Protect Mule Deer and Pronghorn Antelope in Compliance With NEPA and Reasonably Concluded that the Mitigation Measures Will Avoid Significant Impacts to Those Species .......................................................... 9

    II.    BLM Reasonably Concluded that Lease Stipulations and Other Measures Will Avoid Significant Impacts to Water Resources ............................................ 11

    III.   Plaintiffs Have Failed to Demonstrate that an Environmental Impact Statement Was Required for the Lease Sales ....................................................... 14

          A.     The Significance Factors Did Not Mandate the Preparation of an Environmental Impact Statement ............................................................. 15

          B.     The Ninth Circuit's Decision in *Conner* Did Not Mandate the Preparation of an EIS for the Lease Sales ................................................ 19

    IV.   BLM's Determination of NEPA Adequacy for the September Lease Sale Complied with NEPA ......................................................................................... 21

    V.    If the Court Finds that A NEPA Violation Occurred, Neither the Leasing Decisions nor the Leases Should Be Vacated Without Additional Briefing on Remedy .......................................................................................................... 23

CONCLUSION ............................................................................................................... 23

i

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Albuquerque v. Marsh,*
  956 F.2d 970 (10th Cir. 1992) ........................................................ 20

4

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
  524 F.3d 938 (9th Cir. 2008) ......................................................... 10

5

*Blue Mountains Biodiversity Project v. Blackwood,*
  161 F.3d 1208 (9th Cir. 1998) ..................................................... 6, 20

6

7

*Cal. Cmtys. Against Toxics v. EPA,*
  688 F.3d 989 (9th Cir. 2012) ......................................................... 23

8

*City of Mukilteo v. U.S. Dep't of Transp.,*
  815 F.3d 632 (9th Cir. 2016) ......................................................... 14

9

10

*Cold Mountain v. Garber,*
  375 F.3d 884 (9th Cir. 2004) ......................................................... 18

11

*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1988) .............................................. 2, 3, 20, 21

12

13

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
  937 F. Supp. 2d 1140 (N.D. Cal. 2013) ...................................... 4, 6, 7, 8

14

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.,*
  681 F.2d 1172 (9th Cir. 1982) ..................................................... 16, 17

15

16

*Friends of Animals v. Bureau of Land Mgmt.,*
  No. 3:15-CV-0057-LRH-WGGC, 2015 WL 555980 (D. Nev. Feb. 11, 2015) ...... 22

17

*Friends of Animals v. Haugrud,*
  236 F. Supp. 3d 131 (D.D.C. 2017) ................................................. 21

18

19

*Greenpeace Action v. Franklin,*
  14 F.3d 1324 (9th Cir. 1992) ....................................................... 18, 19

20

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,*
  383 F.3d 1082 (9th Cir. 2004) ....................................................... 14

21

22

*Helena Hunters & Anglers v. Tidwell,*
  841 F. Supp. 2d 1129 (D. Mont. 2009) .......................................... 15, 16

23

24

*Kern v. Bureau of Land Mgmt.,*
  284 F.3d 1062 (9th Cir. 2002) ........................................................ 4

25

26

*N. Alaska Envtl. Ctr. v. Kempthorne,*
  457 F.3d 969 (9th Cir. 2006) .................................................... 2, 3, 19

27

28

ii

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
　565 F.3d 683 (10th Cir. 2009) ................................................................. 3, 7, 20

*Nat'l Parks Conservation Ass'n v Babbitt*,
　241 F.3d 722 (9th Cir. 2001) ................................................................. 16

*No GWEN All. of Lane Cty., Inc. v. Aldridge*,
　855 F.2d 1380 (9th Cir. 1988) ................................................................. 14

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
　475 F.3d 1136 (9th Cir. 2007) ................................................................. 1, 2

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
　361 F.3d 1108 (9th Cir. 2004) ................................................................. 12, 13

*Park Cty. Res. Council v. U.S. Dep't of Agric.*,
　817 F.2d 609 (10th Cir. 1987) ................................................................. 20

*Robertson v. Methow Valley Citizens Council*,
　490 U.S. 332 (1989) ................................................................. 5, 10

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*,
　588 F.3d 718 (9th Cir. 2009) ................................................................. 14

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*,
　608 F.3d 592 (9th Cir. 2010) ................................................................. 9

*W. Watersheds Project v. Bureau of Land Mgmt.*,
　774 F. Supp. 2d 1089 (D. Nev. 2011) ................................................................. 9

**Statutes**

42 U.S.C. §§ 4321-4370h ................................................................. 1

**Regulations**

30 C.F.R. § 3162.3-1(a) ................................................................. 12

30 C.F.R. § 3162.3-1(c) ................................................................. 12

30 C.F.R. § 3162.3-1(g) ................................................................. 12

30 C.F.R. § 3162.5-1(c) ................................................................. 12, 13

40 C.F.R. § 1502.16 ................................................................. 14

40 C.F.R. § 1502.21 ................................................................. 4

40 C.F.R. § 1508.27 ................................................................. 15

40 C.F.R. § 1508.27(a)-(b) ................................................................. 15

40 C.F.R. § 1508.27(b)(3) ................................................................. 16

40 C.F.R. § 1508.27(b)(4) ................................................................. 16

40 C.F.R. § 1508.8 ................................................................................................ 14

40 C.F.R. § 1508.9 ................................................................................................ 20

43 C.F.R. § 3101.1-2 ............................................................................................. 10

43 C.F.R. § 3162.3-1(c) ..................................................................................... 3, 12

43 C.F.R. § 3162.5-1(a)-(b) .................................................................................. 11

43 C.F.R. subpart 3163 ......................................................................................... 11

43 C.F.R. subpart 3164 ......................................................................................... 11

46 Fed. Reg. 18,026 (Mar. 23, 1981) ..................................................................... 4

46 Fed. Reg. 18,034 (Mar. 23, 1981) ..................................................................... 4

iv

### INTRODUCTION

Plaintiffs have failed to demonstrate that the United States Bureau of Land Management ("BLM") *et al.* (collectively "Defendants") violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, in authorizing the June 2017 and September 2017 Nevada oil and gas lease sales.  They attempt to place the burden of proof on Defendants.  *See* Pls.' Reply in Supp. of Mot. for Summ. J.; and Resp. in Opp. to Defs.' Cross-Mot. for Summ. J. ("Pls. Reply") at 1 (ECF No. 53).  But that burden lies squarely with the Plaintiffs, and the Court's review should be deferential.  *See Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (review under the Administrative Procedure Act ("APA") standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision") (citation omitted).  BLM's analysis of the impacts of its leasing decisions was reasonable, particularly given that the leasing decisions alone do not authorize any oil and gas development to occur, and that such activity can only occur after additional approval and environmental review by BLM.  Plaintiffs' arguments mischaracterize BLM's analysis and misinterpret relevant precedent.  Therefore, summary judgment should be granted for Defendants.

### ARGUMENT

**I.    BLM Took a Hard Look at the Environmental Impacts of the Lease Sales in Accordance with NEPA**

**A.    BLM Did Not Improperly Postpone Analysis of the Impacts of Development**

In the Environmental Assessment for the June 2017 Oil and Gas Lease Sale ("EA"), BLM undertook an analysis of impacts that was appropriate at the lease sale stage.  In their reply, Plaintiffs backtrack from their previous position that BLM ignored indirect impacts of its leasing decision and now argue that a more detailed analysis of site-specific impacts was required at the lease sale stage.  Their arguments are not supported by Ninth Circuit law.

First, Plaintiffs attempt to disown their prior argument that BLM ignored all impacts of oil and gas development, as indirect impacts of its leasing decision, in the EA.  Plaintiffs assert that their argument is not "that BLM has denied that there will be any foreseeable indirect

impacts from leasing." Pls. Reply at 7. And yet that is exactly what Plaintiffs argued in their opening brief. Specifically, they argued that "BLM fails to analyze the impacts of its decision to lease, instead deferring the analysis to some point in the future." Pls.' Mot. for Summ. J. and Mem. in of Pts. And Auths. in Supp. Thereof ("Pls. SJ Mem.") at 26 (ECF No 45); *see also id.* (claiming that BLM "refus[ed] to analyze impacts at the leasing stage"). As Defendants pointed out in our opening brief, Plaintiffs went so far as to cut out references to the analysis of indirect impacts in quoting language from the EA. *See* Defs.' Mot. for Summ. J. and Mem. in Supp. of Mot. for Summ. J. ("Defs. SJ Mem.") at 12-13 (ECF No. 50). Plaintiffs now claim that they are arguing only that the analysis of indirect effects was not "meaningful," Pls. Reply at 7, but they fail to demonstrate that more analysis was required at the leasing stage.

Second, Plaintiffs argue that Ninth Circuit precedent requires more detailed analysis of the impacts of oil and gas development at the leasing stage. *See* Pls. Reply at 8-9. They are mistaken. As explained in our opening brief, the Ninth Circuit explained in *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006), that BLM is not required to analyze the environmental impacts of developing particular parcels at the lease sale stage. *Id.* at 977. The Ninth Circuit explained that in its earlier decision in *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), it had not established the level of detail that was required for a NEPA analysis at the lease sale stage. *See N. Alaska*, 457 F.3d at 976. In *Northern Alaska*, the Ninth Circuit acknowledged that plaintiffs had raised "legitimate concerns" about the environmental concerns that could occur from oil and gas development, but it explained that "[a]t the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development, if any, may eventually materialize." *Id.* at 976-77. Therefore, the court concluded "that the government was not required at this stage to do a parcel by parcel examination of potential environmental effects." *Id.* at 977. The same is true in this case: there are no plans for development, and Plaintiffs have pointed to none, and therefore a parcel by parcel analysis was not required.

Plaintiffs' attempts to distinguish *Northern Alaska* are to no avail. Plaintiffs argue that the leases at issue here are different from the leases in *Northern Alaska* because the leases here do not allow BLM to prohibit surface disturbance altogether. Pls. Reply at 8. Plaintiffs are

1    simply mistaken.  The leases at issue are non-NSO (no surface occupancy) leases, meaning that

2    they contain no stipulation precluding surface disturbance, just like the leases at issue in

3    *Northern Alaska*.[1]  *See* AR 5648, 5791-807, 5820-33.  The EA acknowledges that surface

4    disturbing activity would occur with development.  AR 5676-80.  But in *Northern Alaska*,

5    notwithstanding the fact that BLM could not prohibit any surface disturbing activity, the Ninth

6    Circuit recognized that BLM still retained significant authority at the drilling permit stage to

7    impose mitigation to protect sensitive resources, 457 F.3d at 977, which is also true in this case.

8    Further, BLM retains the authority to deny drilling permits if impacts to sensitive resources

9    cannot be avoided through reasonable mitigation measures.  *See id.*; 43 C.F.R. § 3162.3-1(c) (no

10   drilling may commence prior to approval from BLM).  And if drilling activities occur, they will

11   occur later in time after further environmental review and approval.  *See* 457 F.3d at 977.

12   Therefore, just as in *Northern Alaska*, a parcel by parcel review is not required.  The Tenth

13   Circuit's decision in *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d

14   683 (10th Cir. 2009), likewise holds that a parcel by parcel review is not required unless specific

15   development plans have been proposed.  *See id.* at 718-19.  Accordingly, Plaintiffs' arguments

16   that a more detailed parcel by parcel analysis is required at the leasing stage should be rejected.

17       Finally, Plaintiffs claim that they are not seeking "a well-by-well assessment of yet-

18   unknown precise individual well sites at the leasing stage."  Pls. Reply at 9.  But that begs the

19   question as to what sort of analysis they are seeking.  As explained by the Ninth Circuit, more

20   specific analysis must be done "at later permitting stages when the sites, and hence more site

21   specific effects, are identifiable."  *N. Alaska*, 457 F.3d at 977.  Plaintiffs have identified no such

22   site-specific plans, which distinguishes this case from *Richardson*, where the record revealed

23   "concrete plans to build approximately 30 wells" on a particular parcel.  565 F.3d at 718.

24   Plaintiffs argue that NEPA required BLM to engage in an analysis of impacts "at the earliest

---

[1] Plaintiffs are apparently confusing non-NSO leases (where surface disturbance is allowed) with NSO leases (where surface disturbance is not allowed).  *See Conner*, 848 F.2d at 1444.  The Ninth Circuit held in *Conner* that the issuance of an NSO lease is not the point of irretrievable commitment of resources at which time a NEPA analysis is required.  *See id.* at 1448.  Defendants are not claiming that the leases at issue in this case are NSO leases.

possible time."  Pls. Reply at 9 (citing *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1152 (N.D. Cal. 2013) (internal quotation marks omitted)).  But BLM has engaged in such an analysis—it just cannot engage in a more specific analysis of impacts to particular locations until site-specific plans are identified.  BLM has not, as Plaintiffs claim, "avoid[ed] disclosing and analyzing at the lease stage" impacts to water resources and wildlife.  Pls. Reply at 9.  In fact, BLM has analyzed such impacts.  AR 5697-702, 5710-17.  Plaintiffs have failed to demonstrate that BLM's analysis was insufficient at the leasing stage.

### B.    BLM Properly Analyzed the Impacts of Fracking

BLM appropriately analyzed the potential environmental impacts of fracking at the leasing stage.  Plaintiffs argue that the analysis was insufficient because reliance on the Hydraulic Fracturing White Paper ("White Paper"), AR 5841, was improper and because BLM's analysis was too cursory.  Neither argument has merit.

First, Plaintiffs claim that it was improper for BLM to rely on the White Paper on fracking appended to the EA.  *See* Pls. Reply at 10-11.  In support of this argument, Plaintiffs largely repeat the misguided argument made in their opening brief relying on *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir. 2002).  As already explained, *Kern* is inapposite because it involved an EIS that contained virtually no analysis of the impacts of a certain kind of fungus and instead referred only to previously issued guidance (not NEPA analysis) regarding the fungus.  *See* Defs. SJ Mem. at 16-17.  Plaintiffs attempt to extend the holding in *Kern* to preclude reliance on any previously issued analyses of environmental impacts, even analyses circulated with, and appended to, the applicable NEPA document, but that theory is contrary to NEPA.  As already demonstrated, BLM was permitted to incorporate documents by reference to avoid duplication.  40 C.F.R. § 1502.21.[2]  Further, in this instance, BLM did not

---

[2] Plaintiffs quibble with the assertion that an appendix should be considered to be a document incorporated by reference.  *See* Pls. Reply at 10 n.1 (citing *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,034 (Mar. 23, 1981).  But either the White Paper should be considered to be incorporated by reference or simply part of the EA.  In either case, the White Paper forms part of BLM's analysis and is not just a document that was briefly referred to in the analysis, as in the *Kern* case.

simply refer to a prior document—instead, it appended that White Paper to the EA and circulated it for public comment. AR 63677 (draft EA). Therefore, Plaintiffs had the opportunity to comment on the White Paper, thus fulfilling an important goal of NEPA. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (obtaining public input is one of the twin goals of NEPA).

Plaintiffs, nevertheless, argue that the White Paper was not "prepared for the EA at issue in this case" and was not "open to comment." Pls. Reply at 11. To the extent they are claiming that the White Paper was not, in fact, appended to the draft EA and made available for public comment, they are simply incorrect. The White Paper was appended to the draft EA, and Plaintiffs were free to comment on it. *See* AR 63677-88 (Appendix E in the draft EA). In fact, in its comments on the draft EA, the Center for Biological Diversity specifically commented on the White Paper, which it acknowledge was appended to the draft EA as Appendix E. AR 5633. Therefore, the assertion that Plaintiffs had no opportunity to comment on the White Paper is groundless.

Further, Plaintiffs suggest that it was somehow improper for BLM to append the White Paper to the EA because BLM had appended a similar white paper to EAs for prior lease sales in Nevada.[3] They note that a similar white paper was appended to an EA supporting a December 2015 lease sale in BLM's Ely District. *See* Pls. Reply at 11; *see also* December 2015 EA at 189-199 (ECF No. 55-1). But they fail to explain why BLM's reliance on a White Paper that is similar to ones that it has relied on in past EAs is improper in any way. They do not claim that the December 2015 lease sale was challenged or that a court has found BLM's reliance on a similar white paper to be improper.

---

[3] Plaintiffs assert that Defendants claimed that the White Paper was "prepared for the EA at issue in this case." Pls. Reply at 11. Defendants never made that claim. We asserted in our opening brief only that "BLM also prepared, and attached to the EA as Appendix E, [the White Paper]." Defs. SJ Mem. at 15. We also clarified that "[t]he White Paper was initially written by BLM's Wyoming State Office and later was modified for leasing in Nevada." *Id.* (citing AR 5841). Therefore, Defendants never asserted that the White Paper was prepared exclusively for the EA for the June 2017 lease sale.

1    Second, Plaintiffs argue that the analysis of the potential impacts of fracking in the EA

2    and White Paper we too general to comply with NEPA.  Pls. Reply at 10-11.  As demonstrated in

3    our opening brief, the EA and White Paper discuss fracking techniques, potential impacts on the

4    environment, and measures to prevent and respond to spills of fluids use in the fracking process.

5    *See* Defs. SJ Mem. at 14-16.  Plaintiffs argue that this analysis was insufficient to comply with

6    NEPA, but they fail to demonstrate what additional analysis could have been done at the leasing

7    stage, when it is not known what development plans companies may propose or if, when, or

8    where fracking may occur.  Once those plans are submitted, BLM will be in a position to

9    evaluate those plans in light of water resources and seismological hazards that may be affected

10   by such plans, as well as assessing impacts to other resources.  *See e.g.*, AR 13956 ("The

11   operator cannot commence either drilling operations or preliminary construction before BLM's

12   approval of the [application for a permit to drill ("APD")].), AR 13950 (conditions of approval

13   are requirements included in an APD that limit or amend specific actions proposed by the

14   operator and "minimize, mitigate, or prevent impacts to public lands or other resources").  Until

15   specific plans are proposed, it makes little sense to analyze hypothetical development plans and

16   speculative environmental impacts, and such analysis is not required by NEPA.[4]

17       Further, Plaintiffs reliance on *Blue Mountains Biodiversity Project v. Blackwood*, 161

18   F.3d 1208 (9th Cir. 1998) is unfounded.  As previously explained, the circumstances in *Blue*

19   *Mountains* were different because, following the authorization of the timber sale at issue in the

20   case, there would be no further opportunity for the agency to consider and approve or reject

21   plans for logging.  *See id.* at 1201.  Unlike a timber sale, an oil and gas lease sale does not

22   authorize oil and gas development.  Instead, development can only occur after BLM considers

23   and approves applications for drilling permits.  *See* Defs. SJ Mem. at 3-5; *see also* AR 13956

24   (drilling operations cannot begin until BLM approves and APD); AR 13936 (consistent with 30

25   _____

26   [4] Plaintiffs claim that the analysis in the White Paper was insufficient because it did not analyze
     alternatives.  Pls. Reply at 10.  But BLM analyzed a range of leasing alternatives in the EA and

27   therefore was not separately required to analyze a range of alternatives in the White Paper.  *See*
     AR 5674-80.  Further, Plaintiffs have brought no claim challenging BLM's analysis of

28   alternatives, and it is too late to do so now.

U.S.C. § 226(g), "no drilling permit may be issued unless the appropriate Secretary approves the surface disturbing activities").  Therefore, the *Blue Mountain* case is distinguishable because additional environmental review will occur before oil and gas development occurs.

Plaintiffs argue that BLM made an "irretrievable commitment of resources," thus requiring compliance with NEPA, by making a decision to lease certain parcels for oil and gas development.  Pls. Reply at 10-11 (citing *Richardson*, 565 F.3d at 716-18).  But Defendants do not dispute that the leasing decision was a point of irretrievable commitment of resources and that therefore a NEPA analysis was required.  *See* AR 5682 ("[I]f a lease is sold, the lessee retains certain irrevocable rights.").  Rather, the issue is the level of detail required in the NEPA analysis at the lease stage, and *Richardson* provides no guidance on that point in the absence of development plans for particular lease parcels.  *See Richardson*, 565 F.3d at 717-18.

Contrary to Plaintiffs' assertions, *Center for Biological Diversity v. Bureau of Land Management*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013) is readily distinguishable from this case. As previously demonstrated, the EA in that case predicted that only one exploratory well would be drilled within the lease sale area and contained only a minimal analysis of fracking and went so far as to state that fracking was "not relevant to analysis of impacts . . . because the reasonable foreseeable development scenario anticipates very little (if any) disturbance to the human environment."  *Id.* at 1148.  The court found that BLM's analysis in the EA in that case was inadequate because, rather than recognizing that fracking activity had "increase dramatically in recent years," BLM chose to ignore the increase in fracking and asserted that issues relating to fracking were "outside the scope of the EA."  *Id.* at 1155-56.  In contrast, in this case, BLM has not ignored the impacts of fracking, has not taken the position that the impacts of fracking are outside the scope of the NEPA analysis, and has relied on a development scenario that is in line with the level of development that BLM expects will occur.  Plaintiffs have offered no evidence that BLM's reasonable development scenario is unreasonable or that more fracking will occur than is analyzed in the EA.  Accordingly, their reliance on the *Center for Biological Diversity* case is unfounded, and their arguments should be rejected.

Finally, it should be recognized that BLM has taken the potential environmental impacts of fracking seriously in the NEPA process and in rendering its leasing decision.  In addition to the analysis in the EA, including the White Paper, the record contains numerous documents demonstrating that BLM carefully considered the impacts of fracking.  *See* AR 24345 (BLM Nevada decision to apply the State of Nevada fracking regulations); AR 24427 (comparison of Nevada Division of Minerals fracking regulations and then-existing BLM regulations on fracking); AR 24452-61 (summary of potential environmental impacts of fracking activities); AR 24462 (presentation to the State Land Use Planning Advisory Council regarding fracking); AR 24483-523 (reasonably foreseeable development scenarios for fracking in Nevada); 24532-35 (BLM talking points discussing the potential impacts of fracking); AR 14594-98 (memorandum of understanding between BLM and the Nevada Department of Minerals, in which BLM agrees to coordinate with Nevada regarding the approval of permits to drill and geothermal drilling permits).  And as indicated in BLM's response to a protest regarding the lease sale, the environmental impact of fracking in Nevada, "when done properly in accordance with State and federal laws and regulations, is considered to be negligible."  AR 23677.  There have been no documented cases in Nevada where fracking has caused "injury to human health, the land surface, surface water, groundwater, air, or created a seismic event."  *Id.*  Moreover, in Nevada, "due to the depth of the target resource, wells are drilled far below any useable drinking water zones and typically located away from populated areas."  *Id.*

Accordingly, BLM's analysis of the potential impacts of fracking—a well stimulation technique that could be employed, if at all, upon the approval of an APD—complied with NEPA, and Plaintiffs' arguments to the contrary should be rejected.

**C.    BLM Did Not Rely on Stale Data in Approving the Lease Sales**

Plaintiffs argue that BLM relied on stale data in the RMPs, and therefore the EA for the lease sale must be invalid.  *See* Pls. Reply at 11-12.  The argument is essentially a strawman because Defendants have not claimed that they are relying on stale data in the EISs for the Tonopah and Eureka-Shoshone RMPs.  As discussed in our opening brief, BLM's leasing process is conducted in phases, with general RMPs setting forth management goals and

objectives and opening areas for leasing, followed by decisions to lease particular areas, which are in turn followed by decisions to allow the development of leased areas. *See* Defs. SJ Mem. at 3-5. Here, Defendants properly analyzed the potential impacts of fracking, impacts to wildlife and water resources, and other potential environmental impacts of oil and gas leasing in the EA for the lease sale. *See* AR 5651-886. Therefore, Plaintiffs claims that the data relied on the RMPs are old is of no moment. What matters is that, taken together, the EISs for the RMPs and the EA for the lease sale together sufficiently analyze the potential impacts of BLM's leasing decision. *See W. Watersheds Project v. U.S. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1099 (D. Nev. 2011) ("Only where neither the general nor the site-specific documents address significant issues is environmental review rejected.") (citing *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592, 602-07 (9th Cir. 2010)). BLM did not rely on stale data, and therefore Plaintiffs' claim should be rejected.

      **D.**      **BLM Properly Analyzed Mitigation Measures to Protect Mule Deer and Pronghorn Antelope in Compliance With NEPA and Reasonably Concluded that the Mitigation Measures Will Avoid Significant Impacts to Those Species**

BLM's analysis of the impacts to mule deer and pronghorn antelope and mitigation to protect those species was sufficient to comply with NEPA. Further, BLM's determination that the required lease stipulations would avoid significant impacts to mule deer and pronghorn was reasonable. Plaintiffs have failed to meet their burden of demonstrating that BLM's analysis was inadequate or that the required stipulations will be insufficient to avoid significant impacts to mule deer and pronghorn. Plaintiffs raise a number of arguments in their reply, none of which have merit.

The EA protects mule deer and pronghorn by requiring timing stipulations in winter habitat areas to avoid surface disturbing activities during the winter months. *See* Defs. SJ Mem. at 21-22. Plaintiffs do not dispute that BLM's leasing decisions require these stipulations, but argue that Defendants have overstated the stipulation by asserting that all surface disturbing activity would be prohibited. *See* Pls. Reply at 12. In fact, the applicable lease stipulations preclude surface distributing activity during the winter months. *See* AR 5792 ("No surface

1   activity within Mule Deer winter range from January 15 through May 15."); 5821 ("No surface

2   activity within Pronghorn Antelope crucial winter habitat from November 1 through April 30

3   [time period recommended by [the Nevada Department of Wildlife ("NDOW")]].").  While not

4   all activities relating to oil and gas development will necessarily be precluded during the winter

5   months, surface disturbing activities clearly are precluded by the lease stipulations.

6        Plaintiffs argue that the analysis of mitigation in the EA is inadequate.  They fail to

7   recognize, however, that NEPA requires only that mitigation be developed and analyzed to a

8   reasonable degree.  *Robertson*, 490 U.S. at 357-58; *Bering Strait Citizens for Responsible Res.*

9   *Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 950 (9th Cir. 2008).  Through the analysis of

10  impacts to mule deer and pronghorn and mitigation to protect those species, BLM has met this

11  standard.  *See* AR 5675, 5711-17, 5761-62, 5792, 5820-25.  Further, the timing stipulations in

12  the EA are consistent with NDOW's recommendation that timing restrictions be placed on

13  certain parcels to protect crucial winter habitat for mule deer and pronghorn and to protect mule

14  deer migration corridors.  AR 6644-45 (NDOW February 2, 2017 letter), 19150-51 (NDOW

15  February 27, 2017 e-mail).  Thus, BLM appropriately considered the comments of the applicable

16  state wildlife agency and revised the lease stipulations in accordance with the agency's

17  recommendation.  This complied with NEPA.

18       Plaintiffs go on to argue that BLM may not impose sufficient mitigation at the drilling

19  permit application stage.  *See* Pls. Reply at 13-14.  And they claim that BLM has not retained

20  sufficient authority to impose additional mitigation, as necessary, at that stage to protect mule

21  deer and pronghorn.  *See id.* at 14 (citing 43 C.F.R. § 3101.1-2).  In fact, the cited regulation

22  allows BLM to impose "reasonable measures as may be required by the authorized officer to

23  minimize adverse impacts to other resources values."  43 C.F.R. § 3101.1-2.  Such measures may

24  include the "relocation of proposed operations" up to 200 meters and prohibiting "new surface

25  disturbing operations" for up to 60 days in a year.  *Id.*  Plaintiffs speculate as to how this

26  regulation might be applied to drilling permits, but they fail to demonstrate that, with the

27  stipulations already required by the EA, application of BLM's retained authority will be

28  insufficient to avoid significant impacts to mule deer and pronghorn.

Further, Plaintiffs ignore other provisions in BLM's regulations governing oil and gas leasing. All operators on lease are required to comply with BLM orders, standards and procedures, and BLM approved drilling or operations plans, must "conduct operations in a manner which protects the mineral resources, other natural resources, and environmental quality," and must "exercise due care and diligence to assure the leasehold operations do not result in undue damage to surface or subsurface resources or surface improvements." 43 C.F.R. § 3162.5-1(a)-(b). Non-compliance may result in assessments, penalties, and the shutting down of operations. 43 C.F.R. Subpart 3163. In addition, operators are required to comply with Onshore Oil and Gas Orders of the BLM. 43 C.F.R. Subpart 3164. Onshore Order #1 explains that APDs may be denied "when analysis or negotiation with the operator will not enable the BLM to approve the permit." AR 13936; *see also* 13950 (BLM may include site-specific required conditions of approval in an APD or "Sundry Notice" to limit or amend proposed actions in order to "minimize, mitigate, or prevent impacts to public lands"). An operator cannot commence drilling or construction activities before BLM approves the APD. AR 13956. Accordingly, BLM retains ample discretion to protect the environment when approving APDs. Plaintiffs will have the opportunity to challenge APDs if and when such permits are approved by BLM.

In sum, Plaintiffs have failed to demonstrate that BLM's analysis of mitigation measures for mule deer and pronghorn was insufficient to comply with NEPA or that BLM's determinations that the lease stipulations would avoid significant impacts to mule deer and pronghorn was arbitrary and capricious.

## II. BLM Reasonably Concluded that Lease Stipulations and Other Measures Will Avoid Significant Impacts to Water Resources.

Plaintiffs also fail to demonstrate anything arbitrary about BLM's conclusion that certain stipulations protecting water resources would avoid significant impacts. Their arguments are flawed because they are premised on a view that BLM can accurately forecast which of the leases offered for sale would be sold, which would be developed, and, of those to be developed, how an operator would propose to proceed. Such details are only meaningfully assessed at the

11

permitting stage, when operational proposals have been submitted as part of an APD.  *See* 30 C.F.R. § 3162.3-1(c).  Plaintiffs appear to believe that affixing water resource stipulations to various leases marks the end of BLM's responsibility.  To the contrary, the stipulations – as well as the general framework for oil and gas development discussed in Defendants' opening brief (*see* Defs. SJ Mem. at 3-4) – specifically anticipate further agency evaluation before operations commence.  *See* 30 C.F.R. § 3162.3-1(a) (requiring development of a well-spacing plan); *id.* § 3162.3-1(c) (requiring submission of an "[APD] for each well"); *id.* § 3162.3-1(g) (requiring BLM to post, for public inspection (for at least 30 days) information on each well applied for, such as the well name or number and well location, using maps or "metes and bounds" descriptions).  In assessing the APD, BLM must "prepare an environmental record of review or an environmental assessment, as appropriate," to be "used in determining whether or not an [EIS] is required and in determining any appropriate terms and conditions of approval of the submitted plan."  *Id.* § 3162.5-1(c).

Further, the stipulation itself contemplates additional BLM analysis, as reflected in its recognition that surface disturbing activities "may require special engineering design, construction and implementation measures, potentially including relocation of operations more than 200 meters to protect water resources." AR 5827.  This phrase clearly contemplates future exercise of BLM's technical expertise and judgment.  Plaintiffs ignore these various assessments yet to occur and simplistically treat the stipulation as a static and solitary measure that fails to protect resources.  But as these authorities underscore, BLM must apply its expertise at the permitting stage, as well as its knowledge of the land it stewards.  And the agency must do so based on a proposed operational plan.  Plaintiffs' unfounded fear that BLM may make poor decisions in the future is no reason to vacate the leases now.

In reply, Plaintiffs argue as to water resources that the agency was arbitrary because it "failed to 'articulate[] a rational connection between the facts found and the choice made.'"  Pls. Reply at 15 (quoting *Ocean Advocates v. U.S. Army Corps of Engineers*, 361 F.3d 1108, 1118 (9th Cir. 2004)).  In particular, they fault the agency for concluding that the water resources stipulation "will avoid all impacts," Pls. Reply at 15-16, when in fact the Finding of No

1    Significant Impact ("FONSI") merely concluded that the expected effects would not be

2    significant.  *See* AR 1533 ("none of the potential effects, adverse or beneficial, are significant").

3    Notably, if circumstances at the permitting stage (with specific operational details before the

4    agency) unexpectedly reveal the possibility of significant effects, then the agency would be

5    obliged at that point to prepare the EIS Plaintiffs seek.  30 C.F.R. § 3162.5-1(c).  This

6    circumstance alone demonstrates the "rational connection" Plaintiffs say is lacking.  *Ocean*

7    *Advocates*, 361 F.3d at 1118.[5]

8           In addition, Plaintiffs charge that BLM was arbitrary because the EA does not analyze the

9    effectiveness of "'special design, construction or implementation measures,'" Pls. Reply at 17,

10   the same phrase quoted by Defendants above as an example of BLM's required exercise of

11   technical expertise and judgment in the future.  The argument, however, is founded on a

12   truncated quote that seems to imply that an actual mitigation measure exists and therefore can

13   and should be studied now.  But no such measure was ever identified, nor need one be.  The

14   phrase Plaintiffs set their hopes on merely asserts that certain circumstances at the permitting

15   stage, when operational plans have been proposed, may demand special measures.  It is plainly

16   intended to alert prospective bidders to a potential added cost and to BLM's intent to require

17   certain adjustments, as well as to reassure conservation-minded members of the interested public.

18          Taken at face value, this is just another example of Plaintiffs' unwarranted assumption

19   that BLM is able to predict how operators will propose to proceed.  It seems Plaintiffs expect

20

21   _____

22   [5] Plaintiffs further fault BLM for not protecting water resources located on parcels that were not
     leased.  As a threshold matter, the charge is entirely speculative, as Plaintiffs fail to identify any
23   unleased parcel that is (i) located downgrade or downstream from a leased parcel, and (ii)
     contains an important water resource.  Despite their burden under the APA standard, Plaintiffs
24   ask the Court to assume the scenario they posit exists and set aside agency action in the off-
     chance that they are correct.  More importantly, nothing in the water resources stipulation limits
25   application of its protective measures to on-parcel resources.  *See* AR 5827 (noting the
     "objective" of protecting "*landscape* features that are sensitive areas for water resource impacts,
26   and maintain proper functioning of water resources" (emphasis added)).  The Court should
     decline Plaintiffs' invitation to read into the stipulation an on-parcel limitation.  The stipulation
27   expressly applies to the three categories of sensitive water resources enumerated in its first
     paragraph, and this paragraph reflects no limitation based on resource location.
28

BLM, in order to proceed rationally, to (i) surmise hypothetical on-the-ground water resource scenarios; (ii) devise "special design" measures to offset the adverse effects of these scenarios; and (iii) explain in an EA why the measures are expected to succeed.  The Court should not accede because NEPA only requires agencies to consider effects of a proposed action that are reasonably foreseeable.  40 C.F.R. §§ 1502.16, 1508.8; *City of Mukilteo v. U.S. Dep't of Transp.*, 815 F.3d 632, 637 (9th Cir. 2016) (sustaining EA over objections that demanded similar speculation); *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1089 (9th Cir. 2004) (noting that the Ninth Circuit has "rejected the notion that every conceivable environmental impact must be discussed in an EIS") (quoting *No GWEN All. of Lane Cty., Inc. v. Aldridge*, 855 F.2d 1380, 1385 (9th Cir. 1988)).  Defendants call the Court's attention to the fact that *South Fork Band Council of Western Shoshone of Nevada v. United States Department of the Interior*, 588 F.3d 718 (9th Cir. 2009), on which Plaintiffs heavily rely, involved no comparable speculation.  The objective in that case was to excavate an 850-acre mining pit *in the water resource*, and to conduct mining operations there over a ten year period.  The specific problem was therefore obvious, not speculative.  It is thus easy to understand why the agency was expected to consider and demonstrate the effectiveness of its mine dewatering plan.  In contrast, the objective here is to avoid water resources.  How this will be done is a question that awaits operator proposals and BLM consideration.

In sum, BLM appropriately examined impacts to water resources and the expected effects of associated protective measures.

**III.   Plaintiffs Have Failed to Demonstrate that an Environmental Impact Statement Was Required for the Lease Sales**

BLM was not required to prepare an EIS for the lease sales.  As discussed above, BLM reasonably concluded that mitigation analyzed in the EA and incorporated into lease conditions and stipulations would avoid significant impacts to mule deer and pronghorn antelope and to water resources.  Plaintiffs' additional arguments that an EIS was required for the lease sale are without merit.

14

**A.      The Significance Factors Did Not Mandate the Preparation of an Environmental Impact Statement**

BLM's conclusion that the issuance of the leases would not cause significant impacts was reasonable and in keeping with applicable NEPA regulations.  *See* 40 C.F.R. § 1508.27. Pursuant to those regulations, in determining whether the potential environmental impacts of its proposed leasing decision would be significant, BLM was required to consider both the context of that leasing decision and the intensity factors listed in the regulations.  *Id.* § 1508.27(a)-(b). After considering both the context and intensity of its proposed leasing decisions, BLM reasonably concluded that the potential harm to the environment would not be significant.  AR 1531-51.  Plaintiffs ignore the context of the leasing decisions and take issue only with three of ten intensity factors analyzed in the FONSI per the regulations.  Their arguments fail to demonstrate that consideration of those factors alone demonstrates that the preparation of an EIS was required.

*Effects on wetlands and ecologically critical areas.*  In their opening brief, Defendants explained why the water resource stipulations, coupled with regulatory requirements at the permitting stage, are sufficient to protect against significant impacts.  They also explained why conditions, stipulations, and best management and engineering practices imposed at the permitting stage, as well as the exercise of agency discretion and technical expertise, would minimize or eliminate such impacts.  Defendants further explained that impacts from the use of hydraulic fracturing would be mitigated by various methods, including sealing of wellbores and recovery and proper disposal of fracking fluids.  Defs. SJ Mem. at 33 (citing AR 5679-80).

In reply, Plaintiffs insist the wetlands and other ecologically critical areas are unprotected, a claim belied by the record, and they insist the Court should be guided by *Helena Hunters & Anglers v. Tidwell (Hunters)*, 841 F. Supp. 2d 1129 (D. Mont. 2009), which turned on the same intensity factor Plaintiffs rely on here.  The case involved a Forest Service decision to issue a special use permit to the Montana Army National Guard to construct a biathlon training facility on the Helena National Forest.  This required construction of five buildings, a parking lot, a vehicle access road, a shooting range, and hiking trails, several of which crossed wetlands.

15

1    The original plan had been to build the facilities *in the wetland*, but the plan was adjusted out of

2    environmental concern and the facilities were relocated to sites *adjacent to the wetlands*,

3    although the EA in question reflected "no consideration whether this proposed 'proximity to . . .

4    wetlands' will cause impacts even though the facility would not be constructed inside the

5    wetland area." *Hunters*, 841 F. Supp. 2d at 1136 (citing 40 C.F.R. § 1508.27(b)(3)).  The EA

6    did, however, note that the impacts of construction "would alter the physical, chemical, and

7    biological processes or attributes that are vital to the integrity of the wetland system in such a

8    way that they are diminished."  *Id.*  The court found this statement of diminished function and

9    the agency's conclusion that the "impacts will be minimal" contradictory, "because [the EA]

10   describes long-term permanent effects to the wetlands, and it also fails to consider whether the

11   proximity of the facility . . . will have any impact."  *Id.*  For this reason, the court concluded that

12   the facts, as stated by the agency, "are not consistent with its conclusion."  *Id.*  But the situation

13   here is very different.  There is no certainty as to which parcels will ultimately be developed, nor

14   are there concrete plans for construction.  Unlike in *Hunters*, there is also no agency conclusion

15   that vital wetland processes would be diminished.  In fact, the objective of the water stipulation

16   is to fastidiously avoid water resources.  Finally, in *Hunters*, there was no requirement of further

17   environmental analysis.  It seems the only real similarity is the fact that in both cases, wetlands

18   were involved.  But this is not enough to demand an EIS.  On present facts, Plaintiffs fail to

19   demonstrate that the intensity factor for wetland proximity demands preparation of an EIS.

20          *Highly controversial*.  The decision to offer public land for leasing, which may result in

21   the development of approximately 25 wells and disturb up to 100 acres of land, AR 1532, within

22   approximately 10.5 million acres of public land in the Battle Mountain District in Nevada, *see*

23   Defs. Summ. J. Mem. at 8 n.5,  is not a "highly controversial" action requiring the preparation of

24   an EIS.  40 C.F.R. § 1508.27(b)(4).  There has been no "outpouring of public protest" in order

25   for this factor to apply.  *Nat'l Parks Conservation Ass'n v Babbitt*, 241 F.3d 722, 736 (9th Cir.

26   2001) (citation omitted).  This is not a case where the agency has received "numerous responses

27   from conservationists, biologists and other knowledgeable individuals, all highly critical of the

28   EA."  *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir.

16

1  1982).  Instead, opposition to the EA and the leasing decision has been limited largely to

2  criticisms raised by environmental advocacy groups, including Plaintiffs.  *See* Defs. SJ Mem. at

3  34-35.  Plaintiffs tout the submission of "8,000 letters and e-mails sent by individual members of

4  the public through a conversation group's portal," Pls. Reply at 19, but what Plaintiffs are

5  referring to is the submission of "8000 form letter emails sent via [the] WildEarth Guardians

6  website."  AR 5871.  The repeated submission of form letters drafted by an environmental group

7  that all say the same thing is far different from the submission of multiple, substantive criticisms

8  submitted by individual scientists and other interested individuals.  *See Found. for N. Am. Wild*

9  *Sheep*, 681 F.2d at 1182.  Simply sending multiple form letters does not create a controversy for

10 purposes of NEPA.

11         Nor do the comments by Nevada Department of Wildlife ("NDOW") render the leasing

12 decision highly controversial.  As previously explained, BLM addressed NDOW's comments in

13 the final EA and developed the resource protection alternative to address those concerns.  Defs.

14 SJ Mem. at 34-35.  Plaintiffs claim that NDOW's concerns regarding parcels 66 and 106 were

15 not addressed because BLM did not defer those parcels from leasing.  Pls. Reply at 19-20.  They

16 acknowledge, however, that parcel 66, in the end, was not leased.  *See id.* at 20.  As to parcel

17 106, the draft EA indicated that the railroad valley tui chub, an endemic and rare species, was

18 present on parcel 106.  AR 63567.  Following public comment on the draft EA, which ran from

19 January 5 to February 3, 2017, but prior to development of the "Additional Resource Protection

20 Alternative" and the associated water resource stipulation, an NDOW biologist emailed BLM

21 stating her understanding that the person who had nominated parcel 106 had expressed concerns

22 about its proposed deferral.  AR 18754.  The biologist stated NDOW's view that continued

23 deferral was appropriate to allow time for further study and "confidence in the compatibility of

24 oil and gas activities and the persistence of the spring system supporting tui chub . . . ."  *Id.*

25 Following a period of internal discussion at BLM, reflected in the correspondence at AR 18762-

26 18768, BLM's Planning and Environmental Coordinator for the Battle Mountain District noted

27 in an email to her BLM colleagues that the [draft] EA had indicated the tui chub "occupies

28 habitat on the parcel," but that she would "correct that, and note it in a list of corrections [for the

final EA] as well as in the comment responses."  AR 18767.  In the "Revisions" section of the

final EA, AR 5671, there is a reference to changes made to the EA in various places, including in

Chapter 3's discussion of BLM sensitive species.  AR 5672.  The passage stated, with respect to

the Railroad Valley tui chub: "location corrected; not found in Parcel 106 but more than two

miles from the parcel."  *Id*.  In Chapter 3, the EA noted as follows: "Railroad Valley tui chub . . .

is a BLM Nevada Sensitive fish species which occupies habitat approximately 2.5 miles from

parcel 106."  AR 5712; *see also* AR 5873 (Summary of Comments and Responses) (noting that

the Fish Creek Springs tui chub, of concern to both NDOW and the Fish and Wildlife Service, is

not located on parcel but is located within 700 meters of parcel 66 and would therefore, at the

permitting stage, receive "close consideration").  In arguing that the leasing decisions are "highly

controversial," Plaintiffs neglect to advise the court of these administrative developments which

followed the public comment period and which are reflected in the final EA.

      Plaintiffs further assert that there is "serious doubt" as to whether the time limitation

stipulations will be sufficient to protect mule deer, but they offer nothing to support that

assertion.  As explained in Appendix H of the EA, summarizing the comments on the EA and

BLM's responses thereto, BLM "included the parcels NDOW named among parcels to which

Timing Limitation stipulations will be applied for mule deer or pronghorn winter range."  AR

5874.  This was a reasonable response to NDOW's comments on the EA and does not show that

BLM's leasing decision was highly controversial.  BLM's conclusion that the leasing decision

was not highly controversial was likewise reasonable.  *See* AR 1533 ("There is not a substantial

dispute within the federal agencies, State of Nevada Government agencies, or the scientific

community as to the effects of oil and gas leasing and development in Nevada, specifically.").

      Plaintiffs' attempts to distinguish *Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004)

are to no avail.  *See* Pls. Reply at 21.  In *Garber*, the plaintiffs argued that a permit for a bison

capture facility was highly controversial and required the preparation of an EIS.  375 F.3d at

891-92.  The court reasoned that whether an action is highly controversial depends upon the

"size, nature, or effect" of the action.  *Id.* at 893 (citing *Greenpeace Action v. Franklin*, 14 F.3d

1324, 1333 (9th Cir. 1992)).  The court cautioned, however, that "the existence of opposition

1   does not automatically render a project controversial." *Id.*  And it rejected arguments that the

2   "numerous criticisms directed at the proposed facility by [the plaintiffs] and other groups" were

3   sufficient to demonstrate that the project was highly controversial.  *Id.*  There, as here, the

4   agency took action to mitigate the impacts of its action based on concerns raised by another

5   agency.  *Id.*  Therefore, the court rejected the argument that an EIS was required.  The same is

6   true here—the Plaintiffs cannot demonstrate that BLM's leasing decision is highly controversial

7   simply through reference to their own comments and the comments of other environmental

8   groups and their arguments relating to the EA.  BLM's leasing decision was not highly

9   controversial, and Plaintiffs have failed to demonstrate otherwise.

10      *Highly uncertain or unknown risks.*  BLM's leasing decision does not present highly

11   uncertain or unknown risks.  *See* AR 1534 ("At the leasing stage, there are no known direct,

12   indirect, or cumulative effects identified in the EA that are considered uncertain or involve

13   unique or unknown risks, as demonstrated through the analysis.").  Plaintiffs argue that "BLM

14   was provided with extensive scientific studies on the impacts to mule deer of oil and gas

15   activities," Pls. Reply at 22, but they fail to explain how this relates to uncertain or unknown

16   risks.  They also argue that more specific analysis of the impacts of fracking on water resources

17   was required, but they do not identify uncertain or unknown risks, and they fail to explain how

18   impacts to particular water bodies could be conducted when site-specific development plans are

19   not known.  *See N. Alaska*, 457 F.3d at 977 ("[T]he government was not required at this stage to

20   do a parcel by parcel examination of potential environmental effects.  Such effects are currently

21   unidentifiable, because the parcels likely to be affected are not yet known.").  BLM is familiar

22   with fracking techniques and the environmental impacts of fracking.  *See* AR 5679-80, 5841-52.

23   Plaintiffs have failed to demonstrate that such impacts are highly uncertain.  In sum, Plaintiffs

24   have failed to demonstrate that CEQ's significance factors warrant the preparation of an EIS.

25      **B.    The Ninth Circuit's Decision in *Conner* Did Not Mandate the Preparation of
                an EIS for the Lease Sales**

26

27      Plaintiffs argue that because the leasing decision was an irretrievable commitment of

28   resources, an EIS was necessarily required to comply with NEPA at the lease stage.  Pls. Reply

at 22.  They are incorrect, and their analysis over-reads the Ninth Circuit's decision in *Conner*. While it is true that the Ninth Circuit stated that an EIS was required in that case, *see* 848 F.2d at 1451, the opinion should not be read as requiring the preparation of an EIS for all oil and gas lease sales, regardless of whether the impacts of the lease sale will be significant and regardless of whether an EIS was previously prepared.  Rather, *Conner* is properly understood as requiring NEPA compliance for an oil and gas lease sale of non-NSO leases—it should not be understood to limit the agency's authority to analyze and properly consider whether the impacts of a lease sale will be significant.[6]  Indeed, in *Richardson*, which Plaintiffs also cite, the Tenth Circuit stated that at the lease stage BLM "was required to analyze any foreseeable impacts" of a leasing decision, but did not state that an EIS was required.  565 F.3d at 718.[7]  Thus, the requirement to comply with NEPA is triggered when BLM decides to offer parcels for oil and gas leasing without including an NSO stipulation, but in order to determine whether the impacts of such a decision will be significant, BLM may prepare an EA.  *See*, *e.g.*, *Blue Mountains Diversity Project*, 161 F.3d at 1212 ("As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS.") (citing 40 C.F.R. § 1508.9).

Even if an EIS were automatically required by the court's decision in *Conner*, which Defendants dispute, that requirements was satisfied by the preparation of the EISs associated with the Tonopah and Shoshone-Eureka RMPs.  *See* AR 4953-5379, 24796-25029, 25355-42. As a factual matter, BLM did prepare EISs for the RMPs, which identified as open for oil and

---

[6] If Plaintiffs' broad interpretation of *Conner* were correct, such that an EIS would be required in all instances, it would be irrelevant whether the oil and gas lease sale would have significant impacts and therefore Plaintiffs' arguments about the significance factors also would be irrelevant.

[7] The Tenth Circuit has upheld the preparation of an EA for a lease sale and rejected the notion that an EIS must necessarily be prepared at the lease sale stage.  *See Park Cnty. Resource Council v. U.S. Dep't of Agric.*, 817 F.2d 609, 622-24 (10th Cir. 1987), *overruled in part on other grounds by Vill. of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992). Defendants inadvertently shortened the citation to the *Park County Resource Council* case in the opening brief.

gas leasing the areas subject to the June and September 2017 lease sales and established goals

and objectives for leasing.  Therefore, *Conner* is distinguishable because, in that case, the agency

offered areas for leasing without preparing an EIS on the theory that the issuance of the leases

alone would have no significant impacts on the environment.  *See* 848 F.2d at 1443-44.  In

contrast for the Nevada lease sale, BLM analyzed the impacts of future oil and gas development

and reasonably concluded that such development would not result in significant impacts on the

environment.  *See* AR 1530-35.  Plaintiffs argue that the circumstances in *Center for Biological*

*Diversity* were similar, but they were not.  In that case, the EA relied on the same development

projection as the EIS, which the court found to be outdated, thus leading the agency to

underestimate the impacts on the environment due to fracking.  *See* 9378 F. Supp. 2d at 1155-56.

That is not the case here because the EA contains a reasonable and current projection of well

development, *see* AR 5676-80, which Plaintiffs do not claim is unrealistic.

In short, Plaintiffs are wrong that an EIS must be prepared at the lease sale stage as a

matter of law.  Instead, they must demonstrate that BLM's leasing decision will have significant

impacts on the environment, and they have failed to do so.

**IV.  BLM's Determination of NEPA Adequacy for the September Lease Sale Complied
with NEPA**

In their opening brief, Defendants explained that reliance on a Determination of NEPA

Adequacy ("DNA") for the September 2017 sale was lawful because the DNA properly

concluded that impacts of developing the three parcels to be offered in September 2017 were

adequately considered and disclosed in the EA for the June 2017 sale.  As indicated, BLM found

that the impacts of the proposed September sale were "essentially similar to" the impacts of the

June action, including in particular impacts on nearby parcel 106, *see* ECF No. 50-1 at 23

(BLM's NEPA Handbook, H-1790-1).  As a result, BLM appropriately decided to proceed based

on a DNA and forego further NEPA analysis.  *See Friends of Animals v. Haugrud*, 236 F. Supp.

3d 131, 132-33 (D.D.C. 2017) (describing the process for a DNA).

Plaintiffs do not dispute that BLM followed the handbook's procedures and instead raise

three distinct objections.  First, they point to an additional case cited by Defendants, *Friends of*

21

1    *Animals v. United States Bureau of Land Management*, No. 3:15-CV-0057-LRH-WGGC, 2015

2    WL 555980 (D. Nev. Feb. 11, 2015), and argue that Defendants have "twist[ed] the only case

3    they rely on . . . ." Pls. Reply at 24. Setting aside the fact that Defendants' DNA argument

4    relied on two cases not one, it is Plaintiffs who do the twisting, in claiming Defendants contend a

5    DNA is valid as long as the proposed activity is of lesser "intensity and scope" than the earlier-

6    analyzed action. *Id*. This is not a fair statement of Defendants' position, nor of the law.

7    Defendants clearly recognize that other considerations govern use of a DNA, including that the

8    proposed action be "essentially similar to" the action previously analyzed, as discussed above

9    and in Defendants' opening brief.

10         Plaintiffs make no attempt to identify dissimilarities between parcels that would render

11    reliance on a DNA improper, nor do they argue that the standard for DNA use, under agency

12    guidance, is not met. Instead, Plaintiffs offer their second argument, which is that the DNA is

13    faulty because the EA is faulty. Defendants concede that if the EA is deficient, so too is the

14    DNA, but they dispute Plaintiffs' challenge to the EA and the contention offered in support that

15    the water resources stipulation should have been applied to parcel 106 and the nearby September

16    parcels. As the record makes clear, the water resource stipulation was not applied to these four

17    parcels, nor to parcel 66 (another point of objection, *see* Pls. Reply at 20), because those parcels

18    lack water resources of concern, as discussed, *supra* at 17-18 (noting that the railroad valley tui

19    chub is not present on parcel 106, nor is the Fish Creek Springs tui chub present on parcel 66).

20    Finally, Plaintiffs incorrectly suggest Defendants are asserting a waiver defense. They did not do

21    so in their opening brief and do not do so here.

22         For the foregoing reasons, the Court should sustain BLM's lawful use of the DNA

23    procedure.

24    **V.**      **If the Court Finds that A NEPA Violation Occurred, Neither the Leasing Decisions**

25             **nor the Leases Should Be Vacated Without Additional Briefing on Remedy.**

26         If the Court finds that BLM violated NEPA with respect to the June or September 2017

27    lease sales, it should not vacate the lease sale and resulting leases, but instead should suspend the

28    leases. Plaintiffs are incorrect that vacatur is a "presumptive" remedy. Pls. Reply at 26. In

determining whether vacatur of a challenge action is appropriate, a court should consider "how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (internal quotation marks and citation omitted); *see also* Defs. SJ Mem. at 39.  Termination of the leases would have serious disruptive consequences on companies who have been granted leases, and multiple courts have decided to suspend or temporarily enjoin leases, if a legal violation is found, rather than vacate them.  Defs. SJ Mem. at 39-40.  Even if the Court were to find a legal violation, Plaintiffs have failed to demonstrate that the equities would demand vacatur of the leases rather than suspension.  Therefore, if the Court finds a NEPA violation, it should suspend the leases rather than vacating them.  Alternatively, if the Court prefers, if the Court finds a legal violation, the parties can submit further briefing on the appropriate remedy.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of Defendants on all claims.

Dated: October 3, 2018           Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*/s/ Luther L. Hajek*
LUTHER L. HAJEK, CO Bar No. 44303
Trial Attorney
Natural Resources Section
999 18th St., S. Terrace – Suite 370
Denver, CO 80202
Telephone: (303) 844-1376
Fax: (303) 844-1350
Email: luke.hajek@usdoj.gov

*/s/ John S. Most*
JOHN S. MOST, VA Bar No. 27176
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 616-3353

23

1

Fax: (202) 305-0506

2

STEVEN W. MYHRE
Acting United States Attorney
District of Nevada
HOLLY A. VANCE
Assistant United States Attorney
100 W. Liberty Street, Ste. 600
Reno, NV 89501
Ph. 775-784-5438
Email: Holly.A.Vance@usdoj.gov

3

4

5

6

7

*Attorneys for Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

1

**<u>CERTIFICATE OF SERVICE</u>**

2

3
I certify that a copy of the foregoing is being filed with the Clerk of the Court using the CM/ECF system, thereby serving it on all parties of record on October 3, 2018.

4

5

_/s/ John S. Most_
JOHN S. MOST
_Counsel for Defendants_

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28