1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                              DISTRICT OF NEVADA

8                                      * * *

9    CENTER FOR BIOLOGICAL                 Case No. 3:17-CV-553-LRH-WGC
     DIVERSITY, et al.,
10
                              Plaintiffs,   ORDER
11          v.

12   U.S. BUREAU OF LAND
     MANAGEMENT, et al.,
13                            Defendants.

14

15          Plaintiffs, the Center for Biological Diversity and the Sierra Club, have filed a motion for

16   summary judgment (ECF No. 45) on all their claims against defendants (collectively the "Bureau

17   of Land Management" or "BLM"). BLM responded by filing a cross motion for summary

18   judgment. (ECF No. 50). For the reasons stated below, the Court denies plaintiffs' motion for

19   summary judgment and grants BLM's motion for summary judgment.

20                      **I. Factual Background and Procedural History**

21          This dispute centers around the leasing of approximately 198,000 acres of land in BLM's

22   Battle Mountain District, which covers large portions of Northern Nevada. One hundred six parcels

23   (195,600 acres of land) were offered for lease in June 2017, and 3 parcels (3,680 acres of land)

24   were offered for lease in September 2017. (ECF No. 50 at 12). The parcels encompass a vast

25   geographic area, covering portions of Diamond Range and Valley, Sulphur Spring Range, Garden

26   Valley, Fish Creek Range and Valley, Big Smoky Valley, and Railroad Valley. (ECF No. 45 at

27   14). Plaintiffs state that while the available land is generally a "semiarid and arid desert

28   environment," there are "many" wetlands and other critical water features present, including "34

springs and seeps, 3.9 miles of perennial streams, 127.9 miles of ephemeral and intermittent streams, 286 acres of swamps and marsh, 348 acres of freshwater forested and shrub wetlands, 9,118 acres of lakes, and 13,044 acres of playa." (*Id*. at 14–15). The wetlands "support a wide array of aquatic wildlife, including seven amphibian and 19 fish species." (*Id*. at 15). The non-wetland portions of the parcels support "approximately 73 types of mammals, including mule deer and pronghorn." (*Id*. at 16). Plaintiff Center for Biological Diversity is a non-profit corporation that "Works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction." (ECF No. 19 at 3). Plaintiff Sierra Club is also a non-profit corporation with more than 825,000 members "dedicated to exploring, enjoying, and protecting the wild places of the earth." (*Id*. at 4).

BLM formally commenced proceedings in November 2016 when it dispatched resource specialists to the proposed parcels to scout the land and coordinate with nearby Native American tribes and the Nevada Department of Wildlife ("NDOW"). (ECF No. 50 at 12). Pursuant to the National Environmental Policy Act ("NEPA"), BLM published a Preliminary Environmental Assessment (the "draft EA") on January 5, 2017. (*Id*.) The draft EA identified three possible actions BLM could pursue: (1) lease all 106 parcels; (2) lease none of the parcels (the "no action alternative"); and (3) a Partial Deferral alternative, which would make some parcels available for lease but not others with the intended goal of protecting environmental resources. (*Id*.; ECF No. 45 at 21). During the 30-day comment period, BLM received over 8,000 comments from various groups and individuals, although most of the comments were form letters sent from the website of WildEarth Guardians, an environmental advocacy organization. (ECF No. 45 at 21; AR at 5871).[1]

BLM published the final EA on April 25, 2018. The final EA included four possible actions: (1) lease all 106 parcels; (2) the no action alternative; (3) the Partial Deferral alternative; and (4) a new Additional Resource Protection plan ("Resource Protection" plan). (ECF No. 50 at 13; AR at 5674–75). BLM decided to proceed with the Resource Protection plan, which was similar to the standard plan (lease all 106 parcels), with the difference being that certain parcels

---

[1] The Administrative Record ("AR") in this case is voluminous, totaling over 63,000 pages. The Court will refer to documents contained within the record with the designation "AR" and the corresponding Bates number.

(the ones that would have been deferred under the Partial Deferral plan) would include stipulations and lease notices "for the protection of wildlife habitat, water resources, and areas with steep slopes." (ECF No. 50 at 13; AR at 5675). The Resource Protection plan included stipulations for "pronghorn antelope seasonal habitat, a timing limitation for mule deer seasonal habitat, a lease notice for mule deer migration corridors, a new stipulation for slopes greater than 30%...and...new water resources." (ECF No. 50 at 13; AR at 5671, 5791, 5808). Along with the final EA, BLM also released a draft Finding of No Significant Impact ("FONSI"). (AR at 63808). The day after the release of the draft FONSI and final EA, BLM issued a notice that it was offering all 106 parcels for lease. (AR at 1395–1466).

Plaintiffs filed a protest with BLM on May 25, 2017, arguing, *inter alia*, that the final EA "failed to adequately analyze the impacts of the lease sale, the stipulations were inadequate to protect water resources and mule deer habitat, and that the project's significant impacts required preparation" of an Environmental Impact Statement ("EIS"). (ECF No. 45 at 22). BLM issued the final FONSI on June 6, 2017. (AR at 1535). In the final FONSI, BLM explained that following a detailed analysis, it believed that the Resource Protection plan would "not significantly affect the quality of the human environment and therefore an EIS was not required." (ECF No. 50 at 16; AR at 1531). On June 12, 2017, BLM dismissed plaintiffs' protests. (ECF No. 45 at 22; AR at 25543–55). The parcel auction took place from June 13 to 14, 2017, with three parcels selling (a total of 5,760 acres of land). (ECF No. 45 at 22; AR at 23924). The following day, BLM sold four more parcels in a non-competitive sale. (AR at 1402).

On June 21, 2017, BLM noticed its intent to offer three additional parcels (a total of 3,680 acres of land in Railroad Valley) for lease. (ECF No. 45 at 22, AR at 5921). In the Decision Record announcing the lease, BLM concluded that based on the stipulations found in the final EA, leasing the three additional parcels would not significantly affect the quality of the human environment. (AR at 5924). This conclusion was based in part on the fact that the parcels were located near one of the parcels (#106) leased in the June sale and shared many of the same ecological features. (ECF No. 50 at 16; AR at 5921). Plaintiffs once again protested the lease of the parcels, but BLM dismissed their complaints and leased the parcels on September 12, 2017. (ECF No. 45 at 23).

Plaintiffs filed their first complaint on September 11, 2017 (ECF No. 1), amending it once on November 20, 2017 (ECF No. 19). After exchanging discovery, plaintiffs filed a motion for summary judgment on June 22, 2018. (ECF No. 45). BLM responded with a motion for summary judgment of its own on August 22, 2018. (ECF No. 50). Having been fully briefed, this matter is now ripe for review.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show "that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn from them, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby*, 477 U.S. at 248. Even so, the mere existence of

4

a scintilla of evidence in support of the non-moving party's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the non-moving party. *See id*. at 252.

### B. Administrative Review

Under the Administrative Procedures Act ("APA"), a District Court may set aside an agency decision only if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A). An agency decision is "arbitrary and capricious" if the agency (1) relied on a factor that Congress did not intend it to consider; (2) failed to consider an important factor or aspect of the problem; (3) failed to articulate a rational connection between the facts found and the conclusions made; (4) supported the decision with a rationale that runs counter to the evidence or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise; or (5) made a clear error in judgment. *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1150–51 (9th Cir. 2009). At all times, the plaintiff carries the burden of showing that any decision or action made by the agency was arbitrary and capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

### III. Discussion

Plaintiffs have lodged a myriad of claims against BLM. Stated more generally, they first allege that BLM failed to take a "hard look" at the environmental impacts of the leases. Second, they argue that BLM's determination that the stipulations attached to some of the leases would prevent significant environmental impacts was arbitrary and capricious. Finally, they argue that BLM's decision to not prepare an EIS was a violation of NEPA. Although many of plaintiffs' arguments overlap with one another, the Court will address them in the order they are organized in the parties' briefs.

### A. BLM's "Hard Look" at NEPA Impacts

Plaintiffs first argue that BLM failed to take a "hard look" at "numerous foreseeable, substantial impacts of oil and gas drilling," as required under NEPA. (ECF No. 45 at 25). These alleged failures include (1) postponing the analysis of oil and gas drilling until after it receives applications to drill; (2) not conducting a more thorough analysis of the impacts of fracking,

including improperly relying on resource management plans ("RMPs") that "contain no analysis whatsoever of the potential impacts of fracking"; and (3) not analyzing the impacts of the leases to big game species and instead relying on ineffective stipulations. (*Id.*)

NEPA is Congress's basic "national charter for protection of the environment." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003). NEPA serves two fundamental purposes: (1) to require agencies to consider detailed information concerning significant environmental impacts of a proposed action; and (2) to inform the public that an agency has considered the environmental impacts in its decision-making process while ensuring that the public can access and contribute to the decision-making process via comments. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1034 (9th Cir. 2006); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 322, 349 (1989). NEPA does not impose any direction or restriction on the ultimate action of an agency. *Hillsdale Envtl. Loss Prev. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012). Instead, "NEPA imposes procedural, information-gathering requirements on an agency[.]" *Id.*

In drafting an EA, NEPA does not impose substantive obligations upon an agency; rather NEPA simply requires that an agency take a "hard look" at the environmental consequences of its decision-making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 322, 350 (1989); *Friends of Animals v. Bureau of Land Mgmt.*, 2018 WL 1612836, at *11 (D. Or. Apr. 2, 2018) ("Thus, the Ninth Circuit has affirmed that the important question is whether the agency has taken a 'hard look' at the environmental impacts of a proposed action."). This hard look includes determining whether the agency adequately evaluated all potential environmental impacts of the proposed action, analyzed all reasonable alternatives to the proposed action, and identified and disclosed to the public all foreseeable impacts of the proposed action. 42 U.S.C § 4332(2)(C). If, after completion of an EA, "an agency determines that the contemplated federal action will not significantly affect the environment, 'the federal action may issue a finding of no significant impact ["FONSI"]…in lieu of preparing an EIS.'" *Friends of Animals*, 2018 WL 1612823, at *2 (quoting *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010)).

///

1  <u>1. BLM's Alleged "Postponement" of Its Analysis</u>

2      Plaintiffs first argue that BLM failed to take a "hard look" at the environmental effects of

3  the proposed action when it did not analyze the specific impacts of leasing the parcels, instead

4  deferring that analysis until after the lessees applied for drilling permits. (ECF No. 45 at 26).

5  Plaintiffs argue that BLM had an obligation to provide an assessment of the direct impacts to

6  various ecological features, such as water resources, increased seismicity, and climate change. (*Id*.

7  at 26–27). They further claim that BLM did not do so. Plaintiffs take issue throughout the

8  administrative record of BLM's purported assertion that because the act of leasing land is purely

9  an administrative matter, there is little to no direct impact on the environment. (*Id*. at 27 (citing

10  AR at 5699, 5709, 5713 5850, 5692). In response, BLM argues that plaintiffs misconstrued its

11  statements concerning impacts in the EA, and that in any event, the analysis it conducted was

12  sufficient to satisfy the "hard look" standard. (ECF No. 50 at 19–20).

13      Plaintiffs' arguments have no basis in fact or the law. In their brief, plaintiffs recite a

14  "quote" from BLM's final EA that purportedly supports their argument that BLM did not conduct

15  a proper analysis:

16      [t]here would be no direct impacts from issuing new oil and gas leases because
       leasing does not directly authorize ground disturbing activities . . . . If an APD is
17      received for a leased parcel, additional site-specific, project specific NEPA analysis
       would address direct and indirect effects of any action and alternatives proposed at
18      that time.

19  (ECF No. 45 at 26). As BLM points out in its response, however, plaintiffs' "quote" does not

20  contain the context necessary to understand its decision. With all the relevant information in place,

21  the passage from the EA actually states:

22      An EA must analyze and describe the direct [and indirect] effects of the proposed
       action and alternatives on the quality of the human environment. Direct effects "are
23      caused by the action and occur at the same time and place," while indirect effects
       "are caused by the action and are later in time or farther removed in distance, but
24      are still reasonably foreseeable." (40 CFR 1508.8). There would be no direct
       impacts from issuing new oil and gas leases because leasing does not directly
25      authorize ground disturbing activities. . .[O]nce a lease is issued to its owner, that
       owner has the "right to use as much of the lease lands as is necessary to explore for,
26      drill for, mine, extract, remove and dispose of the leased resource in the leasehold"
       [subject to stipulations]. Thus, a lease sale makes the offered parcels available to
27      indirect effects…This chapter addresses those indirect effects. If an ADP is
       received for a leased parcel, additional site-specific, project specific NEPA analysis

28

would address direct and indirect effects of any action and alternatives proposed at that time.

(AR at 5682). With their selectively-edited quote, plaintiffs would have the Court believe that BLM purposefully skirted its duties under NEPA to provide any analysis whatsoever of the direct and indirect impacts of oil and gas drilling in the selected parcels. Yet, as the full quote illustrates, BLM appropriately differentiated between the direct and indirect effects of issuing leases and the direct and indirect effects of actual development of surface disturbing infrastructure. Plaintiffs appear to recognize their error, as in their response brief, their argument changes from "BLM offered no analysis" to "the analysis done was not sufficient under NEPA."

The question thus becomes what kind of analysis is required under the "hard look" standard and if BLM's analysis was sufficient to meet it. Throughout briefing, the parties dispute the extent of the Ninth Circuit's holding in *Northern Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006) (hereinafter *Northern Alaska*). In that case, the Ninth Circuit was tasked with determining the extent of the analysis that BLM was required to do in an EIS prepared before parcels were offered for lease.[2] The plaintiffs had argued, pursuant to *Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988), that BLM's analysis in the EIS was insufficient because it did not undertake a "parcel by parcel analysis" of the surfaces that would eventually be explored and developed. *Northern Alaska*, 457 F.3d at 976. In *Connor*, the government defendants had issued two types of leases for oil and gas drilling – NSO leases, which forbade all surface occupancy of the land without prior BLM approval, and non-NSO leases, which only allowed for the government to regulate, not preclude, surface disturbing activities. The *Connor* court held that the government, which did not conduct EISs for any of the leases, was required to do so for the non-NSO leases. But in *Northern Alaska*, the Ninth Circuit clarified that *Connor* did not discuss the type of analysis to be done at the leasing stage (generic or site-specific), only that one *had* to be done when dealing with non-NSO type leases. *Id.* The Ninth Circuit eventually held that "the government was not required at [the leasing] stage to do a parcel by parcel examination of potential environmental

_____

[2] The Court notes that in *Northern Alaska*, the parties were disputing what type of analysis was appropriate in an EIS, whereas here, the parties are disputing the analysis in an EA. The parties do not argue, and neither does the Court believe, that the difference between the two stages is material when the discussion concerns general and site-specific analyses.

8

effects." *Id.* at 977. Instead, it stated that the analysis the government had conducted was sufficient to meet the "hard look" standard, which was an analysis of two hypothetical situations (half the parcels leased and either full development or no development); while the government's analysis looked at the effects of development and no development on the natural resources of the area, because it was merely a hypothetical projection of what could happen, the government did not analyze the impact to specific parcels. *Id.* at 974. The Ninth Circuit reasoned that because the leasing stage was the earliest stage in development, "there is no way of knowing what plans for development, if any, may materialize." *Id.*

Turning back to the facts before the Court, the Court finds that BLM's analysis satisfies the "hard look" standard. The administrative record reveals that BLM, using historical information and its experience (as it did in *Northern Alaska*), analyzed in general terms what could happen if a lessee decides to drill for oil and gas and constructs ground disturbing infrastructure. The EA included such analyses of wetlands and riparian zones (AR at 5701), areas with surface waters (AR at 5700), air quality, climate change, and greenhouse gases (AR at 5686–92), soils (AR at 5693–94), various forms of wildlife, including mule deer and pronghorn antelope (AR at 5713–16), wild horses and burros (AR at 5724–25), geology and minerals (AR at 5745–46), and many others. This is precisely the type of hypothetical analysis grounded in historical data and agency experience that the Ninth Circuit approved of in *Northern Alaska*. *See Northern Alaska*, 457 F.3d at 974–75, 977.

Plaintiffs argue that they do not seek a "well-by-well assessment," but that they only want to "enforce the established principle that agencies must engage in *some* meaningful assessment of foreseeable impacts" at the earliest possible time. (ECF No. 53 at 9) (emphasis in original). Yet as illustrated above, this is what BLM has done. Plaintiffs further claim that when BLM has "relinquished authority to prevent surface disturbance or forbid drilling altogether," it may not "avoid disclosing and analyzing at the leasing stage those impacts." (*Id.*) But once more, that is plainly not what has happened here. Plaintiffs may not be satisfied with BLM's analysis in the final EA, but because it clearly comports with the Ninth Circuit's holding in *Northern Alaska*, the Court finds that it meets the "hard look" standard.

## 2. Whether BLM Failed to Analyze the Impacts of Fracking

Plaintiffs' next argument is similar to its first one. They argue that BLM did not properly analyze the effects of hydraulic fracturing, colloquially known as fracking, in the final EA. (ECF No. 45 at 29). They argue that BLM improperly relied on an older document prepared in 2013 that addresses fracking – the "White Paper" – instead of conducting a specific analysis of the impacts of fracking on the parcels in Nevada to be offered for lease. (*Id*. at 29–30). Plaintiffs cite two main cases in support of their argument – *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002), which they argue stands for the proposition that agencies may not rely on generic documents in lieu of specific analysis, and *Blue Mountains Biodiversity Product v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) (hereinafter *Blue Mountains*), which they argue holds that "general statements about possible effects and some risk" do not satisfy the "hard look" standard. (ECF No. 45 at 30–31). In turn, BLM argues that it was appropriate for it to rely in part on the White Paper, which it had updated to include information on fracking in Nevada. (ECF No. 50 at 21–22). It also argues that plaintiffs' two principal cases are readily distinguishable. (*Id*. at 23–24).

Plaintiffs' reliance on *Kern* and *Blue Mountains* is misplaced, as the Court does not find either of the cases analogous to the facts at hand. In *Kern*, the Ninth Circuit held that the government's analysis of the potential spread of a certain root fungus was inadequate under NEPA because it only consisted of two sentences – a reference to a previous EIS, which had been held to be inadequate, and a reference to a document that was never subjected to NEPA review. *Kern v. BLM*, 284 F.3d 1062, 1074 (9th Cir. 2002). The Ninth Circuit determined that the document, which explained the dangers of root fungus and how best to avoid them, was unlawfully shielded from NEPA review, and as a result, it "circumvent[ed] the purpose of NEPA." *Id*. at 1073. The act of incorporating a document by reference into an EA is called tiering, and although it is generally permissible, it is prohibited in situations such as in *Kern* where the incorporated document was never subjected to public review. 40 C.F.R. 1508.28. Plaintiffs ignore the *Kern* court's holding regarding the root fungus document, instead stating that the case stands for the proposition that "[r]elying on a document in lieu of an analysis fails to meet the demands of NEPA if that document does not specifically analyze impacts on the area." (ECF No. 45 at 30). BLM's reference to the

White Paper in this case does not share the same fatal flaw as the document in *Kern*. The White Paper was attached to the draft EA as an appendix, which allowed for plaintiffs and any other interested member of the public to review and comment it before the final EA was distributed. (AR at 63677, 5671).

In *Blue Mountains*, the Ninth Circuit held that the government failed to take a "hard look" at the environmental effects of awarding a series of timber salvage contracts to loggers. *Blue Mountains*, 161 F.3d 1208, 1210 (9th Cir. 1998). The Ninth Circuit found the government's EA to be inadequate under NEPA because of, *inter alia*, improper tiering and vague analysis. *Id*. at 1213–14. Plaintiffs rely on this reasoning in support of their argument that BLM's EA fracking analysis was too generic and not site-specific enough to satisfy NEPA's requirements. (ECF No. 45 at 31). Yet as BLM points out, there is a fundamental difference between the government's authorization of the timber salvage projects in *Blue Mountains* and BLM's issuance of gas and oil leases here. With the timber salvage contracts, as soon as the contracts were effectuated, the loggers could venture into the burned forests and harvest the downed trees. *Id*. at 1210–11. In other words, the loggers did not have to submit a plan for the government to approve prior to acting. As explained in the previous section, that is not the case with the oil and gas leases here because the lessees must submit a plan, subject to BLM approval, before they can begin surface-disturbing activities. Additionally, BLM must prepare an EA and either an EIS or FONSI at each stage of the drilling process, all of which are subject to public review. *See Village of False Pass v. Clark*, 733 F.2d 605, 614 (9th Cir. 1984) ("NEPA may require an environmental impact statement at each stage: leasing, exploration, and production and development. Furthermore, each stage remains separate. The completion of one stage does not entitle a lessee to begin the next."). In *Blue Mountains* the Ninth Circuit held the government accountable for failing to analyze the direct impacts of allowing the logging projects to move forward.

Here, on the other hand, BLM analyzed the direct and indirect effects of fracking. The White Paper was properly tiered into the final EA because it was made available for the public (and plaintiffs) for comment prior to its inclusion in the final EA. (AR at 5671, 63677). It describes, among other things, the process of fracking (AR at 5841–42), water availability and sources of

water for fracking in Nevada (AR at 5843–46), the impacts to usable water zones (AR at 5846–48), and the potential geologic hazards of fracking (AR at 5850). Also attached to the EA is a copy of Nevada's current fracking regulations. (AR 5853–5867). As the Court stated in the previous section, BLM was not required to conduct a site-by-site analysis of the impacts of fracking at the leasing stage because at the time the leases were sold, BLM did not know what parcels would be sold, what type of ground development the lessees would choose to pursue, and if fracking would even take place. *See Native Village of Point Hope v. Jewell*, 740 F.3d 489, 497 (9th Cir. 2014); *Northern Alaska*, 457 F.3d 969, 977 (9th Cir. 2006).

In sum, BLM's analysis of the potential impacts of fracking meet NEPA's "hard look" standard.

### 3. BLM's Reliance on "Outdated and Inadequate RMPs"

Plaintiffs' third argument is little more than a rephrasing of their first two. They argue that the Court should find that BLM's final EA fails the "hard look" standard because two of the RMPs cited in the EA, the Tonopah and Soshone-Eureka RMPs, are several years old and contain outdated information. (ECF No. 45 at 31–33). This argument is without merit. It is true that both the Tonopah and Shoshone-Eureka RMPs are decades old (21 and 32 years old respectively) and contain outdated information. (AR at 5666–67). Had BLM relied solely on those RMPs for its analysis of environmental impacts in the final EA, the Court would have likely found that the final EA did not meet the "hard look" standard. *See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086–87 (9th Cir. 2011) (hereinafter *Northern Plains*); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (finding that data from six-year-old fish surveys was too stale to meet the "hard look" standard). In *Northern Plains* (a case cited by plaintiffs), the Ninth Circuit found the use of data several years old to be too outdated to meet the "hard look" standard. *Northern Plains*, 668 F.3d at 1086. But there, the government defendants claimed that they were unable to conduct on-the-ground surveys as part of their EIS analysis, meaning that the only data they relied on were aerial surveys as much as 22 years old. *Id.* As BLM points out in its brief, and as the Court has stated elsewhere in this opinion, the Tonopah and

Shoshone-Eureka RMPs were far from the only data BLM relied on in preparing the draft EA and the final EA. (ECF NO. 50 at 25–26).

Plaintiffs cite no caselaw demonstrating that relying in part on stale data is grounds for automatic reversal. In fact, the cases they do cite appear to undermine their own argument. Those cases indicate that sole reliance on stale data is grounds for reversal, but BLM has not done that here. The Court concludes that relying in part on stale data as well as current data may, and in this case does, satisfy the "hard look" standard.

### 4. Ineffective Mitigation Measures Relating to Mule Deer and Pronghorn Antelope

Next, plaintiffs argue that BLM relied on mitigation measures that were "ineffective" to alleviate any alleged significant impact to the mule deer and pronghorn antelope habitats contained within the lease area. (ECF No. 45 at 33). In the final EA, BLM imposed a lease stipulation to parcels with mule deer habitats that prohibits surface activity from January 15 to May 15. (AR at 5792). The stipulation provides for a modification of the restricted area if there is evidence that mule deer no longer live there during the winter and a modification of the timing restriction if new evidence demonstrates that the dates "are not valid." (*Id*.). Modifications must be approved by a BLM official before the lessee can deviate from the stipulation. (*Id*.) Plaintiffs argue that this limitation is insufficient to prevent all significant impacts to mule deer and pronghorn antelope because it only prohibits "initial construction work," and mule deer are also affected by the very presence of oil and gas infrastructure in their habitat. (ECF No. 45 at 34–35). Plaintiffs claim that BLM ignored the "extensive scientific literature" that they submitted during the commenting period, purportedly showing that the mere presence of oil and gas infrastructure "produces significant, long-lasting effects on mule deer population and abundance." (*Id*. at 35).

The Supreme Court has stated that "NEPA does not require a fully developed plan detailing what steps will be taken to mitigate adverse environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989). NEPA does not require that harms actually be mitigated, but only that mitigation measures be discussed with " 'sufficient detail to ensure that environmental consequences have been fairly evaluated.' " *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (quoting *Robertson*, 490

U.S. 332 at 352). Even so, it is well-established that merely listing the mitigation measures is insufficient to meet the "hard look" standard. *Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

It is clear from the record that BLM properly analyzed and adopted measures designed to mitigate the effects of surface development to mule deer and pronghorn antelope. In the final EA, BLM notes how although the mule deer and pronghorn capable of moving away from the drilling activities would do so, some would still likely parish, and a loss of habitat would be inevitable. (AR at 5714). The EA also describes in detail how the chosen Resource Protection plan mitigates the effects of surface development to mule deer and pronghorns. Specifically, the plan utilizes data provided by the Nevada Department of Wildlife ("NDOW") to apply seasonal timing limitation stipulations to parcels that contain mule deer and pronghorn habitats. (AR at 5716). The timing stipulations prohibit surface activity from January 15 to May 15, and any modifications to either the time or area restrictions require BLM approval before the lessee can deviate. (AR at 5792). These limitations are designed to restrict land usage during "the critical seasons to protect populations from disturbance as NDOW recommended." (AR at 5716). This explanation is far from the "perfunctory description" or a "mere listing" of mitigation measures without the supporting analytical data the Ninth Circuit has warned about. *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000). Here, BLM described the purpose of the mitigation measures, how they work, how they can be modified, and has relied on NDOW's data and suggestions in crafting them. The Court is sufficiently satisfied that BLM considered the available data and made a rational decision on how best to mitigate the impacts of oil and gas drilling to mule deer and pronghorn antelope.

Plaintiffs highlight how NDOW initially recommended that BLM defer lease of 28 parcels because of the effect surface development would have on the mule deer population. (ECF No. 45 at 34; AR at 6642). But they fail to mention that NDOW subsequently revised its opinion to include support for the proposed timing limitations, which would, in its words, "protect…priority wildlife including…Mule Deer [and] Pronghorn Antelope." (AR at 6644). Plaintiffs also assert that BLM "ignored evidence" that they submitted, including various studies purporting to show that mule

14

deer migration corridors would not be protected by the timing limitations. (ECF No. 45 at 35). But once again, plaintiffs fail to explain *how* the timing stipulations and related restrictions do not adequately protect mule deer and pronghorn antelope; instead they merely reference the scientific evidence they submitted and make conclusory statements that BLM failed to adequately consider them. NEPA only requires that BLM discuss the mitigation measures with sufficient detail, not that it respond to each and every concern that plaintiffs may have. *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). In any event, BLM was not required to discuss *any* mitigation efforts in the final EA because EAs, unlike EISs, do not require a discussion of mitigation efforts. *Akiak Native Cmty. v. USPS*, 213 F.3d 1140, 1147 (9th Cir. 2000) (citing 40 C.F.R. §1502.16). Of course, this is only permissible if there is a proper discussion of mitigation measures in the final EIS or, as here, BLM appropriately issued a FONSI instead of an EIS. The Court discusses this issue in a later section of the opinion. *See* Section III.C.

The Court once again notes that BLM will be required to conduct further assessment and analysis if parcels containing mule deer or pronghorn habitats are sold and plans for development are submitted. No parcels containing mule deer or pronghorn habitats were sold during either the June or September lease sales. (ECF No. 50 at 31). Plaintiffs and other interested commenters will have the opportunity to review and comment on the proposed surface development plans before any activity begins.

**B. The Water Resource Stipulations' Protection of Wetlands and Similar Habitats**

Plaintiffs next argue that BLM's decision to use the water resource stipulations was arbitrary and capricious because the stipulations do not avoid all significant impacts to the wetlands and associated species in the lease area. (ECF No. 45 at 36). Plaintiffs argue that not only does BLM not apply the water resources stipulation to all parcels containing wetlands, but that the stipulation does not adequately protect the parcels to which it does apply because it can be evaded in certain circumstances, such as when development on protected wetlands cannot be avoided. (*Id.* at 40). Plaintiffs further argue that those circumstances are inevitable because certain parcels contain nothing but wetlands, and others contain mostly wetlands. (*Id.* at 39). BLM counters by

pointing to the extensive record discussing the impacts to wetlands, the species that live in them, and how the stipulations prevent significant impacts to them. (ECF No. 50 at 33–36).

As BLM states, its assessment of the impacts to water resources is found primarily in three documents – the final EIS for the Tonopah RMP, the final EA at issue here, and the water resource stipulations themselves. (ECF No. 50 at 33). The Tonopah EIS, which is from 1994, described in detail the impact of oil and gas development to, *inter alia*, watersheds, vegetation, wildlife, and riparian zones. (AR at 5038, 5040, 5042, 5046). The EIS also included certain protections for the water resources. (AR at 5042, 5045–46). The final EA noted potential impacts to water resources following surface development, including increased sediment in surface waters down-gradient of the developed areas, "potentially severe" consequences to riparian and wetland areas (including redirected water flows following road building and contaminants from any accidental spillage polluting the environment), and unknown impacts to the unique spring mounds that populate the area. (AR at 5701). The final EA goes on to describe how the Resource Protection plan attaches the water resources stipulation to 58,000 acres of land and the slopes stipulation to 72,000 acres of land. (AR at 5702). The stipulations are designed to "protect water resources and prevent erosion, with appropriate avoidance buffers, engineering controls…for resources wherever they may occur within a parcel." (*Id*.) The water resource stipulation attempts to avoid impacts in (1) identified 100-year flood plains and playas; (2) areas within 500 feet of perennial waters, springs, wells, and wetland/riparian areas; and (3) areas within 100 feet of the inner gorge of ephemeral channels. (AR at 5827). It also provides that BLM may require leaseholders to utilize "special engineering design, construction and implementation measures, potentially including relocation of operations more than 200 meters to protect water resources." (*Id*.) There are, however, several exceptions to the stipulations. First, BLM may grant an exception if an "environmental review determines that the action…does not affect the resource or could be conditioned so as to not negatively impact the water resources identified." (*Id*.) Second, an exception could be granted when "areas cannot be avoided and when engineering, best

management practices, and/or design considerations are implemented to mitigate impacts to water resources."[3] (*Id.*)

Based on the administrative record, the Court finds that BLM's conclusion that there would be no significant impacts to wetlands was not arbitrary or capricious. The Court construes plaintiffs' arguments to be a repetition of their last one – that BLM failed to take a "hard look" at the impacts of development to wetlands in the lease area and failed to adequately mitigate the impacts. BLM is only tasked with describing its mitigation efforts with "sufficient detail" to ensure that environmental consequences have been fairly evaluated. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). That has occurred here. Plaintiffs repeatedly argue that the water resource stipulation is ineffective because BLM cannot prohibit all surface activity on parcels with wetlands, and because they believe that the special implementation measures will be ineffective. (ECF No. 45 at 38). As to the former, their argument assumes that any surface occupancy on parcels with wetlands would lead to irreparable harm to those wetlands regardless of any timing, location, activity, or infrastructure limitations. Plaintiffs' cited material from the record vaguely indicates that such harm is *possible*, but they do not cite to any certainty of harm regardless of mitigation measures. (ECF No. 45 at 37–38) (citing AR at 5699–70 ("The primary cause of underground degradation would be from *improperly functioning* well casings. Surface activities *can* degrade groundwater by infiltration of contaminants."); AR at 5701 ("For the numerous springs, seeps, and spring-fed wetlands within the deferred parcels, there would be a *slight risk* that drill would lead to subsurface modification.")) (emphasis added). Certainly, BLM issuing leases that prohibit all manner of surface activity would prevent most significant harm to the wetlands, but there is no requirement in NEPA that BLM must issue NSO leases in any area where wetlands are present. Whether there would be any harm to wetlands would be better predicted once the lessee submits plans to drill on a parcel containing wetlands because BLM and plaintiffs would have the capability of analyzing the specific impact of the specific type of drilling to the specific parcel.

---

[3] There is also an exception for "actions designed to enhance the long-term utility or availability of the riparian habitat," but plaintiffs do not dispute this exception. (AR at 5827).

As to plaintiffs' second argument, their speculation that mitigation measures might be ineffective or that BLM might fail to properly apply its own stipulations is insufficient to support an arbitrary or capricious finding. *See Hapner v. Tidwell*, 621 F.3d 1239, 1247 (9th Cir. 2010) (dismissing the plaintiffs' speculation that the U.S. Forest Service would not follow through with its mitigation measures). Plaintiffs will have ample opportunity to review and comment on any proposed development plans if a parcel containing wetlands is leased and the lessee subsequently submits plans to drill for oil and gas. BLM cannot analyze the effects of every possible type of oil and gas infrastructure on every parcel containing wetlands at the leasing stage, and the Ninth Circuit has held as such. *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 493–94 (9th Cir. 2014); *Northern Alaska*, 457 F.3d 969, 977 (9th Cir. 2006). BLM is only responsible for analyzing "reasonably foreseeable" significant adverse effects, not all possible effects. *Native Village of Point Hope*, 740 F.3d 489, 493 (9th Cir. 2014) (citing 40 C.F.R. §1502.22, 1508.7). Of course, it is reasonably foreseeable that a leaseholder would want to drill for gas and oil on land containing those valuable resources. But BLM cannot reasonably foresee whether any parcels containing wetlands will be sold, what type of surface activity the lessee would want to engage in, and if that surface activity would be near wetland habitats.

In sum, plaintiffs have failed to demonstrate that BLM's chosen mitigation measures regarding wetland habitats was reached arbitrarily or capriciously.

### C. BLM's Purported NEPA Violation for Failing to Prepare an EIS

Next, plaintiffs argue that BLM's decision not to prepare an EIS was arbitrary and capricious because it did not properly consider the presence of three of the "significant factors" enumerated in 40 C.F.R. §1508.27(b). (ECF No. 45 at 43). They also argue that it is mandatory for BLM to prepare an EIS before issuing any oil and gas leases that allow for some manner of surface occupancy, and that its failure to do so constitutes an arbitrary and capricious decision. (*Id.* at 47). The Court will address these arguments in turn.

///

///

///

To meet the goals of NEPA, an agency must prepare an EIS for any major federal action "significantly affecting the quality of the human environment."[4] 42 U.S.C. § 4332(2)(C). An EIS is a formal statement outlining and identifying "the environmental impacts of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(i)-(iii). In reviewing a decision not to prepare an EIS under NEPA, the Court "employ[s] an arbitrary and capricious standard that requires [the court] to determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant.'" *In Def. of Animals*, *Dreamcatcher Wild Horse and Burro Sanctuary v. U.S. Dept. of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (citing *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006)).

Generally, "[a]gencies consider two broad factors to determine whether an action may 'significantly affect' the environment[:] 'context' and 'intensity.'" *Id*. (citing 40 C.F.R. § 1508.27). "Context simply delimits the scope of the agency's action, including the interest affected." *Id*. (quoting *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001)). "Intensity refers to the 'severity of impact,' and the regulations identify ten factors that agencies should consider in evaluating intensity." *Id*. (citing 40 C.F.R. § 1508.27(b)(1)-(10) (listing factors)).[5] The "intensity" factors are the factors at issue here; many of the "context" factors were addressed in previous sections of this opinion. If substantial questions are raised as to whether a

---

[4] The term "human environment" has been "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14.

[5] The intensity factors enumerated by 40 C.F.R. § 1508.27(b) include: (1) impacts that may be both beneficial and adverse; (2) the degree to which the proposed action affects public health or safety; (3) unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; (4) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (6) the degree to which the action may establish a precedent for future actions; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (9) the degree to which the action may adversely affect an endangered or threatened species or its habitat; and (10) whether the action threatens a violation of Federal, State, or local law.

proposed project "may cause significant degradation of some human environmental factor" then a formal EIS is required before approval of the agency action. *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009).

### 1. "Significant Factors" for an EIS

#### i. Whether the Action Affects "Unique" Wetlands and Ecologically Critical Areas

Plaintiffs first argue that because several of the parcels are located on or near wetlands, it was mandatory for BLM to prepare an EIS. (ECF No. 45 at 43–44). This, however, is not the standard for triggering preparation of an EIS. Instead, an agency is only required to prepare an EIS when the proposed project will cause "significant impacts" to the unique areas. *National Parks Conservation Ass'n v. Semonite*, 311 F.Supp.3d 550, 367 (D.C. Cir. 2018). Plaintiffs repeat arguments that the Court has previously rejected, namely that BLM failed to adequately assess the impacts of oil and gas development to wetlands areas. (ECF No. 45 at 44). For the reasons previously discussed, plaintiffs' arguments concerning impacts to wetlands are deficient and this intensity factor does not weigh in favor of preparation of an EIS.

#### ii. Whether the Action is "Highly Controversial"

An action is "highly controversial" when "a substantial dispute exists as to the size, nature, or effect of the major federal action[.]" *Human Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010). "A substantial dispute exists when evidence…casts serious doubt upon the reasonableness of the agency's conclusions." *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004). Controversy does not mean opposition to a project, but rather a "substantial dispute as to the size, nature, or effect of the action." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012). Plaintiffs argue that BLM's proposed plan is highly controversial because they submitted studies purportedly demonstrating that BLM's timing limitation would not prevent all significant impacts to the mule deer population. (ECF No. 45 at 45). They also point to emails from various agencies, such as NDOW and the U.S. Fish and Wildlife Service, recommending that BLM defer leasing on several parcels because of concern for wetlands and fish habitats. (*Id.*)

///

But significantly, the comments that plaintiffs raise mirror the issues that they raised in other portions of their motion for summary judgment. The Court has already dealt with those issues and found that BLM took the requisite "hard look" when analyzing them. Plaintiffs "cannot overcome [their] failure on the merits simply by pointing to comments [and reports] expressing the same concerns. If [plaintiffs] cannot show there is some merit to opposing opinions, they cannot demonstrate controversy." *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1182 (10th Cir. 2012) (citing *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003); *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 957 (9th Cir. 2008)). As the Ninth Circuit quoted in *Bering Strait Citizens*, "[s]imply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or uncertain." *Bering Strait Citizens*, 524 F.3d at 957 (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005)). Plaintiffs also highlight purported NDOW opposition to BLM's proposed plan, but as the Court previously stated, NDOW revised its opinion to include support for BLM's chosen Resource Protection plan. (AR at 6644). Because plaintiffs merely raise issues already presented elsewhere in their brief, and because they are factually incorrect about NDOW's position on the chosen plan, this factor does not weigh in favor of preparation of an EIS.

### iii. Whether the Lease Presents Highly Uncertain or Unknown Risks

Plaintiffs' last significant factor argument is that the lease sale presents "highly uncertain or unknown risks" because "the risks of fracking are unknown" and BLM found that there would be no significant impacts to the mule deer population. (ECF No. 45 at 46). These are little more than repetition of arguments the Court has rejected, and as stated above, repeated arguments fail when the substance behind them is found to be insufficient. *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 957 (9th Cir. 2008).

In sum, plaintiffs have failed to show that BLM improperly analyzed any of the three "substantial factors" they dispute. Therefore, the Court finds that BLM did not err when it prepared a FONSI in lieu of an EIS.

## 2. Whether an EIS is Required Before Oil & Gas Leases

Plaintiffs argue that even if the significance factors do not require the preparation of an EIS, the fact that BLM sold oil and gas leases mandated that it also prepare an EIS. (ECF No. 45 at 47). Plaintiffs argue, once again pursuant to *Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988), that whenever oil and gas leases do not prohibit all surface activity, BLM is required to prepare an EIS. (*Id.*) BLM disputes plaintiffs' reading of *Connor*, arguing that they try to overextend the Ninth Circuit's holding. (ECF No. 50 at 43).

The Court previously discussed *Connor* in the context of whether BLM was obligated to do a site-by-site analysis in its EA. This time, plaintiffs cite the case for the proposition that "unless surface-disturbing activities [are] absolutely precluded, the government must complete an EIS" prior to leasing the property. *Connor v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988). In *Connor*, the Ninth Circuit held that any time that there has been an "irreversible commitment of resources" – i.e. when the government issues a lease that does not prohibit all manner of surface activity – the government must prepare an EIS. *Id.* at 1449–50. In coming to its decision, the Ninth Circuit heavily relied on a contemporary case from the Circuit Court for the District of Columbia, *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983), which had considered the identical issue before the Ninth Circuit and had adopted a rule similar to what the Ninth Circuit would adopt in *Connor*. In *Sierra Club*, the D.C. Circuit was faced with a scenario where the government could place conditions on a leaseholder's permit to drill, but it could not deny the permit itself. *Sierra Club*, 717 F.2d at 1411. The same was true in *Connor. Connor*, 848 F.2d at 1449–50. *See also Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998) (reaffirming the central holding in *Connor*). Both courts determined that having the authority to place limitations on drilling activities with the capability of preventing them all together constituted an irreversible commitment of resources, and an EIS was required. Essentially, whether BLM was required to prepare an EIS in this case depends on whether it has the capability of completely denying a leaseholder's permit to drill.

A recent case from the D.C. District Court is instructive. In *Fisheries Survival Fund v. Jewell*, 2018 WL 4705795 (D.D.C. Sept. 30, 2018), the plaintiffs filed suit against the Bureau of

Ocean Energy Management ("BOEM") to stop it from leasing an area off the coast of New York for the development of a wind energy facility. *Id*. at *1. Pursuant to NEPA, BOEM prepared a draft EA, which was available for public comment, and noted that should the eventual lessee propose to construct a wind energy facility on the leased area, BOEM would conduct a "separate site and project-specific [NEPA] analysis, likely an [EIS], and would provide additional opportunities for public involvement" regarding the proposed Construction and Operations Plan ("COP"). *Id*. at *3. The parcel was leased following an auction, but the plaintiffs had filed their lawsuit prior to the lessee submitting a development plan. *Id*. Like here, one of the plaintiffs' principal complaints was that BOEM should have completed an EIS because to avoid making an "irreversible commitment of resources," the agency making the lease sale must unilaterally retain the "absolute right to prevent all surface-disturbing activities." *Id*. at *8.[6] In turn, BOEM argued that it had not made such a commitment of resources because it retained the authority to deny a COP. *Id*.

The D.C. District Court agreed with BOEM. It noted how the lease itself did nothing more than provide the lessee with the right to submit a COP to BOEM for approval; absent BOEM approval, the lessee could not begin construction of the wind energy facility. *Fisheries Survival Fund v. Jewell*, 2018 WL 4705795, at *8 (D.D.C. Sept. 30, 2018). BOEM also had the authority to deny a COP if it determined that the proposed plan would have unacceptable environmental consequences. *Id*. The D.C. District Court noted that in the two cases that the plaintiffs relied on (*Connor* and *Sierra Club*), the most that the government agencies could do was regulate the activities by imposing stipulations and conditions on the oil and gas drilling. *Id*. As such, the D.C. District Court concluded that BOEM did not make an irreversible commitment of resources when it issued the lease. *Id*. at *9–10.

The Court reaches the same conclusion here. The lessees who purchased the leases at the June and September 2017 sales do not have the authority to begin surface-disturbing activities until they submit an APD to BLM *and* that APD is approved. Unlike the government agencies in *Connor* and *Sierra Club*, who could only impose limitations on the lessees' drilling activities, BLM retains

---

[6] Also like here, the plaintiffs primarily relied on the Ninth Circuit's decision in *Connor*.

the authority to deny a permit to drill outright. *See* 43 C.F.R. §3162.3-1(h) (stating that the authorized officer may return a drilling application to the applicant and advise it of the reason(s) for disapproval); 30 U.S.C. §226(g). If BLM decides to grant an APD at that stage, it will be required to prepare an EIS (and comply with any other NEPA procedures) because it no longer has the authority to prevent the lessee from engaging in surface disturbing activity. Plaintiffs do not cite to any statutes, regulations, or portions in the administrative record that would lead the Court to a contrary finding. The Court finds that BLM has not irreversibly committed its resources towards oil and gas development, and therefore, it was not required to prepare an EIS.

## D. September 2017 Sale's Determination of NEPA Adequacy

Plaintiffs' final argument concerns BLM's decision to issue a Determination of NEPA Adequacy ("DNA") for its September 2017 lease sale instead of an EA or EIS. Although they cite the applicable legal standards, plaintiffs' argument repeats their previous arguments as to why the June 2017 EA was inadequate. (ECF No. 45 at 48). In essence, plaintiffs argue that BLM should have supplemented the prior EA with either another EA or EIS to support the September sale. In turn, BLM explains that the reason why it issued a DNA instead of a new EA was because the three parcels offered for lease in the September sale were either adjacent to or very near one of the parcels (parcel 106) offered in the June sale. (ECF No. 50 at 45). BLM also notes that the September parcels contain similar "geographic and resource conditions" as parcel 106, and that they would be subject to the same stipulations and lease notices as 106. (*Id*.)

Agencies are tasked with preparing supplementations to EAs and EISs when (1) the agency makes substantial changes to the proposed action that are relevant to environmental concerns, or (2) when there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. §1502.9(c)(1). But when agencies take a "hard look" at a reevaluation and determine that the new impacts will not be significant or significantly different from those already considered, they are in full compliance with NEPA and are not required to prepare a supplemental EA. *North Idaho Community Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154–55 (9th Cir. 2008). The Ninth Circuit has previously held that the use of a DNA can meet the "hard look" standard. *Summit Lake Paiute*

*Tribe of Nevada v. U.S. Bureau of Land Mgmt.*, 496 Fed. App'x. 712, 715 (9th Cir. 2012). The decision to not issue a supplemental EA or EIS is judged on the arbitrary and capricious standard. *Id*.

The Court finds that BLM took the requisite "hard look" in determining that the September 2017 lease sale was substantially similar to the June 2017 lease sale. As stated above, BLM found that the three parcels for sale in September were "very near/adjacent" to one of the parcels made available for sale in June (parcel 106). (AR at 5913). Moreover, it determined that the "geographic and resource conditions" are "sufficiently similar," and if the parcels are sold, they would be subject to the "same stipulations and lease notices attached to [parcel 106]." (*Id*.) Based on the Court's review of BLM's DNA, it was reasonable for it to conclude that there would be no new significant impacts. As BLM points out, plaintiffs have failed to describe any differences between the three September parcels and its adjacent land covered in the June EA. They have also failed to explain how leasing three additional parcels adjacent to land already available for lease constitutes a "substantial change" to BLM's proposed plan. As it is plaintiffs' burden to show how the agency action was arbitrary and capricious, it is insufficient to merely argue that BLM's June 2017 EA was inadequate without applying the applicable legal standard. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). Their argument is thus without merit.

### IV. Conclusion

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment (ECF No. 45) is DENIED.

IT IS FURTHER ORDERED that BLM's cross-motion for summary judgment (ECF No. 50) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of the defendants, the United States Bureau of Land Management, Ryan Zinke, and Michael Nedd, and against plaintiffs the Center for Biological Diversity and the Sierra Club.

IT IS SO ORDERED.

DATED this 15th day of January, 2019.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

25